United States District Court
Southern District of Indiana
Terre Haute Division

Phillip Littler,
        Plaintiff,

    v.                                    Cause No. 2:16-cv-00472

Christopher Martinez, et al.,
        Defendants.

## Plaintiff's Second Amended Pleadings

The plaintiff is suing Richard Brown, Frank Littlejohn, Major Russell, Captain Distle, Lieutenant Yarber, Officers Christopher Martinez, Blake Scarbrough, Israel Brewer, Justin Shroyer, Ryan Bottoms, Skyle Thacker, Kirby Mckee, David Smith, and Pamela Hagemeier — all employees of the Wabash Valley Correctional Facility; address: 6908 S. old U.S. Hwy 41, P.O. Box 1111, Carlisle, IN 47838 — and Corizon, L.L.C., Corizon Health, Inc., address 103 Powell St. Brentwood, TN 37027, in their individual and official capacities for the deprivation of Fourth, Eighth, and Fourteenth Amendment rights while acting under color of State Law against the Constitution of the United States of America, pursuant 1/2 U.S.C. §1983.

1.

Plaintiff's Pleadings

1. On December 27, 2015 the plaintiff pursued recreation in a secure indoor room (Plaintiff is housed in a control unit / solitary confinement unit) when the officers who were escorting him instructed him to step into the shower instead. After being secured inside the shower plaintiff was informed by Justin Shroyer that he was to be strip searched. Plaintiff then asked Justin Shroyer why. Initially he was denied an explanation; however, upon realizing the plaintiff was refusing to remove his clothing Justin Shroyer summoned the shift supervisor (Captain Pirtle) who then informed the plaintiff that Justin Shroyer had requested permission to conduct the strip search because the plaintiff had been heard talking aloud in his cell; the ostensible suspicion being that he may possess a cellular phone.

Note: It is well known amongst the staff who work on plaintiff's housing unit that he talks to himself. Plaintiff is housed in a restrictive psychiatric unit specially used for prisoners who suffer from mental illness, and the staff conduct weekly meetings to discuss the behavior of the prisoners. It is also noteworthy that two days prior to the occasion of issue the plaintiff requested to attend outdoor recreation; however, upon being informed by Justin Shroyer that he would

2.

be required to submit to a strip search in order to do so, the plaintiff candidly stated "I don't strip for nobody." Justin Shroyer visibly expressed offense as if he felt that his ego was being challenged.

2. Plaintiff continued to refuse to remove his clothing. Justin Shroyer and the Captain then left. A couple hours of time elapsed as plaintiff remained standing inside of the shower.

Note: The staff were participating in an event called "Officer appreciation week" in which they play games, eat food and win prizes, and they did not want to interrupt the festivities.

3. Plaintiff observed a Lieutenant with the noted Captain along with a regular officer appear in the hall way that is adjacent the shower area. The Lieutenant was visibly upset and stated to the others "I think this one deserves an orange crush." He then looked to them expectantly. They then nodded their heads up and down repeatedly in response. That Lieutenant was Mr. Yarber.

Note: Plaintiff issued interrogatories directed at defendant Richard Brown in the cause of Phillip Littler v. Richard Brown, et al, No. 2:16-cv-00234, of which the instant cause was severed from,

3.

which requested the identities of all staff members who were present during these events. The defendant claimed to have supplied all of those identities, however, failed to provide those of the above noted Lieutenant and Captain. Thus plaintiff moves for the court to compell the defendant to produce all of the identities of all staff members who were present during this event. The defendant then delegated that response to one Lee Hoefling, Executive Assistant who recited the previously supplied identities. This is noteworthy because It is a policy of procedure at the Wabash Valley Correctional Facility for the shift supervisors of the facility on the particular shift (a Lieutenant and Captain Team designated for the purpose) to be present for all cell extractions. Hence the defendant was blatantly deliberately deceptive in his efforts to protect those subjects from their inclusion in this suit. That is the reason for this amendment.

4. Eventually, Justin Shroyer abruptly entered the area and, without Warning, sprayed the plaintiff directly in the face with a large canister of O.C.V–M.K.9S chemical agent (a very highly concentrated and potent form that is rapidly ejected in a nebulized fashion, which more thoroughly saturates a persons' orifices and poores, and suffocates the entire area in which it is deployed.) Such a weapon would ordinarily be employed in cases of a riot or any similarly immediately dangerous situation were it utilized in most

4.

prisons throughout the United States, however, at the Wabash Valley Correctional Facility such is routinely used as a torture instrument against prisoners who are trapped in a cage, and mostly because they refuse to submit to tyrannical commands. (more on this point later.)

