| | | |
|---|---|---|
| PHILLIP LITTLER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 2:16-cv-00472-JMS-DLP |
| | ) | |
| CHRISTOPER MARTINEZ, et al. | ) | |
| | ) | |
| Defendants. | ) | |

**Order Discussing Motion for Summary Judgment**

This case presents both the prison system and prisoner litigation at their worst. A reasonable jury could certainly find, based on the evidence provided thus far, that correctional officers at Wabash Valley Correctional Facility intentionally used excessive force against Plaintiff Phillip Littler solely to make him suffer. This includes, but is not limited to, intentionally shooting him in the face with a pepperball gun at point blank range. And the evidence could also support a finding that they did so at the direction of Wabash Valley's Assistant Superintendent. Worse still, several of the defendants attempted before, during, and after the incident to cover it up, including by creating an apparently false incident report and by submitting an arguably false sworn declaration to this Court. They did this without being deterred by their counsel, even after counsel should have known the declaration was contrary to the evidence. The Court hopes that this is an isolated incident of conduct and litigation gone awry, but is gravely concerned that it is not.[1]

---

[1] Two recent prisoner civil rights cases in this Court involving State Defendants represented by the Indiana Attorney General's Office are illustrative. *See, e.g.*, *Holleman v. Zatecky*, No. 1:14-cv-00671-TWP-DML, Filing No. 124 (detailing evidence submitted by defendants that was not accurate, stating that the Court had "continuing concerns about the accuracy of testimony presented in this case," and requiring the State to pay reasonable expenses and attorneys' fees to rectify the problem); *Paschall v. Coats*, No. 1:15-cv-00621-SEB-MPB, Filing No. 117 (defendant

This action began when Mr. Littler, who remains incarcerated at Wabash Valley, filed a pro se Complaint against numerous Wabash Valley staff members who he says routinely use excessive force against him at the direction of their supervisors.  At issue in this case is one such instance, which occurred on December 27, 2015.  The State Defendants seek summary judgment.  In support, they present sworn declarations that they did not use excessive force or see any other correctional officer do so, and the supervisory staff attest that they did not have any involvement in the incident in question.

At the summary judgment stage of proceedings, the Court of course cannot and does not make factual findings.  But the evidence presented by Mr. Littler (some of which was produced by the State Defendants in discovery) paints a bleak picture of inmate treatment at Wabash Valley—from correctional officers to the highest level supervisors.  Among other things, the evidence shows that the Assistant Superintendent of Wabash Valley, Frank Littlejohn, suggested to Captain Amanda Pirtle that she shoot Mr. Littler at point blank range with a pepperball gun when he was failing to cooperate with a strip search.  She responded that she "love[d]" the idea.  Shortly thereafter, Mr. Littler was shot directly in the face with a pepperball gun at point blank range by a correctional officer.

This and other evidence strongly supports a finding that the malicious use of force was not only accepted by supervisory personnel, but directed by them.  Mr. Littler's willful choice not to obey basic orders of correctional staff may well be frustrating to them, and his past attempts to escape undoubtedly justify restrictive conditions and careful monitoring.  But the Eighth Amendment exists precisely to protect those like Mr. Littler—specifically, individuals whom

moving to strike his prior sworn statement after summary judgment was denied because he could "no longer affirm that the statement in his declaration" was true).

prison staff are inclined to punish by intentionally inflicting pain upon them whenever they so choose.

The purposeful and unnecessary violence against Mr. Littler is undoubtedly the worst part of this case from his perspective. But the apparent efforts—before, during, and after the uses of force—to cover it up are nearly as troubling from the Court's perspective. As detailed below, there is evidence that correctional staff knew they should have videoed the use of the chemical agent and pepperball gun on Mr. Littler, but did not. Although they videoed the subsequent use of the cell extraction team, during critical portions of the incident—when Mr. Littler says he was repeatedly punched in the head—the camera's view is obstructed by a correctional officer.

The cover up not only involved ensuring there was no video evidence of the incidents, but also filing what is quite possibly a false report after the fact. The pepperball gun report submitted by the officer who shot Mr. Littler states that he was shooting the pepperball gun into the wall when Mr. Littler moved his face into the line of fire. Again, although the Court cannot make factual findings at this stage, this report is implausible on its face. Given that the evidence supports the conclusion Assistant Superintendent Littlejohn directed Mr. Littler to be shot at point blank range, the odds that the correctional officer shooting Mr. Littler had no intent to do so are vanishingly small.

Regrettably, the cover up appears to have continued during this litigation. Assistant Superintendent Littlejohn submitted a declaration under penalty of perjury stating, among other things, that he did not order the cell extraction on December 27, 2015, and instead, the only order he issued was for Mr. Littler's cell to be inspected weekly. These statements are unsupportable, given that Assistant Superintendent Littlejohn's emails show he directed Mr. Littler to be shot with the pepperball gun at "no minimum distance." Worse still, having filed what is seemingly false

evidence in support of the State Defendants' motion for summary judgment, counsel for the State Defendants did nothing to correct the representation to the Court once these emails came to light. Instead, a reply brief was filed that ignored these emails and insisted that summary judgment was still warranted.