5 Plaintiff was made to remain in this agonizing state for a lengthy time period. Eventually, Justin Strayer returned with another fresh canister of the same chemical agent and repeated the procedure; however, on this occasion he asked if the plaintiff was "going to cuff up", however, did not wait for a response before assaulting the plaintiff with the chemical agent again.

6. After another lengthy time period, as the plaintiff stood at the bars of the door motionless, quiet except for labored breathing, and blinded by the effect of the chemical in his eyes, abruptly he heard shots fired directly above his head from a "pepperball system" (a weapon resembling a typical paintball gun, however, much more powerful, and utilizing a projectile consisting of a hard plastic container filled with a powder derived from a pepper extract, which burns and irritates the skin and especially the air passage and lungs.) A moment

5.

Thereafter plaintiff was struck directly in his nose with a single shot, which fractured the bridge and septum. As plaintiff's nose proceeded to bleed he merely stood still for a few moments and then responded saying "you just broke my fucking nose." He then turned around, exposing the back of his head to the assailant so that he would not be injured in the face again. Immediately, plaintiff was shot several more times in the back of the head in rapid succession until the weapon was exhausted of c.o. 2 gas, which is utilizes as a propellant. The defendant's responses to plaintiff's interrogatories revealed that Mark Shroyer (father to Justin Shroyer) did commit this assault.

Note: It is noteworthy that plaintiff has a very high tolerance for pain. His calmness and candor in enduring this abuse is not at all typical. These weapons inflict severe pain. And most people could not withstand such an assault without becoming hysterical. But the plaintiff has been subjected to a significant amount of abuse throughout his life — particularly in his formative years — and so he is accustomed to pain. Moreover, plaintiff is a practiced martial artist and so he is adept at exercizing self discipline in the face of adversity.

In presenting these facts plaintiff wants to convey the fact that the appearance can be misleading. This treatment is absolutely torturous... both in that it is extremely painful as well as the practice ~~being~~ being for a typically torturistic purpose. There is no principled distinction between this situation ad, for example, restraining someone to a chair and repeatedly battering them because they refuse to say what the assailant wants them to say.

In this, it is also noteworthy that this occasion is not at all uncommon at the Wabash Valley Correctional Facility. Indeed, the defendants operate a policy of torturing their non-compliant prisoners, albeit in very conniving manners. In this particular scenario they will repeatedly assault the person with these weapons, ad in excessive amounts — notwithstanding the fact that he is no threat (even potentially) because he is locked inside of a steel and concrete cage solitarily — and they will repeat/continue the process for excessive durations of time merely because he fails to submit to their commands. This is in fact the true essence of torture. And it is routine for this practice to continue for hours before a cell-extraction team is even assembled. It is also ~~notable~~ notable that the defendants do not video

7.

record this torture — obviously so to conceal their abusive practice and thereby circumvent civil liability. In Truth, there is no excuse for this. To deliberately and repeatedly assault a prisoner under these controlled conditions is an occasion that should surely always be video recorded.

This plaintiff is seeking a permanent injunction to require the defendants to video record all organized applications of force against their prisoners, to include the deployment of chemical agents. And plaintiff is seeking a declaration from the court that the manner in which chemicals were used against him in this case — both in their excessive quantities and the duration of time implemented as well as that the potency of the form used in such a nonthreatening situation — constitute torture.

7. Another lengthy time period later, plaintiff heard noise of approaching people. He was asked if he was going to cuff up. He stated very candidly "you know I'm not." The door was opened and he was immediately tackled into the wall. That initial tackling resulted in a fractured rotator cuff, although plaintiff did not realize that until later. He was then repeatedly beat on top of the head by one officer while another officer applied restraints to plaintiff's wrists and ankles.

The officers who conducted this cell extraction (identities



8.

supplied through the above noted discovery procedure) were Christopher Martinez, Blake Scarbrough, Israel Brewer, Justin Shroyer, Ryan Bottoms, Skyle Thacker, Kirby Mckee, David Smith, Denver Smith.

Note: Richard Brown and Frank Littlejohn exercize a policy of not disciplining their officers for using excessive force against prisoners. When plaintiff files grievances over such occasions they will rather be ignored or denied arbitrarily in spite of the conspicuous merits thereof. One "Major Russell" is responsible for that as well as he is the lead custody supervisor.