This conduct by Assistant Superintendent Littlejohn and the State Defendants' counsel implicates the Court's inherent authority and that provided by Rule 11 of the Federal Rules of Civil Procedure. Our system of justice depends on the honesty of its participants, as many cases hinge on it. *See Secrease v. Western & Southern Life Ins. Co.*, 800 F.3d 397, 402 (7th Cir. 2015) ("[F]alsifying evidence to secure a court victory undermines the most basic foundations of our judicial system."). This is equally true, if not more so, when defendants and their counsel are representatives of the government, litigating against a pro se prisoner who does not have the same ability to marshal evidence to support his claims as individuals who are not incarcerated or have counsel. Notably, Mr. Littler only obtained the emails revealing the State Defendants' troubling conduct after his discovery request for them was rejected by the State Defendants' counsel on grounds the Court later determined were insufficient, and the Court granted his motion to compel.

For the reasons explained in more detail below, the State Defendants' motions for summary judgment are denied except as to defendant David Smith, who Mr. Littler acknowledges had nothing to do with the incident in question. Separate show cause orders will issue to Assistant Superintendent Littlejohn and the State Defendants' counsel, which will provide an opportunity to show cause why they should not be sanctioned for their conduct during this litigation.

## I.
## Summary Judgment Legal Standard

Summary judgment is appropriate when the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law. *See* Fed. R.

Civ. P. 56(a).  A "material fact" is one that "might affect the outcome of the suit." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).  To survive a motion for summary judgment, the non-moving party must set forth specific, admissible evidence showing that there is a material issue for trial.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  The Court views the record in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor.  *Darst v. Interstate Brands Corp*., 512 F.3d 903, 907 (7th Cir. 2008).  It cannot weigh evidence or make credibility determinations on summary judgment because those tasks are left to the fact-finder. *O'Leary v. Accretive Health, Inc.*, 657 F.3d 625, 630 (7th Cir. 2011).

A dispute about a material fact is genuine only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.  If no reasonable jury could find for the non-moving party, then there is no "genuine" dispute. *Scott v. Harris*, 550 U.S. 372, 380 (2007).

## II.
## Background

Mr. Littler filed this action pursuant to 42 U.S.C. § 1983 against the following State Defendants: Superintendent Richard Brown, Assistant Superintendent Frank Littlejohn, Major Dusty Russell, Captain Amanda Pirtle, Lieutenant Yarber, Christopher Martinez, Blake Scarbrough, Israel Brewer, Justin Shroyer, Mark Shroyer, Ryan Bottoms, Skyler Thacker, Kirby McKee, David Smith, and Denver Smith.[2]  The Court permitted Eighth Amendment excessive force and failure to intervene claims to proceed against these defendants in their individual capacities.

---

[2] The titles of individuals in the Indiana Department of Correction have changed under Indiana law—for example, from Superintendent to Warden.  The Court will use the titles in use at the time of the incident in question throughout this Order, rather than their current titles.

The following facts are drawn from either the undisputed or indisputable evidence or, if disputed, the evidence taken in the light most favorable to Mr. Littler, as the foregoing standard of review requires. Given this standard, nothing in the Court's analysis should be construed as findings of fact.

### A.  Uses of Force Against Mr. Littler

The details of the uses of force against Mr. Littler on the day in question are critical to understanding both the Court's ruling on the motions for summary judgment and why sanctions may be warranted, so they are set forth below. They include three separate incidents of force, all of which occurred on December 27, 2015, while Mr. Littler was in the shower cell and refusing to submit to a strip search: repeated spraying of Mr. Littler with a chemical agent, shooting Mr. Littler with a pepperball gun, and a physically assaulting Mr. Littler when correctional officers entered the shower.

On the day in question, Mr. Littler was escorted to the shower cell for a strip search at approximately 11:15 a.m. The State Defendants maintain that the strip search was necessary due to concerns that Mr. Littler possessed a cell phone or other electronic device. But Mr. Littler attests that this concern was a false pretext used by defendant Justin Shroyer—against whom Mr. Littler had recently filed a grievance—in order to "degrade" Mr. Littler. Filing No. 173 at 2. Mr. Littler was placed in the shower cell, but refused to submit to a strip search. Capitan Pirtle arrived and spoke with Mr. Littler, but he continued to refuse to submit to a strip search.

Assistant Superintendent Littlejohn foreswore any involvement in the subsequent uses of force against Mr. Littler. His declaration sworn under penalty of perjury provides, in relevant part, as follows:

15. I was not directly involved in the cell extraction on December 27, 2015. I did not order the cell extraction or participate in the cell extraction. The only order I issued was for Phillip Littler's cell to be inspected weekly for the safety and security of the facility.

Filing No. 88-2 at 3. After this declaration was filed, Mr. Littler obtained through discovery several emails related to the shower cell extraction, one of which shows that Assistant Superintendent Littlejohn's declaration is at best incorrect, and at worst, false.