When plaintiff attempted to grieve Major Russells' ignoring of his grievances in this regard Mr. Littlejohn intervened and prevented the filing thereof. Major Russell as well as Mr. Brown and Mr. Littlejohn have exercized blatant deliberate indifference to their prisoners' safety in this practice. Moreover, it is a common practice at the Wabash Valley Correctional Facility for those officers who demonstrate a propensity for applying excessive force

9.

To be promoted in rank much faster than officers who do not. These practices necessarily encourage and even facilitate the abuse of prisoners.

8. Plaintiff was then escorted to be treated by a nurse. The nurse — observing the injury to plaintiff's nose — began to attempt to clean the blood caked into his mustache; however, as such was already dried and thickly embedded into his hair, she quickly abandoned her effort. She did not provide nor offer any meaningful medical treatment. That nurse was Pamela Hagemeier.

Note: It is noteworthy here that Corizon (the medical services corporation contracted with the Indiana Department of Correction), of whom Pamela Hagemeier is employed, exercises a policy of denying prisoners any treatment whatsoever under these circumstances. Unless the injury is life threatening the nursing staff are ordered not to provide medical treatment. The prisoner must submit a formal request for health care, and then be referred to the physician. Most often, he will not be seen by the physician for several weeks... if he is seen at all. Moreover, the Doctor will most often refuse to provide any treatment. This plaintiff has filed numerous grievances over the lack of health care. And he is aware of very many other

10.

prisoners who have also. Thus the poor health care is well known amongst the administrators of the facility; indeed the whole Department, and also Corizon. Therefore they are all liable for this abuse.

9. Thereafter, plaintiff's clothes were cut off of his body. He was then escorted back to the shower that was still saturated in chemical agents. He was placed under the faucet still in restraints and unable/disallowed to wash the chemicals off of himself. As the water was warm — a factor that exacerbates the effect of these chemicals — plaintiff reasoned it prudent to not remain under the faucet and so told the officers that he was done; although he was very obviously covered in the chemicals, and such had had ample time to set in the pores of his skin, and so it would require a thorough shower in order to fully decontaminate his body of them. The burning sensation is absolutely horrible. And it did not subside for over two days thereafter.

Note: It is common knowledge amongst the staff who work in the Department of Correction that in order to wash chemical agents away from one's body he must use cold water and soap for a lengthy amount of time, repeatedly washing and rinsing. These officers routinely deny their prisoners a shower

11.

in these situations, and even force them under a hot water faucet because they know that the effect is torturous. This plaintiff has filed numerous grievances over this issue and they were all rather blatantly ignored or denied under a conniving excuse. Those denials were authored by Major Russell. Plaintiff intends to pursue his identity through the discovery procedure and add him as a defendant individually.

10. Plaintiff was then escorted to his housing cell. He was not provided an exchange of clothing. He was made to remain in his underwear that were soaked in chemicals, and such significantly burned the sensitive area of his genitals. Plaintiff actually peeled away a substantial amount of skin from his body, particularly from his genitalia, as the very potent chemicals — and due to the excessive amount of time that they remained on him along with the exacerbating effect of the hot water — had caused substantial damage. This effect increased the pain that plaintiff felt over the forth coming days. It was truly torturous.

Plaintiff did request a shower from the above noted ~~Captain~~ after the situation was over. She refused to allow the plaintiff an actual shower. Plaintiff remained naked (as he could not wear the underwear that were saturated in chemicals) and without bedding until the early morning hours of the next day. Plaintiff asked to be provided such from the Sergeant who worked

12.

the night shift. The Sergeant informed him that the orders passed on to the night shift were not to give the plaintiff anything until four o'clock in the morning. Plaintiff intends to pursue the identity of who issued this order through the discovery procedure and add them as a defendant individually.

Note: On the unit of which plaintiff was housed on the date in question (the Custody Control Unit, or C.C.U) the cells are very cold, particularly at night time, and especially in the winter. It is a combination of factors that produces this effect. The vents in the cells that blow air into them do so powerfully, but the air is not warm. Contrarily, the air vents that suck air out of the cells do so weakly. This produces a pressure effect by which the air in the cells constantly pushes at the door way and prevents the warm air that is in the corridors outside of the cells from entering the cells. The heating system only supplies warm air to the vents outside of the cells.