Specifically, Captain Pirtle emailed Assistant Superintendent Littlejohn at 11:53 a.m., requesting advice on how to proceed. Their full email exchange reads as follows (this, and all other emails in this Order, are presented in reverse chronological order):

From: Pirtie, Amanda
  Sent: Sun Dec 27 12:05:23 2015
  To: Littlejohn, Frankie
  Subject: RE: ICARSH inquiry
  Importance: Normal

I love that. lol
**From:** Littlejohn, Frankie
**Sent:** Sunday, December 27, 2015 12:00 PM
**To:** Pirtie, Amanda
**Subject:** Re: ICARSH Inquiry
There is no min distance for the pepperball, correct? I'm in the giving mood so instead of the team lets shoot him. He has a history of weapons. We need to be very careful with him.

Sent from my iPhone

On Dec 27, 2015, at 11:53 AM, Pirtie, Amanda APirtie@idoc.IN.gov> wrote:
  I have littier in the shower refusing to strip. He wants to take on the team. I am gonna wait for a while before doing anything. I won't leave my mess for the next shift, but I refuse to take orders from an offenders.

Filing No. 174-1 at 6.

At approximately 12:45 p.m., Justin Shroyer sprayed Mr. Littler with a chemical agent, OCV MK-9s. Not long thereafter, Mr. Littler was sprayed with at least a second round of the chemical agent. Although the defendants assert that Mr. Littler was "not bothered" by the chemical

agent and that it was "not effective," Mr. Littler states that it "tremendously bothered" him. Filing No. 173 at 2. Indeed, the video of the cell extraction team shows several of the officers repeatedly coughing merely because they were in the shower cell and near to Mr. Littler. Mr. Littler attests that he was "repeatedly" assaulted by the chemical agent "over a protracted time frame." Filing No. 174 at 6. And he states that Captain Pirtle and Lieutenant Yarber had the opportunity to prevent Justin Shroyer's excessive use of the chemical agent, but failed to do so. *Id.* Indeed, Mr. Littler overheard Lieutenant Yarber, when discussing the situation with Captain Pirtle, state that Mr. Littler "deserves an orange crush," which is understood to mean the officers would intentionally harm him.

At approximately 12:55 p.m., Mark Shroyer then arrived with the pepperball gun "at the request of Capt. A. Pirtle." Filing No. 174-1 at 97; *see* Filing No. 137-1 at 1 (Mark Shroyer attesting that he was "ordered" to use the pepperball gun). Mr. Littler states that Mark Shroyer fired three rounds toward the back wall above Mr. Littler's head, and, even though Mr. Littler was standing still, Mark Shroyer "then fired one single round directly at the plaintiff's nose" at point blank range. Filing No. 173 at 2; Filing No. 174 at 34. Mr. Littler turned around "so as to no longer expose his face to the assault," and Mark Shroyer "immediately fired several more rounds in rapid succession to the back of [Mr. Littler's] head until the weapon stopped working." Filing No. 174 at 34; *see* Filing No. 173 at 2.

Pictures taken after the fact and video evidence following the incident show that the plaintiff sustained significant injuries to at least his nose and upper lip. *See* Filing No. 93; Filing No. 169-1 at 2-3. Mr. Littler attests that Assistant Superintendent Littlejohn, Captain Pirtle, and Lieutenant Yarber conspired to have Mark Shroyer deliberately shoot him in the face with the

pepperball gun, and that they all had the opportunity to intervene and failed to do so.  Filing No. 174 at 6.

Mark Shroyer filled out an implausible pepperball incident report later that day.  It states that he fired "approximately five (5) rounds, impacting towards the ceiling of the shower."  Filing No. 169-1 at 7.  It continues: "I began to fire three (3) pepperball rounds into back wall[,] when offender moved into the line of fire, striking him in the facial area.  The offender turned his back towards me and I fired two (2) pepperball rounds[,] impacting his back shoulder area.  The pepperball weapon began to misfire after ten (10) pepperball rounds were impacted."  *Id.* at 7-8.  Emails later that day from Mark Shroyer attempting to have the pepperball gun repaired also suggest he was attempting to fire more than ten rounds:  "After 10 rounds it acted as if it was out of $CO_2$[,] but the gauge was indicating full.  I was only able to impact 10 rounds successfully."  Filing No. 169-1 at 4.

After use of the pepperball gun, the cell extraction team was utilized at approximately 1:15 p.m.  Lieutenant Yarber briefed the officers before they entered the shower, and was present and witnessed the cell extraction.  *See* Filing No. 174 at 4; Filing No. 174-1 at 97.  Entering the shower were correctional officers Martinez, Scarbrough, Brewer, Bottoms, and Thacker.  Officer McKee filmed the cell extraction using a handheld video camera.  Officer Denver Smith was present as the "recorder" for the cell extraction team (although this role is explained no further by the State Defendants).

The first two officers to enter the shower, Officers Bottoms and Thacker, tackled Mr. Littler into the wall (which Mr. Littler says broke his clavicle).  They then began repeatedly striking Mr. Littler in the head with closed fists.  None of the other officers listed in the preceding paragraph

who were part of this operation attempted to intervene or prevent this assault. Eventually, Mr. Littler was placed in restraints and removed from the shower.

The defendants submitted the video of the cell extraction team entering the shower and the aftermath. As discussed further below, video was not taken when Justin Shroyer sprayed Mr. Littler with the chemical agent or when Mark Shroyer shot him with the pepperball gun. And during nearly all of the critical points when the cell extraction team entered the shower—that is, when the video would show what force was being used against Mr. Littler—the video is obstructed by the officer at the back of the cell extraction team.