Moreover, the cells' exterior walls are merely composed of 6 in' of concrete with no insulation or reinforcement. They also contain a window that provides an inlet for a draft. These are obvious factors to anyone who frequents the unit. But the facility staff are also made aware by the prisoners who constantly complain about it. This plaintiff has submitted complaints in this regard personally, and they were ignored. Thus plaintiff surmises that this situation must be deliberate for the purpose of punishing

13.

the prisoners as this is a punitive unit.

It is also noteworthy that the staff of this facility engage in many conniving methods of nefarious punishment against the prisoners thereof. From denial of all meaningful health care, and provisions of the most minimal and unappetizing portions of food; the very severely oppressive living conditions; but, most ~~pertinently~~ pertinently to this cause, the routine acts of excessive force and various forms of abuse, and even torture on occasion, that the staff are completely allowed to perpetrate unimpeded. This fact alone evidences that such is the administration's strategy in deterring their prisoners from asserting themselves and maintaining their dignity. Such tacit approval from any cognizant adminis- trator is very implicitly an official authorization. And such a corrupt practice is a direct violation of these prisoners' rights to be free from such degradation and harm; indeed, such a deliberation in this effect truly constitutes a crime.

An unfortunate effect of this situation is that it imperatively fosters the development of a progressively bigoted, depraved, brutish and brutal community that necessarily perpetuates itself, because the imperative nature of such an endemic cultural mentality intrinsically insulates itself from any contrary or alternative perspective because the psychological need to repell any challenge to ones' ideals in order to preserve and affirm personal validation of their pride and emotional security —

14.

When correlated with the sociological function of compulsion to conform to the conventional standard in order for the continuity thereof — invariably suppresses such opposition, and such ~~a~~ a process can only be reinforced within the confines of a prison, where people exercise power over people who differ in their perspective, and who lack any immediate protective mechanisms.

Under such circumstances it becomes absolutely necessary for the prisoners who are subject to such influence to organize and apply themselves in the interest of conscientious rebellion — not only to preserve their dignity and thus their sense of humanity — but also to prevent further deterioration of their condition and promote/compell an amelioration thereof. In this, it is most advantageous for them to pursue redress through the judiciary and thereby provoke public scrutiny because otherwise their hardship and suffering will surely become much more severe.

Plaintiff hereby implores this court to take cognizant notice of the importance in this. Without the courts circumspect assistance the plaintiff's plight as well as the humanity of our society will never progress.

In as much, it is worth mentioning the detriment that is the judicial mandate for awarding the administrators of these penal institutions a deference in their policies and procedures.

15.

It is a very concerning, indeed disturbing circumstance that the Judiciary so values the opinions of prison administrators. For these people have not only served any legitimate and/or positive purpose or bestowed any true benefits upon our society. Indeed, they have served quite the opposite.

Plaintiff thinks that any cursory overview of the immediate conditions of the prison environment will add nothing to the knowledge of anyone at all involved with such circumstances, but an exhaustive account would proceed for thousands of pages and become a distraction for the purpose of this memorandum. So, being that those factors should be a matter of common sense to any learned and veracious person (the targeted audience) he will instead focus on the broader implications and relate them back to their true causal factors in an effort to dispel that convention which so arbitrarily credits these administrators. However, while the plaintiff does wish to avoid complicating the subject of this discourse, he does recommend a review of the pleadings that he presented in the course of litigating his past lawsuits in one's effort to derive a definitive account.

Wherefore, the truth is that these people have created an environment that does nothing but breed resentment, hostility and corruption... not to mention abuse. And, yes, those prisoners

who eventually conform to societal customs are corrupt and abusive. Actually, they tend to be the most so, mostly embracing and embodying the connivance thereof in their presentation. The typical conditions of the prison environment not only promote crime within the prisons themselves and the escalation/exacerbation of those subjected to their criminal orientation, but also to society at large.

Obviously, prisoners — in their desperation, because they are trapped in a hostile and corrupt environment — commits crimes within prisons, and also in society from prison, and of course probably continue accordingly if they are released. But what effect does such an ~~xxxxx~~ environment take upon the staff who work there? — given their position of power. Such a situation can only teach that it is appropriate to degrade and harm other people in one's effort to compell their submission to one's desire. In fact, the very essence of what is heinous criminality.

It becomes inevitable that that mentality will carry over to their homes and the various communities that they interact with outside of prison; per the psychological and sociological imperatives previously indicated. And thus that influence will provoke the same in others and then proceed accordingly in their traversal of corresponding communities in an increasing propagation. The ramifications are literally exponential in this effect.