During the foregoing events, while Mr. Littler acknowledges that he refused to agree to take his clothes off for the strip search, he was calm and "not at all combative" with any of the defendants. Filing No. 174 at 15. He attests that he did not threaten anyone and remained completely calm, but was nevertheless subjected to extreme uses of force. *Id.* at 29. Of course in ruling on summary judgment, his version of events is to be credited.

After Mr. Littler was removed from the shower, he was taken to visit a nurse at the medical station. He was then strip searched by having his clothes, except his boxer shorts, cut off him by members of the cell extraction team. Following a decontamination shower, Mr. Littler was returned to his cell.

**B.      Video Evidence and Efforts to Cover Up the Uses of Force against Mr. Littler**

Mr. Littler presents significant evidence showing that several of the State Defendants purposefully set out to avoid videoing all three uses of force against Mr. Littler. First, emails between Wabash Valley staff suggest they believed it was a good thing for them that the spraying of Mr. Littler with the chemical agent was not filmed. Specifically, Mr. Littler presents an email

exchange between Superintendent Brown and David Thompson (Mr. Littler's counselor) that occurred the day after the assault. The email exchange provides, in relevant part, as follows:

**From:** Thomson, David
**Sent:** Monday, December 28, 2015 11:58 AM
**To:** Brown, Richard L.
**Subject:** RE: Candy

Haven't been out there today yet. Frank had said he took one right between the eyes. Just heard Dusty talking that during the ordeal with the pepper spray at least no video was being shot.
**From:** Brown, Richard L.
**Sent:** Monday, December 28, 2015 11:56 AM
**To:** Thomson, David
**Subject:** RE: Candy
How does Littier look today? I figure his eyes should be black today after taking a direct hit from the pepperball yesterday.

Filing No. 174-1 at 312-13. The "Dusty" referenced in the email presumably refers to Major Dusty Russell, who apparently thought it was good that the chemical agent "ordeal" was not videoed, "at least no video was being shot."

Second, this same email exchange reveals that Superintendent Brown himself acknowledged that the use of the pepperball gun should have been, but was not, videoed:

**From:** Brown, Richard L.
**Sent:** Monday, December 28, 2015 12:03 PM
**To:** Thomson, David
**Subject:** RE: Candy
Hmmm, ok.
**From:** Thomson, David
**Sent:** Monday, December 28, 2015 12:02 PM
**To:** Brown, Richard L.
**Subject:** RE: Candy
Between me and you, I don't think video was done when the gun was used.
**From:** Brown, Richard L.
**Sent:** Monday, December 28, 2015 11:59 AM
**To:** Thomson, David
**Subject:** RE: Candy
Yes he did take one between the eyes. I sure hope they used video on the pepperball gun.

Filing No. 174-1 at 312. Major Dusty Russell sent an email that same day, which also reveals that Captain Pirtle should have videoed the use of the pepperball gun:

From: Russell, Dusty
Sent: Mon Dec 28 13:43:38 2015
To: Curry, Richard L
Subject: FW: Message from "RNP002673ABD2C5"
Importance: Normal
Attachments: 201512281232.pdf

FW: Message from "RNP002673ABD2C5"
 The attachment has the critical incident report from this past weekend when chemical agent and the pepper ball was used on Offender Littler, Phillip # 121098. For whatever reason the shift captain did not video the pepper ball( I will address that with the shift captain and the sergeant ). I will get a copy of the extraction tape and will burn you a copy of the range tape which will show the sergeant shooting the pepper ball gun, just cannot see the offender. Medical did check out the offender, he got hit around the nose area, the injuries was a bloody upper and lower lip and bloody tip of his nose.

Filing No. 174-1 at 298.  This email shows not only that the pepperball gun use should have been filmed, but that it was such a breach of protocol that Major Russell was going to address it with Captain Pirtle and, presumably, Sergeant Mark Shroyer.

The above emails show that there was consistent acknowledgement after the fact that the use of the pepperball gun should have been filmed.  But the video evidence submitted to the Court also suggests that this was known by at least some of the State Defendants at the time, yet they deliberately set out not to video this portion of the incident.  The video begins with the cameraman, presumably Officer McKee, stating the time and date, then shows the members of the cell extraction team waiting down the hall from Mr. Littler as they prepare to enter the shower to extract him.  *See* Filing No. 93.  An unidentified correctional officer states that they have assembled the cell extraction team because Mr. Littler is refusing to strip or leave the shower.  He states that the plan is to "spray him," use the pepperball gun, and then "take the team in."  Just over a minute later, several loud "pops" can be heard, and an officer notes that it is the pepperball gun.  Approximately thirty seconds later, the same officer asks the cameraman if the camera is on, then makes a hand signal to turn it off.  The camera is then turned off, and the video resumes once the

cell extraction team is ready to enter the shower. It is unclear how much time elapsed between when the camera was shut off and when it was turned back on.