Such proceeds to foster a pervasive cultural of depravity,

which — if one has lived in conventional U.S.A for any substantial time period and they are cognizant then they are certainly well aware — has already long exacted control of our society. Many may subscribe to delusion in their avoidance of the emotional disturbance associated with such a realization. They may adopt the conniving rhetoric in the conventional representation about the morals and ethics thereof. But the courageous, and the veracious know the cause for all of our societal problems.

From the degenerative mentality of absent mindedness that leads to ignorance and stupidity; the regressive emotional instincts consequent a trauma that provoke immature, impulsive and brutish behavioral patterns, to all of the other myriad maladaptive coping/defense mechanisms, and altogether lending to the devaluation of people in their individual dignity, as well as their conception of the worth of personal dignity in general, as abusive treatment becomes normalized, and these ignorant/senseless people equate that with an idea of rightness or acceptability.

While it is true that there exist many economic and political factors that make their contribution in this process, it nevertheless remains that this seemingly endemic cultural mentality has become pandemic in our society, and that the very tyrannical, corrupt and hypocritical institution of

18.

the Department of Correction — and its proliferation throughout — has made a significant contribution thereto.

Some people may simply become exasperated by the stress in such a depraved society, and simply resort to drug usage as a medicine or distraction. They may become careless in this and commit a robbery in support of their expensive habit; for the hyperinflation of its value when it is a ~~contraband~~ prohibited commodity, along with the preexisting social stigma of its association, certainly only lends support to the commission of financial crimes (bearing in mind that the vast majority of robbers don't intend to actually harm anyone, but they are rather not intelligent enough to understand or just too desperate to care that such a precariously volatile engagement might result in that.) Nevertheless, they will probably eventually land in prison, where they will probably endure many forms of abuse, and then probably return to society more inclined to crime: vengeful; maybe heartless and hardened as a coping and defense mechanism; maybe perverted by the abuse they had suffered in that they will now derive pleasure in perpetrating the same against others... only now more knowledgeable of the art of subterfuge. Maybe they affiliated themselves with a militant organization for protection with the understanding that they would work to further that organization's criminal aims

19.

when they are released. Regardless, he will more than likely continue their drug habit ... and the associated activities.

But some people may simply lead seemingly law-abiding lives only to vent their frustration by abusing their children, especially since the behavior is so common in most instances that is is not even considered abuse, although it in fact is. Maybe their child grows up to be a drug addict and a thief. Maybe they commit rape or molestation, or assault their spouse or children, thus perpetuating this perverted cycle, or pattern. Maybe in an act of desperation they blow their parents heads off, and then go to prison only to emerge a couple decades later a complete sociopath, and just itching for revenge — consciously or subconsciously.

Maybe the guy at the post office who's always so nice, or the college boy who's just so quiet ... maybe your friend, your brother, your son ... they finally became fed up with all of the connivance, exploitation, disrespect and their helplessness to do anything to confront and correct it when they are trapped in a society who collectively persecutes anyone who doesn't conform to the custom, or just tells the truth. Maybe they kill their entire family and shoot up the local shopping center in a last

20.

ditch ~~this~~ desperate effort to draw any meaningful attention to these issues.

But of course we should all know by now that those who choose to live are mostly those who have subscribed to the conventional delusional rhetoric as their method in this life, and so they deny the reality of the situation and "just don't understand why anyone would do such a thing." While others simply keep their opinions to themselves, lest they incite the wrath of those delusive conformists. So nothing is ever confronted much less corrected.

But, typically, this is just it. People will merely resort to adopting the corrupt tactics they confront in their efforts to navigate the treachery and attempt to compete on equal terms. And their contribution in this will only persuade/compell others to do likewise: manipulate, exploit, abuse... and feign kindness and sincerity. This is the prescription to thrive in civilization. Just don't call it what it is, for that would obstruct the process. Hence the misguided terminology for cowardice as fearing combat when, in truth, it is the avoidance of that which is challenging in general. But deep down these cowards know who they are. They just don't possess the courage to confront it and thus their fervor in harming this plaintiff. Maybe we should all just hurt one another so as to feel better about ourselves. It's normal. So it must be right. Shhh! Just don't acknowledge it. That makes it okay.

21.

But its not okay. And normalcy does not at all equate righteousness. Everyone is suffering needlessly. And, logically, this is totally wrong. And as for those who do find this situation to be pleasurable, or at all desirable... those are the heinous individuals who truly belong in prison, and not those who merely commit their crimes in the interest of survival or as an implicit solicitation for help in a misunderstood response to a trauma.