Moreover, the above email from Major Russell suggests that the use of the pepperball gun was captured by a range camera. Specifically, he said that it shows Mark Shroyer "shooting the pepperball gun, [but you] just cannot see [Mr. Littler]." Filing No. 174-1 at 298. Major Russell states that he would create a copy of the range tape. Yet when Mr. Littler specifically asked for video evidence from the range camera during discovery, State Defendants' counsel informed Mr. Littler and the Court that no such video exists, as the range camera footage is only preserved for a limited period. Major Russell's email directly calls that representation into question—an issue discussed further in the Court's show cause order that will issue separately.

Third, although the entrance into the shower cell by the cell extraction team was videoed, the video evidence provided is essentially worthless for determining whether excessive force was used. At least three aspects of the video suggest that the camera view was intentionally obstructed throughout the video. First and foremost, the camera is directed straight into back of the last officer to enter the shower throughout the critical moments of the video. This officer does not engage Mr. Littler, but primarily remains in the shower door blocking the camera's view. At no point during the shower incident itself can the viewer see Mr. Littler or whether or not any of the first officers to enter the shower are, as Mr. Littler attests, slamming him into the wall or punching him in the head. Second, at the beginning of the video, two officers engage in a discussion about keys, and one officer says to the officer at the back of the line that they will want him "on the camera." Under the circumstances, this statement suggests that it is this officer's role to intentionally block the camera's view. Third, toward the end of the video, once Mr. Littler is returned to his cell, the officer blocking the camera for most of the video crouches down to assist the other officers in

removing Mr. Littler's restraints. Another officer taps him on the shoulder and motions him to move back, at which time he moves into the cell door, entirely obstructing the video. Together, this evidence suggests that even though the defendants videoed the cell extraction team entering the shower, they executed a coordinated effort to obstruct the video during the critical moments.

### III.
### Discussion

The Court screened Mr. Littler's complaint and amended complaints in this action and permitted the following claims to proceed: (1) Eighth Amendment excessive force or failure to protect or intervene claims against all of the State Defendants in their individual capacities[3]; and (2) Eighth Amendment medical claims against Nurse Hagemeier and Corizon. *See* Filing No. 10; Filing No. 60. Only the first of these claims is at issue here, as the Medical Defendants have a separate motion for summary judgment pending that the Court will rule on by separate Order. The State Defendants move for summary judgment on all of Mr. Littler's Eighth Amendment excessive force related claims.

Each State Defendant submitted a declaration under penalty of perjury that she or he did not use excessive force against Mr. Littler or see anyone else do so, or that they had nothing at all to do with the uses of force against him. Despite the clear disputes of material fact created by Mr. Littler's evidence in response—and significant evidence that at least several of the State

---

[3] Mr. Littler's response brief references conditions of confinement claims against the State Defendants. The Court, however, did not identify any such claims in its Screening Entries. If Mr. Littler thought that the Court should have but did not identify such claims in its Screening Entries, he should have filed a motion to reconsider at that time. At this juncture, however, it is too late for him to do so. Moreover, any such claim would likely have to be filed in a separate action. *George v. Smith*, 507 F.3d 605, 607 (7th Cir. 2007). Thus no such claims are proceeding in this action. The only claims proceeding against the State Defendants in this action are Eighth Amendment claims related to excessive force and the failure to intervene in or prevent the use of that force.

Defendants violated his Eighth Amendment rights—the State Defendants ignore Mr. Littler's significant evidence and continue to assert in their reply that they are entitled to summary judgment. Because most of them are obviously not entitled to summary judgment, the Court's analysis need not be extensive. The Court will therefore set forth the governing law, before briefly assessing each use of force against Mr. Littler in turn.

The "unnecessary and wanton infliction of pain . . . constitutes cruel and unusual punishment forbidden by the Eighth Amendment." *Whitley v. Albers*, 475 U.S. 312, 319 (1986) (citation and quotation marks omitted). "[T]he question whether the measure taken inflicted unnecessary and wanton pain and suffering ultimately turns on whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm." *Hudson v. McMillian*, 503 U.S. 1, 6 (1992) (citation and quotation marks omitted); *see Wilkins v. Gaddy*, 559 U.S. 34, 37 (2010) (per curiam). "To determine whether force was applied in good faith, [the Court] consider[s] several factors, 'including the need for the application of the force, the amount of force applied, the threat an officer reasonably perceived, the effort made to temper the severity of the force used, and the extent of the injury that force caused to an inmate.'" *Santiago v. Walls*, 599 F.3d 749, 757 (7th Cir. 2010) (quoting *Fillmore v. Page*, 358 F.3d 496, 504 (7th Cir. 2004)).

Liability under the Eighth Amendment extends not only to individuals who use excessive force, but also to those who fail to intervene in an ongoing instance of excessive force. *See Harper v. Albert*, 400 F.3d 1052, 1064 (7th Cir. 2005). It is a "long-established rule that '[a]n official satisfies the personal responsibility requirement of § 1983 if she acts or fails to act with a deliberate or reckless disregard of the plaintiff's constitutional rights.'" *Fillmore v. Page*, 358 F.3d 496, 506 (7th Cir. 2004) (quoting *Crowder v. Lash*, 687 F.2d 996, 1005 (7th Cir. 1982)). In short, "[a]n

officer who fails to intervene to try to prevent known cruel or unusual force, despite a reasonable opportunity to do so, may be held liable under § 1983." *Wilborn v. Ealey*, 881 F.3d 998, 1007 (7th Cir. 2018); *accord Gill v. City of Milwaukee*, 850 F.3d 335, 342 (7th Cir. 2017).