But of course those heinous people shouldn't just be locked in a cage and needlessly tormented and tortured for decades like they have wished upon or subjected others. That would obviously bestow no legitimate benefit for anyone. And ruining peoples' lives and traumatizing them is obviously not conducive to rehabilitation: the ostensible purpose of the D.O.C.

The only legitimate interest in imprisonment should be in crime prevention and actual rehabilitation for the legitimate zbeal of correction — as in psychological therapy, and education to show a better way —— to lead by example, and not set the worst possible example: to abuse people for fun. But the authoritarian communities of our society have collectively normalized abuse and thereby produced a circumstantial situation by which necessarily leads to the devaluation, the degradation of the very concept of personal dignity.

22.

The basic concept underlying the Eighth Amendment is nothing less than the dignity of man. — Trop v. Dulles, 356 U.S. 86, 100, 2 L. Ed. 2d 630, 78 S. Ct. 590 (1958)

One could continue with this discourse for a thousand pages and it would not present any contest to the plethora of documentation which have previously elucidated these facts. These are not at all novel concepts. But, yet, these people have very deliberately endeavored to perpetuate this contriving form of exploitation and abuse, and they (absurdly) possess the audacity to cite — of all things — the crime rate in society as their cause for their actions. Perhaps they're just stupid.

To truly understand the cause-effect in this one must be considerate of the fundamental precepts of human psychology and their sociological imperatives. As it pertains to a civilization, where people are protected by social convention, which engenders the custom and predilection of convenience, the necessary result is the commonality of degeneracy in personal functionability. The pursuit of convenience is the essential characteristic of cowardice, in which one avoids challenging applications that are so integral — as a fundamental

law of physics — To personal development and progressive evolution.

The case of laziness and absent mindedness that produces an underdeveloped intellect and lack of capability is the common denominator that unites the conventional community where popularity, or the majority rules. It must be said, in all probability, the majority will certainly prefer convenience. And the protection that the community offers only serves to preserve the life of one so inclined — the incompetent and unintelligent, or inferior — when they would surely not survive in a less accommodating environment; thus they may continue to bestow the influence of their according sensibilities and thereby proliferate the life-style.

And so the weak inherited the earth. But they are not necessarily meek. They are merely corrupt and subversive, and they have conspired, or at least colluded to to devise many a furtive maneuver in their efforts to exact control and thus subdue the competition. It bears mentioning that degenerates typically possess an inferiority complex. And as their cowardice predisposes them to corruption — thus they possess no principled scruples — they tend to preoccupy themselves in pursuit of capitalism; I.E. egotistical materialism, in which the principal objective consists of benefiting oneself or the

24.

expense of others, and degrading others merely to feel better about oneself.

Nevertheless, notwithstanding the objective, a coward is inherently a conformist, which — as it pertains to a selfish pursuit — entails appealing to a crowd for support. And as the function translates to a "civilized" society such entails the moral concern or purpose, A.K.A: the pretext as ploy; hence the scapegoat... the excuse for one's behavior or as a distraction from one's faults.

Needless to say, a prisoner makes for the most convenient scapegoat, but especially if he possesses personal dignity, integrity, prowess, and is confident in his application and thus represents an affront to someone of lesser worth. Such a presentation in contrast to the degenerate vicariously exemplifies the unadulterated essence of their being. And it is not flattering. And such ~~conviction~~ tends to foster animosity in someone who possesses such an immature and weak ego as the resent their perceived competition. While, in theory, ideally, people may be treated equally under the law, in reality, none is actually equal. This may be considered an elitest perspective in bigotry over inferior people. But that misconstrues the intent, and the facts. In truth, such is a realist perspective. And, unfortunately, the elite tend to be the only people who accept

25.

This Jealism. The intent in this (from a true elitist) is not to persecute or degrade. No, the legitimate intent is to enlighten and inspire. But a simpleton will not understand this because they lack the sensibilities, desires and insight garnered from such a pursuit, ~~which are prerequisite~~ which are prerequisite the growth and development of an elite person. They will instead waste their energy portraying the concept derisively — as they so typically attempt to degrade everything that they jealously abhor — as opposed to investing their resource progressively. And, yet, they secretly wonder why they "can't" be better.

And there you have it, as it were, the real reason for perpetuating a failed system of communal discipline. And such is the real reason why the defendants do persecute the plaintiff as a criminal, or (pejoratively) "offender". In truth, they are the real criminals.