Except for defendant Officer David Smith, whom Mr. Littler concedes was not involved in the conduct at issue, the evidence viewed in light most favorable to Mr. Littler demonstrates that each of the State Defendants was either directly involved in or failed to intervene in at least one instance of excessive force against Mr. Littler. First, Justin Shroyer's spraying of Mr. Littler with the chemical agent constitutes excessive force. Mr. Littler asserts that he was "repeatedly" assaulted by the chemical agent "over a protracted time frame," Filing No. 174 at 6, and that the agent "tremendously bothered" him, Filing No. 173 at 2. He also attests that Captain Pirtle and Lieutenant Yarber had the opportunity to prevent Justin Shroyer's excessive use of the chemical agent, but failed to do so. Filing No. 174 at 6. Indeed, Mr. Littler overheard Lieutenant Yarber state to Captain Pirtle that he deserves to be subjected to harsh treatment. And this all occurred despite Mr. Littler's evidence that he was not at all combative or threatening. Presumably because the use of the chemical agent was so terrible for Mr. Littler, Major Russell stated that "at least no video was being shot" during the "ordeal." Filing No. 174-1 at 312.

It is true, as the State Defendants suggest, that "the use of mace is appropriate 'when reasonably necessary . . . to subdue recalcitrant prisoners.'" *Santiago*, 599 F.3d at 757 (quoting *Soto v. Dickey*, 744 F.2d 1260, 1270 (7th Cir. 1984)). This might support their position had Mr. Littler been subjected to only a single burst of the chemical agent before the cell extraction team was engaged. But the above evidence—especially Mr. Littler's evidence that he was only passively resisting the officers—would easily permit a reasonable jury to conclude that Justin Shroyer, with the approval of Lieutenant Yarber and to Captain Pirtle, utilized the chemical agent

"maliciously and sadistically for the very purpose of causing harm," rather than in a "good faith effort to maintain or restore discipline." *Hudson*, 503 U.S. at 6.

Second, the shooting of Mr. Littler with the pepperball gun constitutes excessive force. Assistant Superintendent Littlejohn's email to Captain Pirtle clearly directed Captain Pirtle to shoot Mr. Littler with a pepperball gun, and it implies she should do so at point blank range. Captain Pirtle then ordered Mark Shroyer to use the pepperball gun against Mr. Littler. Given this, Mark Shroyer's story in the pepperball gun report—that he was firing at the wall when Mr. Littler moved his face into the line of fire—is seriously undermined. Rather, it is much more likely, as Mr. Littler attests, that Mark Shroyer intentionally shot Mr. Littler in the face at point blank range. *See* Filing No. 173 at 2; Filing No. 174 at 34. Mr. Littler then turned around "so as to no longer expose his face to the assault," and Mark Shroyer "immediately fired several more rounds in rapid succession to the back of [Mr. Littler's] head until the weapon stopped working." Filing No. 174 at 34. If this were not troubling enough, the evidence suggests that Mark Shroyer would have shot Mr. Littler with more rounds had the pepperball gun not malfunctioned.

Not only could a reasonable jury find that Mark Shroyer utilized the pepperball gun "maliciously and sadistically for the very purpose of causing harm," *Hudson*, 503 U.S. at 6, it may well be surprising if they did not, given the evidence before the Court. Assistant Superintendent Littlejohn and Captain Pirtle are no less responsible, as the evidence reveals that they directed Mark Shroyer to utilize the pepperball gun against Mr. Littler.

Third, viewed in the light most favorable to Mr. Littler, the use of force against Mr. Littler by members of the cell extraction team clearly constitutes excessive force. Again, Mr. Littler attests that he was calm, not at all combative, and did not threaten anyone before force was used against him. Despite this, even though Mr. Littler had been repeatedly sprayed with a chemical

agent and shot directly in the face with a pepperball gun (and in the back of the head), Officers Bottoms and Thacker entered the shower, slammed Mr. Littler into the wall and punched him in the head several times. Faced with an inmate who is not physically resisting them, a reasonable jury could easily conclude that such force was used "maliciously and sadistically for the very purpose of causing harm," rather than in a "good faith effort to maintain or restore discipline." *Id.*

Officers Martinez, Scarbrough, Brewer, Denver Smith, and McKee (who was filming the cell extraction) took no action to intervene in these assaults, nor did Lieutenant Yarber, who Mr. Littler says directed and accompanied the cell extraction team. Not only does it appear that several blows to the head provided sufficient time for the other members of the cell extraction team a "reasonable opportunity" to intervene, *Wilborn*, 881 F.3d at 1007, but Mr. Littler states that it is their custom and practice during previous cell extractions for the first two officers to "immediately assault the prisoner for a few moments while the following officers obstruct the view of the video camera," Filing No. 174 at 4. Each of these facts are sufficient to render all members of the cell extraction team personally responsible for the assault or the failure to intervene during it.