And, yet, still these administrators' opinions over their policies are afforded the merit of that of an expert. It is certainly absurd to seek a result while consistently deferring the practice to people who have deliberately perpetuated the same failed tactics and all-encompassing strategy for decades, albeit through many a various connivingly ploy. If anything, these administrators' opinions should be valued as the diametrical

26.

divergence from the truth that they very well are, and solely used as an instrument in that navigation.

While it is true that judicial mandates have on occasion effectuated (some) progress in curtailing the abilities of states officers in their abusive agendas, such (for the most part) has only served to compell those officers to devise ever-increasingly devious and conniving tactics in their performance so as to circumvent that scrutiny. And such has only made it increasingly more difficult for prisoners to elicit scrutiny — when appearances are obscured and disguised — and especially when prison officials are granted such wide-ranging deference; again (absurdly) inspite of their very well documented and pervasive connivance.

It is truly intriguing that such presumably circumspect judicial authorities would entertain these peoples' opinions as at all credible, for the very broad and uniquely uniform record of prison management in America reflects the singular fact that no meaningful progress is ever going to occur until a higher governmental entity intervenes to codify prison administration under the auspices of higher morality and higher intelligence than these current administrators are apparently capable of, or even genuinely care to pursue. Granted, the judiciary can not feasibly undermine the executive or the legislative branches of our government, but it could stop allowing

for blatant corruption and abuse.

To this, it is noteworthy that prison administrators are not at all scholars. They are certainly not saints. Most often, they entered the D.O.C. very young, with barely a high school education, and they —impressionable and still yet to refine their inherently immature and brutish inclinations — then proceeded under the tutelage of individuals who, having similarly began their careers with the same sensibilities, still promote the very same archaic mentality of which they were mentored. As a community based on military principles — as with all militant communities — challenging the establishment is typically no way to promote oneself. Instead, it is a sure quest for retribution. Thus it leads a stagnant existence. And therein lies the most integral element of the problem with this so called department of correction! It is entirely premised on the archaic notion that punishment equates correction.

But any learned person knows — as even a cursory account of history clearly demonstrates — the fallacy that is the idea that punishment is essential to, or even conducive for effective discipline ... especially as it pertains to the overbearingly derogatory sort typical of the D.O.C. But, again, the "corrections"

28.

Community is not known for its exemplary education. Indeed, with such low wages and limited benefits, it necessarily would deter an educated persons' application for employment. Moreover, the gang-banging culture that [is] this militant institution, so stuck in its ways for its unwillingness to question itself, would only ostracize and persecute, and thereby push away anyone with an enlightened and progressive perspective once they entered the community and began to confront its brutish ways.

Additionally, experience does not necessarily translate to intelligence, or even a comprehensive understanding of a subject and its contingent potentiality (as in the potential which is contingent upon one's personal application in mobilizing such), and the myriad implications thereof, and especially if one's experience consists entirely of following orders blindly — as the D.O.C. mandates for itself.

To appreciate the parameters and their various, nuanced affects, and the contingent potentiality thereof, in and of prison administration — and especially the wide-ranging implications, ramifications, and repercussions in that — requires the erudite



and esoteric wisdom garnered from being simultaneously privy to the perspectives of a penological scholar, psychologist, sociologist, economist, politician, and (probably most important) a person with the insightful perspective of both an officer and a prisoner under the study of the dynamics of their relations.

In as much, one must take notice that it is not very difficult to observe the prison environment in all its various formations and take notice of the routine happenings and procedures, and also to ponder and devise methodology in the interest of its administration and then extrapolate the general potential (especially if you live in the environment constantly and just so happen to be well educated and possess common sense). And it is not difficult to study well established generalized material and simply apply such within one's own experience so to develope a comprehension thereof; again, especially if you live in a cage with nothing better to do and without much distraction. But it is impossible to deduce the raw experience of something utterly foriegn and contrary to one's nature, and especially to the extent of grasping the profundity that is the extreme effects that such a trauma as that typical of incarceration in this system can take upon a persons' psyche.

30.

An outside observer may assume (rather simplistically) that such is of no substantial consequence, but to anyone with the personal experience — even those not intelligent enough to effectively articulate it — that would very grossly and gravely undermine the truth of what is the very extensive, multi-faceted, degrading, overwhelmingly treacherous, and altogether insurmountable challenge that is the average prisoners' life, but particularly of those who wish to maintain their humanity inspite of the increased hardship in that — especially if they suffer the raw existential despair that is a minimum twenty-odd year sentence.