Lastly, the State Defendants argue that Superintendent Brown, Assistant Superintendent Littlejohn, and Major Russell were not personally involved in the uses of force against Mr. Littler and thus are entitled to summary judgment. This is a non-starter with respect to Assistant Superintendent Littlejohn, since, as discussed above, he directly ordered the use of the pepperball gun. State Defendants' counsel continued to request summary judgment for him in reply, without acknowledging the key evidence against him. This is, at best, inappropriate and a waste of the Court's and parties' time and resources.

Whether Superintendent Brown and Major Russell are personally liable, however, requires more discussion. "Individual liability under § 1983 . . . requires personal involvement in the

alleged constitutional deprivation." *Colbert v. City of Chicago,* 851 F.3d 649, 657 (7th Cir. 2017) (internal quotation omitted). Mere "knowledge of a subordinate's misconduct is not enough for liability." *Vance v. Rumsfeld*, 701 F.3d 193, 203 (7th Cir. 2012) (en banc). Nevertheless, "[a]n inmate's correspondence to a prison administrator may thus establish a basis for personal liability under § 1983 where that correspondence provides sufficient knowledge of a constitutional deprivation." *Perez v. Fenoglio*, 792 F.3d 768, 781-82 (7th Cir. 2015).

Superintendent Brown and Major Russell both attest that Mr. Littler did not write to them prior to December 27, 2015, regarding officers' repeated use of excessive force against him. *See* Filing No. 88-3; Filing No. 88-4. Mr. Littler disputes this. His cell is searched on a weekly basis because prison officials have deemed him an escape risk, as he has attempted to escape in the past. But Mr. Littler regularly refuses to cooperate with correctional officials wanting to search his cell, which necessitates his extraction. During these cell extractions, Mr. Littler states he is regularly subjected to excessive force. He states that he sent Superintendent Brown and Major Russell (as well as Assistant Superintendent Littlejohn) several letters throughout 2015, several of which specifically complained about correctional officers' routine uses of force against him.

Although he asserts that the State Defendants wrongfully refused to produce these letters during discovery, Mr. Littler presents several grievances he filed that are directed to Major Russell complaining about officers using excessive force during cell extractions. *See, e.g.*, Filing No. 174-1 at 191, 200. Mr. Russell denied these grievances, stating the video of the extraction did not show any excessive force (which is unsurprising if the videos of those cell extractions were anything like the one before the Court—that is, purposefully obstructed by correctional officers). Indeed, Mr. Littler specifically complained that Major Russell was instructing correctional officers to use

excessive force against him during these cell extractions, and Assistant Superintendent Littlejohn denied that grievance. *See id.* at 233.

Not only does Mr. Littler attest that he sent Superintendent Brown several letters regarding excessive force used against him, Mr. Littler also presents an email from Superintendent Brown that suggests he is well aware of Mr. Littler's ongoing complaints. Portions of the email are reproduced above, but are produced again here to provide context:

**From:** Brown, Richard L.
**Sent:** Monday, December 28, 2015 12:08 PM
**To:** Thomson, David
**Subject:** RE: Candy
Oh no, I won't say anything!!
**From:** Thomson, David
**Sent:** Monday, December 28, 2015 12:07 PM
**To:** Brown, Richard L.
**Subject:** RE: Candy
I'm sure you will. Don't mention my name! lol
**From:** Brown, Richard L.
**Sent:** Monday, December 28, 2015 12:06 PM
**To:** Thomson, David
**Subject:** RE: Candy
I bet he wasn't. I am sure I will hear from him. LOL
**From:** Thomson, David
**Sent:** Monday, December 28, 2015 12:05 PM
**To:** Brown, Richard L.
**Subject:** RE: Candy
He wasn't too happy with Yarber, Pirtie, maybe Hendrickson and not sure who the Sgt was?
**From:** Brown, Richard L.
**Sent:** Monday, December 28, 2015 12:03 PM
**To:** Thomson, David
**Subject:** RE: Candy
Hmmm, ok.
**From:** Thomson, David
**Sent:** Monday, December 28, 2015 12:02 PM
**To:** Brown, Richard L.
**Subject:** RE: Candy
Between me and you, I don't think video was done when the gun was used.
**From:** Brown, Richard L.
**Sent:** Monday, December 28, 2015 11:59 AM
**To:** Thomson, David
**Subject:** RE: Candy
Yes he did take one between the eyes. I sure hope they used video on the pepperball gun.
**From:** Thomson, David
**Sent:** Monday, December 28, 2015 11:58 AM
**To:** Brown, Richard L.
**Subject:** RE: Candy

**From:** Thomson, David
**Sent:** Monday, December 28, 2015 11:58 AM
**To:** Brown, Richard L.
**Subject:** RE: Candy

Haven't been out there today yet. Frank had said he took one right between the eyes. Just heard Dusty talking that during the ordeal with the pepper spray at least no video was being shot.
**From:** Brown, Richard L.
**Sent:** Monday, December 28, 2015 11:56 AM
**To:** Thomson, David
**Subject:** RE: Candy
How does Littler look today? I figure his eyes should be black today after taking a direct hit from the pepperball yesterday.