But this plaintiff is that unique person who truly appreciates all of those perspectives in all their differing interests and prospects — both individually and correlatively — and he has invested a considerable amount of his personal resource into synthesizing them so as to develope method by which we may resolve the differences in a manner to effect the most meaningful progress for society as a whole. And while such is obviously too vast and complex a matter to give proper treatment in the course of the discourse at hand, it is nevertheless worth mentioning that such a truly expert perspective (if that's even an appropriate terminology for the purpose) is essential to the prudential

31.

administration of what would be true correctional facilities. And obviously the current administrators are certainly not appreciative — as in understanding or even personally invested — of any of that. They are biased. They are prejudiced. And they are selfish.

They are not at all concerned with the rehabilitation of their prisoners. Indeed, such would only serve to detriment their job security as well as the typical excuse for their brutish behavior. The people who perform this job, and especially those who excell in it, typically only serve their own very selfish and base interest in gratifying themselves at others' expense... but of course also for financial exploitation. They just don't possess the courage to be honest about it.

They are simpletons. And they are cowards. They are quintessential bullies; hypermotivated to abuse other people in effort to gratify their degenerative ego; however pretend to be legitimate when confronted with a legitimate authority. Their only real interest is in degrading and sub-jugating their prisoners so as to feel as if they are above someone. This is their true concern in maintaining such oppressive control of their prisoners. They merely constrain and modify their

32.

efforts to conform to the occasion, according to what they think they can get away with. And this fact is very well evidenced by even the most cursory overview of the multitude of prisoner complaints contained within the federal citations as such administrators very consistently and diligently oppose any meaningful reformation to remediate the problems.

It is well understood amongst the Judiciary that the standard for what constitutes cruel and unusual punishment should evolve with the typical standards of decency in society generally. And it should also be well understood about the Judiciary by now that the people who typically pursue careers within the D.O.C. do not embody this sentiment at all. Indeed, they wholly appear to want to revert to the manners of the dark ages, or at the very least back to the time when the courts ignored the prisons altogether. In this, again, it becomes entirely necessary — if we are to ever make any meaningful progress — for the judicial system to intervene and overhaul the prison system.

Notwithstanding, nor is these administrators purported interest in their prisoners' rehabilitation at all relevant to

33.

begin with. The majority of the prisoners at the Wabash Valley Correctional Facility, and in most every maximum security prison in the United States, are serving life-reining sentences. How could such a paradoxical eventuation bear any substantial meaning or relevance when its bearing is confined to a cage? But that is yet another inquiry which belongs to the Judiciary that, unfortunately, can not be answered here.

But I digress, these administrators opinions bear little significance in the eyes of Justice. They can be essentially equated with that of a rumor in the dichotomy of fact. Therefore, the little significance they may present is purely as one extreme of the balance in the measure for Truth. They are certainly not worthy of deference.

34.

In Summary, the defendants in this cause have blatantly and wantonly violated the plaintiff's rights under the 8th Amendment to the U.S. Constitution's Cruel and unusual punishment clause because they either used excessive force against him or exercised deliberate indifference to his safety. And they have deliberately violated plaintiff's 14th Amendment ~~rights~~ rights under the U.S. Constitution's substantive due process clause. Therefore, plaintiff is entitled to compensatory and punitive damages as well as injunctive and declaratory relief to effectuate remediation of the circumstances which caused or allowed for his inadequate treatment.

# Requested Relief

1. One thousand dollars compensatory damages and Ten thousand dollars in punitive damages against the officers who failed to intervene as their fellow officers assaulted the plaintiff.

2. Ten thousand dollars compensatory damages and one hundred thousand dollars punitive damages against Richard Brown, Frank Littlejohn, Capt. Pistle, Lt. Yarber, Major Russell, Sgt. J. Shrayer, Sgt. M. Shrayer, and the officers who beat the plaintiff, and Nurse Pamela Hagemeier.

3. One hundred thousand dollars compensatory damages and one million dollars punitive damages against Corizon, L.L.C.

4. A formal declaration that the manner in which chemical agents were used in this case do constitute Torture.

5. A permanent injunction to mandate that the defendants modify their procedures to effect remediation of the circumstances that caused and/or allowed for the Treatment at issue in this cause.

Phillip Littler #121098
Westville Central Unit
5501 South 1100 West
Westville, IN 46391

36.