Filing No. 174-1 at 312-13. This email, sent the day after the incident in question, confirms that Superintendent Brown had previously heard from Mr. Littler regarding his treatment at the prison, anticipated hearing from him concerning this incident, and inexplicably that Superintendent Brown found Mr. Littler's complaints humorous. It also suggests that Superintendent Brown would seek to keep his subordinates out of any trouble Mr. Littler's complaints would cause.

Taken together, the above evidence is sufficient for a reasonable jury to conclude that Superintendent Brown and Major Russell are personally responsible for the uses of force against Mr. Littler on the date in question. *See Perez*, 792 F.3d at 782 (holding that defendants who had actual knowledge of the specifically complained about conduct via "grievances and correspondences" and then "failed to exercise [their] authority to intervene on [the plaintiff's] behalf to rectify the situation, suggesting they either approved of or turned a blind eye to his allegedly unconstitutional treatment," was sufficient to establish personal responsibility and deny those defendants summary judgment).

# IV.
## Conclusion

The Court is deeply troubled by what the evidence produced thus far in this action reveals about the constitutional guarantees to which all inmates at Wabash Valley, including ostensibly difficult ones such as Mr. Littler, are entitled. If Mr. Littler's version of events is even partially true—which several of the emails and other documents almost indisputably show it is—his constitutional right to be free from cruel and unusual punishment has been flagrantly ignored by several staff members at Wabash Valley, including by those at the highest levels of administration.

Not only are the facts of this case disturbing, so too are Assistant Superintendent Littlejohn's and State Defendants' counsel's conduct during this litigation. Prisoner litigation critically depends on defendants' and their counsel's honesty. Pro se prisoners face numerous barriers to effectively litigating their cases, including opposing summary judgment when they think the defendants are not being truthful. Thus for the Court to reach just results in these cases—several hundred of which are filed each year—the Court must be able to trust that defendants and their counsel are complying with their obligations to be truthful with the Court. Regrettably, cases like this erode that trust.

Emails Mr. Littler obtained after Assistant Superintendent Littlejohn declared under penalty of perjury that he did not give any orders regarding the incident in question directly contradict that sworn declaration. Had Mr. Littler not been a particularly tenacious pro se litigant, and received assistance from the Court with discovery, these emails would never have come to light and Assistant Superintendent Littlejohn may very well have been granted summary judgment.

As previously noted, "falsifying evidence to secure a court victory undermines the most basic foundations of our judicial system." *Secrease*, 800 F.3d at 402. Thus the Court treats perjury with the utmost seriousness. As the Seventh Circuit has explained, "[i]f perjury pays benefits

when it escapes detection, but has no cost when detected, there will be far too much perjury and the accuracy of judicial decisions will be degraded." *Rivera v. Drake*, 767 F.3d 685, 687 (7th Cir. 2014). A separate show cause order will issue to Assistant Superintendent Littlejohn, which will provide him the opportunity to show cause why serious sanctions should not be imposed.

A show cause order will also issue to the State Defendants' counsel who signed the relevant pleadings in this action. Rule 11(b) provides that when an attorney presents a filing to the Court, she or he certifies "that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances . . . (3) the factual contentions have evidentiary support." Even if counsel believed that Assistant Superintendent Littlejohn's declaration was true when she initially filed it (which could only be the case if her client was not truthful with her), she should have been alerted to the contradiction when she subsequently produced emails to Mr. Littler demonstrating as much. She did not withdraw the declaration at that time or take any corrective action. Instead, she pressed on, filing a reply brief that entirely ignored the emails and requested summary judgment for Assistant Superintendent Littlejohn, arguing there was "no evidence" that he knew correctional officers "were going to allegedly use excessive or inappropriate force" against Mr. Littler. Filing No. 180 at 4. This seems a clear violation Rule 11, and counsel will be provided an opportunity to explain why serious sanctions should not be imposed.

For the reasons explained above, the State Defendants motions for summary judgment are **denied** as to all defendants except David Smith, who is **granted** summary judgment given Mr. Littler's acknowledgement that he was not involved in the uses of force against him. Filing No. [88]; Filing No. [137]. Mr. Littler has requested counsel to assist him with this action, and the Court grants that request. The Court will attempt to recruit counsel for Mr. Littler and will permit recruited counsel to conduct further discovery prior to a settlement conference or trial. Mr.

Littler's motion to appoint counsel is **granted**.  Filing No. [182].  No partial final judgment shall issue at this time.

**IT IS SO ORDERED.**

Date: 9/13/2018

Hon. Jane Magnus-Stinson, Chief Judge
United States District Court
Southern District of Indiana

Distribution:

PHILLIP LITTLER
121098
WABASH VALLEY - CF
WABASH VALLEY CORRECTIONAL FACILITY - Inmate Mail/Parcels
Electronic Service Participant – Court Only

Jeb Adam Crandall
BLEEKE  DILLON  CRANDALL ATTORNEYS
jeb@bleekedilloncrandall.com

Jill Esenwein
INDIANA ATTORNEY GENERAL
jill.esenwein@atg.in.gov

Christopher Andrew Farrington
BLEEKE DILLON CRANDALL ATTORNEYS
drew@bleekedilloncrandall.com

Amanda Elizabeth Fiorini
INDIANA ATTORNEY GENERAL
Amanda.Fiorini@atg.in.gov