UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
TERRE HAUTE DIVISION

| | | |
|---|---|---|
| PHILLIP LITTLER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 2:16-cv-00472-JMS-DLP |
| | ) | |
| CHRISTOPER MARTINEZ, et al. | ) | |
| | ) | |
| Defendants. | ) | |

**Order Sanctioning Defendant Pamela Hagemeier and her Counsel, Jeb Crandall**

**I.**
**Introduction**

Plaintiff Phillip Littler is a state inmate incarcerated at the Wabash Valley Correctional Facility ("Wabash Valley"). He brought this action pro se, alleging that several correctional officers used excessive force against him and defendants Nurse Hagemeier and Corizon ("Medical Defendants") failed to adequately treat his injuries. The evidence is undisputed that the correctional officers twice sprayed Mr. Littler with chemical spray, shot him in the face with a pepperball gun, and then used a cell extraction team to remove him from a shower cell. Mr. Littler presented evidence that he suffered a head injury from the pepperball gun and repeated blows to the head, was bleeding from his mouth and nose, and that his nose and scapula may have been broken. Mr. Littler attests that despite his complaints, Nurse Hagemeier did not meaningfully assess his condition. Instead, he claims she only attempted to wipe away some of the blood from his nose and lip but quickly gave up when she realized it would take a significant amount of effort to properly clean his wounds.

The State Defendants (correctional officers and their supervisors at Wabash Valley) and the Medical Defendants moved for summary judgment on Mr. Littler's claims, but their motions

were denied. As to Nurse Hagemeier, the Court concluded that barely cleaning Mr. Littler's bloodied nose and lip after he informed her that he had been shot in the face with a pepperball gun and punched in the head is sufficient evidence for a jury to conclude that she was deliberately indifferent to a serious medical need.

In its Orders denying summary judgment, the Court expressed grave concerns regarding the truth of sworn statements submitted by defendants Nurse Hagemeier and the Assistant Superintendent Frank Littlejohn. Through Mr. Littler's persistence and court intervention, video evidence and emails were uncovered that cast serious doubt on the veracity of their sworn statements. The Court also expressed concerns regarding their respective counsel, Jeb Crandall and Amanda Fiorini. It appeared that both may have violated Rule 11 and their ethical obligations as officers of the Court. Four Show Cause Orders issued detailing the Court's concerns, and the Court recruited counsel to represent Mr. Littler. Two hearings were held at which the two defendants and their counsel testified. This Order concerns only Nurse Hagemeier and her counsel, Mr. Crandall.

The hearings regarding Nurse Hagemeier's and Mr. Crandall's conduct only increased the Court's concerns. Examining one of Nurse Hagemeier's falsehoods only uncovered several more. Not only did Nurse Hagemeier offer false testimony in multiple affidavits in support of her motion for summary judgment, she doubled-down at the hearing, repeatedly offering false testimony about the medical treatment (or lack thereof) she provided Mr. Littler. The Court finds that she was motivated at least in part out of animus toward Mr. Littler. For example, to cast Mr. Littler in a bad light and explain her lack of treatment, Nurse Hagemeier falsely insisted that Mr. Littler responded to an offer of treatment by telling her to "go to hell."

Mr. Crandall facilitated Nurse Hagemeier's falsehoods by falling woefully short of his ethical obligations and those under Rule 11 to ensure that he reasonably investigated whether the factual assertions he included in support of the motion for summary judgment had evidentiary support. Had he done so, Mr. Crandall would have known that Nurse Hagemeier's First Affidavit, and thus his motion for summary judgment, contained false statements.

If this were Mr. Crandall's only misstep, lesser sanctions would be appropriate. But things spiraled from there. When Mr. Littler, who was still proceeding pro se at this point, pointed out in his summary judgment opposition that video evidence in the record showed Mr. Crandall and Nurse Hagemeier had made false statements, Mr. Crandall ignored him. Instead of moving to withdraw Nurse Hagemeier's First Affidavit and correcting the false statement in his motion for summary judgment, Mr. Crandall filed a reply and a Second Affidavit from Nurse Hagemeier that repeated the falsehood and added more.

Mr. Littler's recruited counsel, Gavin Rose from the American Civil Liberties Union, made a closing statement at the hearing that perfectly captures the Court's concerns:

> There is probably no legal office in the state more aware than the three offices here of the full spectrum of pro se litigation, and particularly, inmate litigation. And I think everyone involved can probably agree that Mr. Littler is an exceptionally competent, exceptionally persistent litigant. And I . . . am confident in saying that is probably the Court's understanding as well.

> If I had filed a brief highlighting the exact same issues that Mr. Littler did in citing to the exact same record of evidence, I am hard-pressed to imagine that those issues would have been ignored and that we would have reached this . . . point in the proceedings. . . . [W]e are only here because of some perfect storm of an exceedingly competent pro se litigant and the Court's willingness to . . . take an active role in the discovery process and analyze the pro se pleadings and hundreds of pages worth of exhibits.

> And it is not at all difficult to imagine how under even slightly different circumstances, this case would be over, and judgment would have been awarded in favor of all Defendants.

Filing No. 235 at 118-19.

Mr. Rose's two most salient points are worth reiterating. First, only due to the "perfect storm" of Mr. Littler's litigation skills and the existence of video evidence of his medical treatment was the most egregious misconduct in this case uncovered. But for this "perfect storm," Mr. Rose is correct that the Court very easily could have granted the Medical Defendants' motion for summary judgment based on their litany of false evidence. By way of understatement, the Court is disturbed by this prospect.

In almost every prisoner civil rights case regarding medical care, defendants and their counsel know that the pro se plaintiff will only be able to rebut defendants' evidence with his own lay testimony and/or whatever evidence the defendants provide.[1] There are usually no depositions, and untestable or untested defense affidavits are almost always the foundation of a defense motion for summary judgment. Under these circumstances, it is paramount for the Court to be able to trust that the information and sworn statements provided by defendants are truthful. This case has shattered that trust.

Second, much of this could have been avoided had Mr. Crandall not dismissed Mr. Littler as a nuisance litigant. Mr. Crandall gave Mr. Littler's summary judgment opposition such short shrift that he failed to appreciate that Mr. Littler cited video evidence demonstrating that Nurse Hagemeier and Mr. Crandall had provided false testimony to the Court. This lack of appreciation is compounded by the fact that Mr. Crandall also missed the existence of genuine issues of material fact, thoroughly undermining the premise of his motion.

---

[1] In response to the misconduct uncovered in this case, the Court now requires certain initial disclosures in all prisoner civil rights cases, including documentary and video evidence. *See* Standard Pretrial Schedule, Exhibit A to this Order.

Unfortunately, this attitude is not unique to Mr. Crandall.  In the overwhelming majority of prisoner civil rights cases, defendants move for summary judgment regardless of whether there are genuine issues of material fact.  When pro se plaintiffs respond with evidence that creates a material dispute of fact, much of the time they are ignored.  Defendants then reply not by confronting plaintiffs' evidence, but by asking the Court to grant summary judgment based on *their* version of the disputed facts.  This is the very antithesis of the summary judgment standard.

It violates Rule 11(b)(2) for counsel to ask the Court to commit an obvious legal error, and counsel rarely make such a request when the plaintiff is not a pro se prisoner.  When defendants move for summary judgment or reply to their motion for summary judgment, there must be a good-faith basis to argue that summary judgment is warranted.  The defendants' approach is essentially "it can't hurt to ask.  It can.  Any frivolous motion[] [or] pleading . . . is subject to sanctions." *Meeks v. Jewel Companies, Inc.*, 845 F.2d 1421, 1422 (7th Cir. 1988).

The Seventh Circuit sounded a clear warning to defendants that the failure to take seriously the summary judgment standard is improper and sanctionable:

 [The defendant] seems to have based its litigation strategy on the hope that neither the district court nor this panel would take the time to check the record. Litigants who take this approach often (and we hope almost always) find that they have misjudged the court. We caution [the defendant] and other parties tempted to adopt this approach to summary judgment practice that it quickly destroys their credibility with the court.

This approach to summary judgment is also both costly and wasteful. If a district court grants summary judgment in a party's favor based on its mischaracterizations of the record, the judgment will in all likelihood be appealed, overturned, and returned to the district court for settlement or trial. This course is much more expensive than simply pursuing a settlement or trying the case in the first instance. Further, the costs incurred while engaging in these shenanigans stand a real chance of being declared excessive under 28 U.S.C. § 1927, even if the abusive party prevails at trial on remand. Risking such pitfalls in the hope of avoiding a trial is a dramatic miscalculation of the risks and rewards of each approach.

*Malin v. Hospira, Inc.*, 762 F.3d 552, 564-65 (7th Cir. 2014) (citation omitted). Despite the Seventh Circuit's warning, "these shenanigans" remain all too common in this District and are certainly present in this case.

In the end, the Court concludes that serious sanctions are warranted for Nurse Hagemeier's and Mr. Crandall's misconduct. But the big picture is also important. Hundreds of pro se prisoners file civil rights actions in this Court every year (over 700 in 2018) seeking to vindicate their constitutional rights. Some are successful, while others are not. In all of these cases, the Court cannot and will not treat filings and evidence submitted by pro se prisoners differently than that submitted by represented parties. Counsel litigating against pro se prisoners cannot either. Every time they do, it erodes the perception of equal justice under law that this Court and all attorneys should seek to promote.

The Court fears that no amount of judicial action can fully mitigate the harm done when defense counsel treats opposing pro se parties as second-class litigants or when counsel so ignores the standard of review on summary judgment as to demonstrate complete disrespect for the Court's and opposing party's time. This Order and the sanctions issued in it are a small but hopefully meaningful step toward halting this practice by deterring counsel litigating against pro se prisoners[2] from proceeding down the same ill-advised path.

## II.
## Legal Standards

### A.    Misconduct by Parties

"A district court has inherent power to sanction a party who has willfully abused the judicial process or otherwise conducted litigation in bad faith." *Secrease v. Western & Southern*

---

[2] While the Court is emphasizing pro prisoner cases due to the context of this case, warnings against specious summary judgment motions are just as applicable to non-prisoner litigation.

*Life Ins. Co.*, 800 F.3d 397, 402 (7th Cir. 2015); *see Montano v. City of Chicago*, 535 F.3d 558, 564 (7th Cir. 2008); *Greviskes v. Universities Research Ass'n*, 417 F.3d 752, 758-59 (7th Cir. 2005). This power "is permissibly exercised not merely to remedy prejudice to a party, but also to reprimand the offender and to deter future parties from trampling upon the integrity of the court." *Salmeron v. Enterprise Recovery Sys., Inc.*, 579 F.3d 787, 797 (7th Cir. 2009) (citation and quotation marks omitted).

The power of a district court to issue sanctions extends to "default judgments against defendants as well as to dismissals against plaintiffs." *Secrease*, 800 F.3d at 401. This power "should be used only when there is a record of delay [or] contumacious conduct . . . . In deciding what measure of sanctions to impose, the district court should consider the egregiousness of the conduct in question in relation to all aspects of the judicial process." *Greviskes*, 417 F.3d at 759 (citation and quotation marks omitted). District courts are required "to consider other sanctions before resorting to dismissal" or default judgment. *Rivera v. Drake*, 767 F.3d 685, 686 (7th Cir. 2014).

Perjury is "false testimony concerning a material matter with the willful intent to provide false testimony, rather than as a result of confusion, mistake, or faulty memory." *Montano*, 535 F.3d at 564 (citation and quotation marks omitted); *see id.* at 566 (noting that it is "almost always perjury" when "a witness [] knowingly lies about a material matter"). "A litigant's misconduct can justify default judgment, and perjury is among the worst kinds of misconduct." *Rivera*, 767 F.3d at 686. After all, "no one needs to be warned not to lie to the judiciary." *Ayoubi v. Dart*, 640 Fed. Appx. 524, 528-29 (7th Cir. 2016); *see Jackson v. Murphy*, 468 Fed. Appx. 616, 620 (7th Cir. 2012) (holding that "a warning to testify honestly [is] not required" because the plaintiff, "like any litigant, required no notification that he . . . must tell the truth when testifying in an affidavit").

Not only does false testimony undermine the truth-seeking function of the judiciary, but a party's "lies put the judicial system through . . . unnecessary work," *Rivera*, 767 F.3d at 686, which harms "honest litigants who count on the courts to decide their cases promptly and fairly," *Secrease*, 800 F.3d at 402.

**B.  Misconduct by Attorneys**

Three authorities governing the conduct of attorneys are relevant here.  First, Federal Rule of Civil Procedure 11(b) provides that when an attorney signs a filing presented to the Court, the attorney certifies "that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances . . .(2) the claims, defenses, and other legal contentions are warranted by existing law; [and] (3) The . . . factual contentions have evidentiary support . . . ."  Rule 11(c) authorizes the Court to sanction attorneys who violate this rule.

Second, 28 U.S.C. § 1927 authorizes the Court to sanction an attorney who "so multiplies the proceedings in any case unreasonably and vexatiously."  Sanctions are warranted under § 1927 "if the attorney has acted in an objectively unreasonable manner by engaging in a serious and studied disregard for the orderly process of justice . . . or where a claim [is] without a plausible legal or factual basis and lacking in justification."  *Lightspeed Media Corp. v. Smith*, 761 F.3d 669, 708 (7th Cir. 2014) (citation and quotation marks omitted).

Finally, the Indiana Rules of Professional Conduct,[3] Rule 3.3(a), states that "[a] lawyer shall not knowingly . . . (1) make a false statement of fact . . . to a tribunal or fail to correct a false statement of material fact . . . previously made to the tribunal by the lawyer."

---

[3] Local Rule 83-5(e) provides that "The Indiana Rules of Professional Conduct and the Seventh Circuit Standards of Professional Conduct . . . govern the conduct of those practicing in the court."

**C.      Standard of Review for a Motion for Summary Judgment**

A motion for summary judgment asks the Court to find that a trial is unnecessary because there is no genuine dispute as to any material fact and, instead, the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a). On summary judgment, a party must show the Court what evidence it has that would convince a trier of fact to accept its version of the events. *Gekas v. Vasilades*, 814 F.3d 890, 896 (7th Cir. 2016). The moving party is entitled to summary judgment if no reasonable fact-finder could return a verdict for the non-moving party. *Nelson v. Miller*, 570 F.3d 868, 875 (7th Cir. 2009). The Court views the record in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor. *Skiba v. Illinois Cent. R.R. Co.*, 884 F.3d 708, 717 (7th Cir. 2018). It cannot weigh evidence or make credibility determinations on summary judgment because those tasks are left to the fact-finder. *Miller v. Gonzalez*, 761 F.3d 822, 827 (7th Cir. 2014).

**III.**
**Nurse Hagemeier's Misconduct**

**A.      Show Cause Order**

The Court's Show Cause Order to Nurse Hagemeier provided:

> Nurse Hagemeier submitted a second declaration, sworn under penalty of perjury, which states that she was never told by Plaintiff Phillip Littler (or anyone else) that Mr. Littler had been shot in the face with a pepperball gun or otherwise beaten by correctional officers. Video evidence previously submitted to the Court, however, shows that these statements are most likely false. *See* Filing No. 93.

> The video shows correctional officers escorting Mr. Littler to the medical room where Nurse Hagemeier attests she was waiting for him while the cell extraction occurred. Although the interaction between Mr. Littler and Nurse Hagemeier cannot be seen, parts of their discussion can be heard (while other parts are more difficult to hear). Not long into their discussion, Mr. Littler clearly states, "I just want to tell you for the record, they shot me in the face three times, [and] punched me in the head several times. I didn't resist." *Id.*

> This video evidence likely shows that Nurse Hagemeier's sworn statement contains a false assertion of fact. Specifically, she attests in her second declaration that Mr. Littler "never told me he was shot in the face, beaten, or otherwise assaulted by officers." Filing No. 188-1 at 3.

Filing No. 197 at 1-2.

Nurse Hagemeier responded to the Court's Show Cause Order. *See* Filing No. 204. She stated that, after reviewing the video, she realized that her sworn statement was incorrect when she swore that Mr. Littler did not tell her he was shot with a pepperball gun or punched in the head. She explained that she believed her sworn statement to be true at the time she made it, but she simply had no recollection of Mr. Littler informing her of this. Nurse Hagemeier testified to the same during the hearing, stating that she simply "made a mistake." Filing No. 237 at 11.

In addition to her response, Nurse Hagemeier submitted a Third Affidavit.[4] In it, she seeks to "correct the sentence at issue in Paragraph 7 of my Second Declaration," by replacing her previous false statement with the statement that, "[v]ideo evidence establishes that Mr. Littler stated that he had been shot and punched in the face, but I do not recall Mr. Littler making this statement to me, even after watching the video footage." Filing No. 204-1 at 3.

## B.  Nurse Hagemeier Offered Knowingly False Testimony in Two Sworn Statements When She Stated that Mr. Littler Never Told Her He was Beaten or Shot in the Face with a Pepperball Gun

The Court does not find Nurse Hagemeier's testimony credible that she made an innocent mistake when she twice attested that Mr. Littler did not tell her about the cause of his injuries. Nurse Hagemeier knew Mr. Littler was presented to her for medical treatment after a cell

---

[4] Although Nurse Hagemeier's four sworn statements in this case are not sequentially titled, for clarity, the Court refers to them as follows: First Affidavit (Filing No. 78-1, filed with motion for summary judgment); Second Affidavit (Filing No. 188-1, filed with reply to motion for summary judgment); Third Affidavit (Filing No. 204-1, filed with response to the Show Cause Order); and Fourth Affidavit (Filing No. 231-1, filed with Motion to Correct record after the hearing).

extraction, and he clearly had at least a bloodied nose and mouth. He stated shortly after arriving at the nurse's station that "for the record" he was punched in the head and shot in the face with a pepperball gun. The Court further concludes that Nurse Hagemeier offered knowingly false testimony when she said she did not remember this.

Several aspects of Nurse Hagemeier's testimony reinforce this conclusion. Nurse Hagemeier claims she did not recall Mr. Littler's very specific allegation of excessive force that caused the injury she was supposed to treat, but she also claims to remember several other specific details of her interactions with Mr. Littler that were not documented in any medical record. *See, e.g.*, Filing No. 188-1 at 2 ("No officer ever told me what happened to Mr. Littler when I saw him."); Filing No. 188-1 at 3 ("When Mr. Littler came in, I asked him if he had any other injuries besides his face, and he said no. I examined the back of his neck and top of his shoulders to see if there were any bruises or red marks, and there were none."). The most salient example of Nurse Hagemeier's selective memory, as discussed further below, is her statement, "I asked Mr. Littler if he wanted to shower and if he wanted ice, and he said he wanted to go back to his cell and said, 'You can go to hell.'" Filing No. 188-1 at 3. It is much too convenient that Nurse Hagemeier remembered specific comments made by Mr. Littler that reflected poorly on him or justified a lack of treatment, but she failed to recall his very clear statement that was relevant to how she should examine and treat him.

Nurse Hagemeier also had reason to be dishonest. Foreswearing knowledge of the cause of Mr. Littler's injury allowed her to characterize the little treatment she gave him as adequate under the circumstances and, more specifically, allowed her to argue that she was not deliberately indifferent. Nurse Hagemeier's selective (and inaccurate) memory raised the Court's suspicion, and her lack of credibility during the hearing confirmed that the Court was right to be suspicious.

The Court finds that Nurse Hagemeier intentionally offered false testimony in her First Affidavit and Second Affidavit when she attested that Mr. Littler "made no complaints regarding being sprayed with chemicals or being shot with a pepper spray gun," Filing No. 78-1 at 4-5, and "never told me he was shot in the face, beaten, or otherwise assaulted by officers," Filing No. 188-1 at 3.

Nurse Hagemeier testified during the hearing that other than the lone falsehood pointed out in the Court's Show Cause Order, she had no concerns about the veracity of any other statements in her first two affidavits. Filing No. 237 at 11. As set forth below, she should have.

## C. Nurse Hagemeier Offered Knowingly False Testimony When She Stated that She Checked Mr. Littler's Pupil Reactivity for Signs of a Head Injury

In her Second Affidavit, Nurse Hagemeier attested that during her medical assessment of Mr. Littler she "checked to see if his pupils were reactive, which they were," and that "[i]f a patient cannot follow your finger with his eyes or answer questions appropriately, there may be a cognitive issue and I would have sent him to the infirmary." Filing No. 188-1 at 3. Nurse Hagemeier was questioned about this during the hearing. She reaffirmed that she examined his pupils' reactivity by having him follow her finger with his eyes and by using a Penlight. Filing No. 237 at 23. She testified that Mr. Littler did not require any assistance opening his eyes to complete these tests. Filing No. 237 at 23.

It was clear during the hearing that Nurse Hagemeier knew she was not truthful about this examination. The Court does not credit her testimony that she tested Mr. Littler's pupils for signs of a head injury. If her lack of credibility while testifying was not enough, several other factors confirm that Nurse Hagemeier was dishonest.

Nurse Hagemeier made no mention of testing Mr. Littler's pupils in her First Affidavit, even though she explained the encounter in some detail. *See* Filing No. 78-1 at 4-8. It was not until Mr. Littler argued in his response that Nurse Hagemeier failed to assess him for a severe head

injury that Nurse Hagemeier claimed, in her Second Affidavit filed with her reply, that she tested Mr. Littler's pupil reactivity. *See* Filing No. 188-1 at 3. Given that there is no mention of testing Mr. Littler's pupil reactivity in the medical records, *see* Filing No. 78-2 at 17, this at least raises the question why, if true, this was not included in the First Affidavit.

The video evidence, however, confirms that Nurse Hagemeier did not test Mr. Littler's pupils. The video shows Mr. Littler being escorted out of the nurse's station. As he is escorted through the door, he is ordered by one of the correctional officers to "stand there" and then "turn toward" him. Filing No. 93, 10:20-10:26. Mr. Littler responds, "I can't know where you're at right now." And it becomes immediately apparent why. Mr. Littler is turned toward the camera, which zooms in on his face. The video clearly shows that his eyes are swollen and remain tightly pressed shut. Filing No. 93, 10:28-10:36. The correctional officers begin slowly moving him again, and Mr. Littler states, "where am I going?" Filing No. 93, 10:36-10:40.

It is entirely unsurprising that Mr. Littler's eyes were swollen and pressed shut the entire time they are visible on the video, as Mr. Littler had just been sprayed twice with chemical spray and shot directly in the face with a pepperball gun. What would be surprising, to say the least, is if immediately before being escorted out of the nurse's station, Mr. Littler had his eyes sufficiently open such that Nurse Hagemeier could complete a pupil reactivity test.

Despite being shown this portion of the video during the hearing, Nurse Hagemeier refused to back away from her claim that she completed a pupil exam. When asked if it appeared on the video that Mr. Littler's eyes were swollen, Nurse Hagemeier responded, "Not that I could tell from that video." Filing No. 237 at 24. She was then asked whether she heard Mr. Littler respond to a correctional officer by saying, "I can't know where you are at," and she responded, "No." Filing No. 237 at 24. When pressed about how Mr. Littler was able to follow her finger during the alleged

pupil reactivity test, Nurse Hagemeier testified that "in the medication room he was standing erect. There was a lot more light, and I was talking to him one on one." Filing No. 237 at 24. These factors hardly, if at all, explain why Mr. Littler went from being able to complete a pupil reactivity exam to having his swollen eyes continuously pressed shut such that his small movements had to be directed by correctional officers. His eyes were not any less swollen or burning from the chemical simply because he was in more light or standing erect.

Nurse Hagemeier was asked whether the Second Affidavit is the only place she documented testing Mr. Littler's pupils, and she responded that she also documented it in an email sent later that day. Filing No. 237 at 26. Specifically, she pointed to the portion of the email where she stated his "[v]ital signs were within normal limits." Filing No. 181-1 at 270. She was then asked whether pupil reactivity was one of Mr. Littler's vital signs, and she responded "[y]es, part of his assessment, overall assessment." Filing No. 237 at 26.

This, of course, is not true. Corizon's own policies, which the Court required the Medical Defendants to submit after the hearing, do not define pupil reactivity as a vital sign. *See* Filing No. 234-1 at 3 (listing vital signs as pulse, respirations, blood pressure, temperature, and weight). Similarly, prison medical records do not include pupil reactivity in the "Vital Signs" portion of their standard medical records. *See, e.g.*, Filing No. 78-2 at 17.

Nurse Hagemeier may well have fabricated that she checked Mr. Littler's pupil reactivity because she was aware of Corizon's standard protocols for treating patients who present with a head injury or after a use of force and she knew she did not follow them. *See* Filing No. 234-1 at 18-21. Both protocols require nurses to perform several specific tests well beyond simply taking the patient's vital signs, very few of which Nurse Hagemeier performed. For example, a nurse is

supposed to evaluate the patient's Glascow Coma Scale,[5] which includes scoring their eye-opening response, verbal response, and motor response. Filing No. 234-1 at 18. Nurses are supposed to score these three areas again fifteen minutes later. Filing No. 234-1 at 18. Nurse Hagemeier simply failed to do this and many of the other tasks required by the protocols.

In the end, Nurse Hagemeier simply lied under oath when she stated in her Second Affidavit and testified during the hearing that she tested Mr. Littler's pupil reactivity. Rather than admitting this, Nurse Hagemeier offered increasingly far-fetched explanations in an attempt to cover up her initial false statement.

**D.** **Nurse Hagemeier Knowingly Offered False Testimony When She Stated that Mr. Littler Told Her, "You can go to Hell"**

As noted above, Nurse Hagemeier attested in her Second Affidavit that she asked Mr. Littler "if he wanted to shower and if he wanted ice, and he said he wanted to go back to his cell and said, 'You can go to hell.'" Filing No. 188-1 at 3. When questioned during the hearing about this, she again testified under oath that Mr. Littler said this to her. Filing No. 237 at 19-23. Her testimony that Mr. Littler said this to her lacked credibility. The Court finds that Nurse Hagemeier knew this was false both times she stated under oath that it occurred.

Even if the Court were unsure about Nurse Hagemeier's credibility (which it is not), her testimony regarding why the video did not capture Mr. Littler telling her to "go to hell" reveals the lengths she would go to in order to not admit she fabricated this statement. She testified that she is not confusing this interaction with another she had with Mr. Littler; that he told her to "go to

---

[5] According to the Mayo Clinic, the Glascow Coma Scale is a "15-point test [that] helps a doctor or other emergency medical personnel assess the initial severity of a brain injury by checking a person's ability to follow directions and move their eyes and limbs. The coherence of speech also provides important clues." *Diagnosis of a Traumatic Brain Injury*, Mayo Clinic, https://www.mayoclinic.org/diseases-conditions/traumatic-brain-injury/diagnosis-treatment/drc-20378561 (last visited Mar. 4, 2019).

hell" toward the end of the visit; and that he did so in his normal tone of voice. Filing No. 237 at 20-22. But the video captures their conversation at the end of the visit, and Mr. Littler says no such thing. Although one cannot make out every word of their conversation, it is clear enough to definitively conclude that Mr. Littler did not tell her to "go to hell." Yet Nurse Hagemeier testified under oath that it happened, even though she also acknowledged she did not listen for this statement in the video when she watched it and simply "do[esn't] know" why it cannot be heard. Filing No. 237 at 21-22.

Nurse Hagemeier's motivation for lying was clear: her animus toward Mr. Littler. In the midst of implausibly explaining how Mr. Littler went from speaking to her in a respectful and normal tone of voice to telling her to "go to hell" when she offered him a shower and ice, Nurse Hagemeier made a statement that encapsulates her entire view of the situation: "That is just offender Littler." Filing No. 237 at 22. While her meaning may not come across from the hearing transcripts, it was all too clear during the hearing. She believes Mr. Littler is simply a troublesome prisoner and thus less deserving of proper medical care, let alone honesty. Such a dismissive approach to honesty under oath is shocking, as is Nurse Hagemeier's attitude toward a patient under her care.

**E.** **Nurse Hagemeier's First Affidavit Was Based on the Knowingly False Statement That She Reviewed Medical and Other Records Before Signing It**

Nurse Hagemeier was asked early in the hearing what materials she reviewed prior to submitting her sworn statements in support of summary judgment. The following exchange occurred:

> Q.    Ms. Hagemeier, what, if anything, did you review prior to submitting your first affidavit in this case?
>
> A.    Nothing.

16

Q.      You didn't review Mr. Littler's medical records?

A.      No, no.

Q.      I am sorry.  You didn't . . . review the video evidence?

A.      No, sir.

Q.      You didn't review any e-mails you submitted on that date?

A.      No, sir.

Q.      You signed the entire affidavit from your memory?

A.      Yes.

. . . .

Q.      . . . [D]id you review anything prior to signing this second affidavit?

A.      No, sir.

Q.      Okay.  Can you explain your thinking in not reviewing Mr. Littler's medical record[s] before signing an affidavit concerning these interactions.

A.      Before the first one was signed, I no longer worked at the Wabash Valley Correctional Facility.

Q.      Okay.  At any point did you make a request of your attorneys to review any documentary evidence before signing your first or second affidavit?

A.      No, sir.

Filing No. 237 at 9-10.

As noted above, Nurse Hagemeier's First Affidavit began by attesting that "[t]he matters stated in this Affidavit are based on my personal knowledge . . . as well as a review of the patient's medical records and cell extraction records maintained by the Indiana Department of Correction ("IDOC").  True and correct copies of pertinent portions of the medical records and cell extraction records are attached to this Affidavit."  Filing No. 78-1 at 2.  Nurse Hagemeier explicitly stated during the hearing that this was false; she did not review anything and explained why.  Nurse

Hagemeier, of course, knew she had not reviewed these records when she signed the First Affidavit.

It is nearly impossible that this was a mere oversight on Nurse Hagemeier's part. As discussed in greater detail below, substantial portions of her First Affidavit are nothing more than a recitation of the medical records. *See, e.g.*, Filing No. 78-1 at 3 ("The patient's medical records show the following."). Moreover, Nurse Hagemeier details Mr. Littler's interactions with other medical staff at Wabash Valley about which she could not have personal knowledge and cites to the medical records in support of these attestations. *See, e.g.*, Filing No. 78-1 at 3 ("On October 28, 2015, [Mr. Littler] saw LPN Charlotte Holcomb after another use of force."). Whether due to laziness or a disdain for Mr. Littler and this process more generally, Nurse Hagemeier simply lied in her First Affidavit when she stated she reviewed the medical records, leaving the Court with a factual record on summary judgment that was mostly her counsel's own creation.

As discussed in further detail below, this reflects poorly not just on Nurse Hagemeier, but also Mr. Crandall. It also reveals how in a slightly different case—where there is no video evidence and the pro se prisoner is not as competent and tenacious as Mr. Littler—the Court could grant summary judgment based on false statements and counsel's recitation of medical records submitted through the affidavit of a medical defendant. The potential prejudice to the "just, speedy, and inexpensive determination" of pro se prisoner cases cannot be overstated. Fed. R. Civ. P. 1.

## IV.
## Nurse Hagemeier's Sanctions

The Court has the "inherent power to sanction a party who has willfully abused the judicial process or otherwise conducted litigation in bad faith." *Secrease*, 800 F.3d at 402. Nurse Hagemeier willfully abused the judicial process by providing false sworn statements in an attempt

to secure summary judgment in her favor. Any possibility that her false sworn statements were made inadvertently, rather than intentionally, vanished during the show cause hearing when she reaffirmed these lies and offered or revealed new ones. The Court is mindful of the jury's role as factfinder. But the Court's findings of fact here are part of the Court's inherent authority to ensure that parties are not willfully abusing the judicial process by using false evidence to secure an unjust victory. *See id.*

The Court considered sanctions short of entering a default judgment against Nurse Hagemeier but concludes that none of them are appropriate under the circumstances. For example, the Court considered making adverse factual findings against Nurse Hagemeier, such as that she knew Mr. Littler suffered from a serious head injury, or that she did not assess Mr. Littler for a serious head injury. But such factual findings are what the jury would almost certainly conclude from the video and other undisputable evidence. Thus, this hardly would amount to a sufficient sanction. *See Rivera*, 767 F.3d at 687 ("If perjury pays benefits when it escapes detection, but has no cost when detected, there will be far too much perjury and the accuracy of judicial decisions will be degraded.").

More importantly, such factual findings are an insufficient response to Nurse Hagemeier's repeated perjury. If the Court made adverse factual findings that did not essentially amount to judgment in Mr. Littler's favor, this would give Nurse Hagemeier the opportunity to testify at trial. The Court has no confidence that Nurse Hagemeier would testify truthfully to the jury, particularly given her testimony and demeanor during the hearing. A party who lies in an attempt to secure summary judgment and then lies under oath during a hearing about her misconduct does not deserve another opportunity to commit further perjury. *See Greviskes*, 417 F.3d at 759.

The seriousness of the situation also militates against monetary penalties as a sufficient sanction. A litigant who is repeatedly dishonest under oath even after being called to account for it may think a modest or even substantial monetary sanction is worth risking if their false testimony might avoid a substantial damages award at trial.

In the end, the Court concludes that entering a default judgment against Nurse Hagemeier is the appropriate sanction. This is both because it is the appropriate consequence for her pattern of lying under oath and because such a severe sanction is necessary to deter other parties from lying to the Court, especially defendants similarly situated with Nurse Hagemeier. *See Salmeron*, 579 F.3d at 797.

The Seventh Circuit has recognized that a "litigant's misconduct can justify default judgment, and perjury is among the worst kinds of misconduct." *Rivera*, 767 F.3d at 686; *see also Secrease*, 800 F.3d at 401 ("Dismissal can be appropriate when the plaintiff has abused the judicial process by seeking relief based on information that the plaintiff knows is false."). Moreover, ending a case "is an appropriate sanction for lying to the court in order to receive a benefit from it, because no one needs to be warned not to lie to the judiciary." *Ayoubi*, 640 Fed. Appx. at 528-29. A party like Nurse Hagemeier who not only lies to the Court, but when called to account for it, continues to lie under oath is deserving of the most severe sanctions. *See Greviskes*, 417 F.3d at 759 (affirming the dismissal with prejudice of the plaintiff's claims, explaining: "Rather than admit her initial wrongdoing to the district court, [the plaintiff] subverted the purpose of the evidentiary hearing by engaging in further fraudulent conduct"); *see also Secrease*, 800 F.3d at 402 (stating that sanctions short of dismissal "would not have been sufficient because the wrongdoing was so egregious and repeated").

This sanction is also necessary to adequately "deter future parties from trampling upon the integrity of the court." *Salmeron*, 579 F.3d at 797. As noted above, this is one of the few, if not only, prisoner civil rights cases before the undersigned where medical care was captured on video. In the overwhelming majority of pro se prisoner civil rights cases, the plaintiff's only evidence is his sworn version of events. Given this reality, if a just result is to be reached in these cases, it is paramount for defendants to be honest with the Court. Consequently, the need to deter parties from following the path Nurse Hagemeier charted here is evident, especially when so many defendants know there will be no evidence other than the testimony of a pro se prisoner to contradict their testimony in the vast majority of these cases.

"[F]alsifying evidence to secure a court victory undermines the most basic foundations of our judicial system." *Secrease*, 800 F.3d at 402. Although Nurse Hagemeier's efforts to achieve an unjust victory in this case were not successful, her false testimony imposed "unjust burdens on the opposing party, the judiciary, and honest litigants who count on the courts to decide their cases promptly and fairly." *Id.* The Court is keenly aware of how much time and effort has been spent unraveling the misconduct of parties and counsel in this case, and how this has penalized honest litigants with genuine disputes who await a ruling from the Court in their cases. The Court can only hope that this severe sanction will pay dividends by deterring similar conduct in the several hundred prisoner cases filed in this Court every year.

## V.
## Jeb Crandall's Misconduct

### A.      Show Cause Order

The Court's Show Cause Order issued to Mr. Crandall explained:

[T]he Court has grave concerns over whether the Medical Defendants' counsel, Jeb Crandall, submitted a sworn statement from Nurse Hagemeier that he knew or should have known contained a false statement. Such conduct implicates Rule 11

of the Federal Rules of Civil Procedure and the Indiana Rules of Professional Conduct.

. . . .

In support of the Medical Defendants' motion for summary judgment, Mr. Crandall submitted a second [affidavit], sworn under penalty of perjury, from Nurse Hagemeier. This sworn statement contains an assertion by Nurse Hagemeier that she was never told by Plaintiff Phillip Littler (or anyone else) that Mr. Littler had been shot in the face with a pepperball gun or otherwise beaten by correctional officers. Video evidence previously submitted to the Court, however, shows that these statements are most likely false. *See* Filing No. 93.

Filing No. 198 at 1-2. The Court ordered Mr. Crandall to show cause why he should not be sanctioned for violating Rule 11 and Indiana Rule of Professional Conduct 3.3(a) and explain "the reasonable inquiry under Rule 11 into the factual basis for Nurse Hagemeier's sworn statements prior to their filing." Filing No. 198 at 2.

In his response to the Show Cause Order and again during the hearing, Mr. Crandall acknowledged that the video evidence shows that Nurse Hagemeier's statement in her Second Affidavit that Mr. Littler did not tell her he was shot in the face or assaulted by correctional officers was false. *See* Filing No. 203 at 2. But Mr. Crandall contends he did not know it was false when he moved for summary judgment or filed his reply. This failure, he explains, was because he had not watched the video before submitting the Second Affidavit, as it was accidentally placed in the file for a different case brought by Mr. Littler. He did not think more of it because he assumed that only the use of force, not the subsequent medical treatment, would be on the cell extraction video. He and his firm have since instituted new policies to ensure this does not happen again.

Mr. Crandall states that he had several conversations with Nurse Hagemeier about the content of her affidavits, and her memory was corroborated by the medical records. Following the issuance of the Show Cause Orders to Assistant Superintendent Littlejohn and Ms. Fiorini, Mr. Crandall contacted Nurse Hagemeier to ensure that the information she was providing the Court

was accurate, and she assured him that it was. Because his investigations corroborated Nurse Hagemeier's recollections, Mr. Crandall believes he conducted the reasonable investigation required by Rule 11.

Mr. Crandall's testimony at the hearing was largely consistent with his response to the Show Cause Order. Unlike with Nurse Hagemeier, the Court does not have concerns that Mr. Crandall was dishonest during the hearing. Nevertheless, his conduct in this case and the content of his testimony have deeply disturbed the Court.

The Court focuses first on the specific issue identified in the Show Cause Order. Second, the Court discusses Nurse Hagemeier's acknowledgment during the hearing that she did not review any medical records and how Mr. Crandall handled that revelation following the hearing. Third, the Court turns to the troubling and unethical practice by defense counsel in this and many other prisoner civil rights cases of moving for summary judgment regardless of whether the motion has arguable merit. Although the Court was certainly aware of this improper practice prior to this case, this case has demonstrated just how entrenched the practice is.

## B. Mr. Crandall Failed to Comply with Rule 11's Requirement to Conduct a Reasonable Investigation Before Presenting Factual Contentions to the Court Both when He Moved for Summary Judgment and When He Filed his Reply

Mr. Crandall filed a motion for summary judgment on behalf of the Medical Defendants. In support of their motion, the Medical Defendants relied solely on Nurse Hagemeier's First Affidavit and medical and cell extraction records. Nurse Hagemeier attested as follows regarding her treatment of Mr. Littler on the day in question:

> [Mr. Littler] was extracted from the shower and had a swollen top and bottom lip. I noted his nose was raw, swollen, and bruised. I cleaned the areas, made a visual assessment, and took the patient's vitals. [Mr. Littler] was brought to medical and voiced no complaints. . . . [He] made no complaints regarding being sprayed with chemicals or being shot with a pepper spray gun.

Filing No. 78-1 at 4-5.

Mr. Crandall argued that Nurse Hagemeier was entitled to summary judgment because Mr. Littler did not have an objectively serious medical need and, even if he did, she was not deliberately indifferent to it. Regarding deliberate indifference, Mr. Crandall's argument was that Mr. Littler only presented with raw, swollen, and bruised lips and nose, which Nurse Hagemeier treated by performing a visual assessment, cleaning the wound, and taking Mr. Littler's vital signs. *See* Filing No. 77 at 13. No further treatment was necessary, Mr. Crandall argued, because Nurse Hagemeier attested that Mr. Littler "did not mention . . . being sprayed with chemicals or shot with a pepper spray gun." Filing No. 77 at 13.

We now know that Mr. Crandall's argument was predicated on the false statement of Nurse Hagemeier. Mr. Crandall acknowledged that he was aware there was video evidence in this case before he filed for summary judgment. *See* Filing No. 235 at 7-8. Had he viewed it, he would have known that the motion for summary judgment he intended to file was at least in part predicated on false testimony.

Nevertheless, Mr. Crandall argues that the totality of his investigation was reasonable and thus he did not violate Rule 11(b)'s requirement that his "factual contentions have evidentiary support" based on "an inquiry reasonable under the circumstances." This is, at best, unconvincing. Any reasonable inquiry into the facts of a case requires reviewing all the evidence in the case itself. Mr. Crandall's failure to review the video evidence provided to him based on an unexplained assumption that it did not contain evidence relevant to his client is not an inquiry reasonable under the circumstances. Furthermore, even if Mr. Crandall was right that the video only captured the cell extraction, he still should have watched it as part of his reasonable investigation into the facts

of the case. It at least could have showed the cause of Mr. Littler's injuries, which, as discussed in detail below, is often relevant to whether the medical treatment provided was adequate.

For this reason, Mr. Crandall violated Rule 11(b)(3) by presenting Nurse Hagemeier's false statement to the Court as a basis for granting summary judgment. Had this been Mr. Crandall's sole Rule 11 violation, the potential for sanctions would be greatly diminished. But Mr. Crandall's subsequent Rule 11 violation, which was the subject of the Court's Show Cause Order, is significantly worse.

Mr. Littler filed a comprehensive response to the Medical Defendants' motion for summary judgment. He disputed several aspects of the Medical Defendants' version of events with both his own sworn statements and numerous exhibits. His response included a subsection specifically disputing the Medical Defendants' argument that Nurse Hagemeier was not deliberately indifferent. In that section, he stated: "The defendants claim that the plaintiff 'had no complaints,' but this is blatantly untrue. The plaintiff clearly informed [Nurse] Hagemeier that he was shot in the face as soon as he was presented to her. See the D.V.D. record (State Defendants' exhibit A.)." Filing No. 181 at 21. As detailed above, the video to which Mr. Littler cites is just as he describes it. Mr. Littler can clearly be heard stating to Nurse Hagemeier, "I just want to tell you for the record, they shot me in the face three times, [and] punched me in the head several times. I didn't resist." Filing No. 93.

Mr. Crandall filed a reply on behalf of the Medical Defendants that completely ignored both Mr. Littler's sworn statement that he told Ms. Hagemeier he was shot in the face and punched in the head (which itself is competent evidence) and the video evidence to which he cited. Instead, he filed Nurse Hagemeier's Second Affidavit, which restates the demonstrably false claim that Mr. Littler "never told [her] he was shot in the face, beaten, or otherwise assaulted by officers." Filing

No. 188-1 at 3.[6] Mr. Crandall relied on this testimony in reply. He argued, among other things, that this evidence showed that Mr. Littler did not have a severe head injury and that Nurse Hagemeier was not deliberately indifferent to it. *See* Filing No. 188 at 6-7.

As determined above, Mr. Crandall violated Rule 11 by failing to review the video evidence before filing the motion for summary judgment. But his failure to review the video evidence after Mr. Littler cited to it and pointed out that it established that Nurse Hagemeier's sworn statement was false is a brazen disregard of Rule 11's requirements, not to mention Mr. Crandall's ethical obligations as an officer of the Court.

Mr. Crandall was questioned about these failures at the hearing. His responses only made matters worse. First, Mr. Crandall attempted to downplay the importance of Nurse Hagemeier's false statement to his legal arguments. He testified that what a patient reports regarding how an injury occurred is irrelevant to whether the patient receives proper medical treatment under the Eighth Amendment. *See* Filing No. 235 at 11 ("[T]he statement . . . about [Nurse Hagemeier] not being told that Mr. Littler was punched and shot in the face was really a nonessential statement to our defense, to our case."); Filing No. 235 at 14 ("[M]y defense of the nurse is based on, on what she did, her actions as opposed to what Mr. Littler may have told her during the assessment because the . . . mechanism of injury is . . . basically irrelevant as to how she treats the injury. . . ."); Filing No. 235 at 14 (agreeing that "how the injury occurred" was not "necessary for [his] argument . . . about why the medical care rendered was constitutionally adequate").

---

[6] As discussed further below, had Mr. Crandall watched the video with an eye toward examining whether any of Nurse Hagemeier's other sworn statements were false, he would have also realized she was not truthful when she said she "checked to see if [Mr. Littler's] pupils were reactive, which they were," and that Mr. Littler told her she could "go to hell." Filing No. 188-1 at 3.

One does not need to be a medical professional to know this claim of irrelevance is not credible. As an initial matter, Mr. Crandall relied on Nurse Hagemeier's false testimony that Mr. Littler never informed her he was shot in the face with a pepperball gun or otherwise assaulted to argue that Mr. Littler did not have a severe head injury and that Nurse Hagemeier was not deliberately indifferent to it. *See* Filing No. 188 at 6-7. Thus, Mr. Crandall thought the absence of such a complaint relevant to his legal argument at the time.

Moreover, when the undersigned pressed Mr. Crandall and Nurse Hagemeier at their hearings regarding the seemingly obvious proposition that a patient's report of the cause of an injury is relevant in determining the appropriate medical treatment, both agreed. *See* Filing No. 235 at 20 (Mr. Crandall, when asked if what Mr. Littler told Nurse Hagemeier regarding the cause of his injuries "doesn't matter . . . in terms of how she treated him," responded "[n]ot that it doesn't matter . . . but she doesn't treat what caused the injury"); Filing No. 237 at 30 (Nurse Hagemeier testifying that a "subjective statement from the patient about how his injury occurred" is a "partial piece of the assessment").

If the mechanism of an injury is relevant to determining the appropriate medical treatment, it can also be relevant to the legal question of whether a medical professional was deliberately indifferent to a serious medical need. This case presents a perfect example of why this obvious proposition is valid. Establishing deliberate indifference requires a plaintiff to "provide evidence that an official *actually* knew of and disregarded a substantial risk of harm." *Petties v. Carter*, 836 F.3d 722, 728 (7th Cir. 2016) (en banc). If Nurse Hagemeier was unaware that Mr. Littler was shot in the head with a pepperball gun or punched in the head—that is, if she had not known the cause of his injuries—there is at least a tenable argument that cleaning his facial wounds was sufficient to show that she was not deliberately indifferent to his medical needs. But if Mr. Littler

told her how his injuries occurred—as the video evidence establishes that he did—he has provided evidence that Nurse Hagemeier knew he could have a serious head injury and disregarded that risk by failing to adequately assess him. As discussed above, the potential for head trauma was the reason why Mr. Crandall submitted evidence from Nurse Hagemeier (which was also false) that she tested Mr. Littler for a serious head injury by testing his pupil reactivity. Nurse Hagemeier acknowledged in her Second Affidavit that if Mr. Littler had signs of a serious head injury, "there may be a cognitive issue and [she] would have sent him to the infirmary." Filing No. 188-1 at 3.

The Court is confident that Mr. Crandall, having litigated dozens of Eighth Amendment medical cases, knows the significance of a patient history. The fact that he downplayed his misconduct during the hearing by attempting to convince the Court that the false evidence he presented was not relevant to the legal question under review only raised doubts about whether he was as contrite as he otherwise appeared during the hearing.

Second, when asked why he did not even mention in his reply that Mr. Littler's response pointed to video evidence showing that Nurse Hagemeier was untruthful, Mr. Crandall described it as an "oversight," noting that that portion of Mr. Littler's response did not "jump out" to him. Filing No. 235 at 9-10. If an assertion that video evidence in the record shows that he and his client submitted false statements to the Court does not "jump out" to Mr. Crandall, he is either not reading the response at all or is skimming it with such little care he might as well have not read it at all.

Mr. Crandall's testimony shed some light on how he missed the significant evidence contained in Mr. Littler's response. The statement in Mr. Littler's response did not "jump out" to him, Mr. Crandall explained, because Mr. Littler's response "was 55-some pages of a handwritten brief." Filing No. 235 at 9. He repeated this again during cross-examination. Asked why "it

didn't jump out to you," Mr. Crandall answered, "Well . . . his 55-page handwritten response was fairly lengthy, obviously." Filing No. 235 at 13.

The message from Mr. Crandall was clear: Mr. Littler's lengthy handwritten pro se filing was a burden and, as such, too much trouble to carefully review. This perspective in untenable—especially from an attorney who well knows that many pro se prisoners have no avenue to attempt to vindicate their constitutional rights other than by submitting lengthy handwritten submissions to the Court.

First and foremost, the Court is certain that Mr. Crandall would not have been so dismissive of Mr. Littler's response and his obligation to carefully read it had Mr. Littler been represented by counsel. Much like Nurse Hagemeier, Mr. Crandall conveys that Mr. Littler, a pro se prisoner, is a nuisance and a less deserving litigant. But Mr. Crandall, and all those litigating against pro se parties, must understand that this Court does not share this view and will not accept it from counsel appearing before it. The undersigned, like all Judges of this Court, takes the judicial oath to "administer justice without respect to persons, and do equal right to the poor and the rich" with the utmost seriousness. 28 U.S.C. § 453. Abiding by this oath requires the Court to treat cases, filings, and evidence submitted by a pro se prisoner no differently than those filed by counsel.[7] The Court expects Mr. Crandall and any counsel litigating against pro se prisoners to do the same.

---

[7] Indeed, in certain respects, this Court must give pro se litigants leeway counseled litigants do not receive, *see Perez v. Fenoglio*, 792 F.3d 768, 776 (7th Cir. 2015) (holding that pro se pleadings must be construed "liberally" and held "to a less stringent standard than formal pleadings drafted by lawyers" (citation and quotation marks omitted)), and has discretion to take a more "flexible" approach to pro se litigants' compliance with procedural rules, *Gray v. Hardy*, 826 F.3d 1000, 1004-05 (7th Cir. 2016) (holding that district courts are not required to hold pro se litigants to the potential consequences of their failure to comply with the Local Rules and can instead take "a more flexible approach," including by ignoring the deficiencies in their filings and considering any evidence they submit).

Second, the Court is not sympathetic to the notion that an opposing attorney is excused from noting a critical passage in a response because it was handwritten and lengthy. As noted, Mr. Littler does not have access to a word processor. And in any event, as the Court noted in rejecting Mr. Crandall's request that Mr. Littler's response be stricken because it was longer than permitted by the Local Rules, "many of the handwritten pages in his response contain significantly fewer words than a page typed on a word-processor would. Thus, it is likely his 52-page response brief is not much longer than a typed 35-page brief, if at all." Filing No. 195 at 4.

Moreover, pro se prisoner litigation makes up an ever-increasing proportion of this Court's docket. In 2018, more than 700 prisoner civil rights cases and 600 habeas cases were filed in this Court, almost all of which were filed by prisoners proceeding pro se. The undersigned was assigned, respectively, 137 and 128 of those cases. Yet this Court read Mr. Littler's handwritten submissions in detail and examined all the evidence he presented in the same manner it does in all cases. Mr. Crandall and all opposing counsel are expected to do the same.

Third, the first two points are all the more salient when one considers that a substantial portion of Mr. Crandall's work in this Court is defending actions brought by pro se prisoners. He currently has several dozen such cases pending in this Court, and his firm has even more. The Court fears that he may be taking this same dismissive approach in this type of case. The Court's sanctions are hopefully an important step in ensuring he does not, as well as a warning for other attorneys practicing against pro se litigants to not follow this path.

Finally, the Court questions the degree to which Mr. Crandall has learned from his misconduct in this case. Mr. Crandall's first response to the question of what he would do differently if he could do it all over again was, "I would not put a statement in there . . . where it is a nonessential factual contention. I would not include that." Filing No. 235 at 15. It is telling

that Mr. Crandall's first instinct was not to either (1) ensure that he reasonably investigated the facts before presenting them to the Court or (2) ensure that he carefully read and considered Mr. Littler's response and evidence cited therein. Instead, his first instinct was to regret that he presented false evidence not because it was false, but because he later determined that he did not need it to prevail. This suggests that Mr. Crandall does not fully grasp the specific misconduct that most concerns the Court, and the Court cannot be assured that similar misconduct will not occur in future cases.

In sum, Mr. Crandall violated Rule 11(b)(3) by failing to reasonably investigate whether his factual contentions in his motion for summary judgment and reply had evidentiary support. The latter violation is significantly more egregious given that Mr. Crandall submitted his reply after Mr. Littler had pointed to video evidence that established that Mr. Crandall's previous factual contention was false. Because the latter violation was the subject of the Show Cause Order issued to Mr. Crandall, the Rule 11 sanctions set forth below are those warranted based solely on this violation.

### C.    Mr. Crandall Violated Rule 3.3 of the Indiana Rules of Professional Conduct by Failing to Correct False Statements Nurse Hagemeier Presented to the Court

As discussed above, Nurse Hagemeier falsely stated in her First Affidavit that "[t]he matters stated in this Affidavit are based on my personal knowledge . . . as well as a review of the patient's medical records and cell extraction records maintained by the Indiana Department of Correction ("IDOC"). True and correct copies of pertinent portions of the medical records and cell extraction records are attached to this Affidavit." Filing No. 78-1 at 2. Thus, not only did Nurse Hagemeier make a false representation to the Court, but she her authentication of the medical records submitted in support of summary judgment was false. Perhaps recognizing how

striking this revelation was, after the hearing Mr. Crandall filed a "Motion to Correct Record" and a Fourth Affidavit from Nurse Hagemeier. *See* Filing No. 231.

Nurse Hagemeier's Fourth Affidavit provides that her previous statement that she reviewed medical records was "inaccurate." Filing No. 231-1 at 1. The remainder of her Fourth Affidavit explains this inaccuracy as follows: "Although I was provided with Mr. Littler's medical records and cell extraction records, I do not believe that I reviewed them before signing my Affidavit. I instead relied on my memory. I inadvertently did not notice this sentence in my Affidavit before signing." Filing No. 231-1 at 1.

But as discussed above, it is nearly impossible that Nurse Hagemeier only inadvertently overlooked a single sentence in this affidavit. Mr. Littler's response to the Motion to Correct Record is worth setting out at length, as it perfectly captures the absurdity of the proposition:

> Immediately after [Nurse Hagemeier's statement that she reviewed the medical records], the affidavit also purports to authenticate Mr. Littler's "medical records and cell extraction records." (Dkt. 78-1 at 2 [¶ 3] ["True and correct copies of pertinent portions of the medical records and cell extraction records are attached to this Affidavit as 'Exhibit A-1.'"]). It then *repeatedly* references the plaintiff's medical records. In paragraph 5, for instance, Nurse Hagemeier indicates that Mr. Littler's "allegations [in this lawsuit] are false and are refuted by the medical records." These records, according to Nurse Hagemeier, "show that the patient was examined and provided treatment after every cell extraction and use of force." (Dkt. 78-1 at 2-3 [¶ 5]). Paragraph 6 is prefaced with a statement that "[t]he patient's medical records show the following" before describing, with citations to Mr. Littler's medical records, an examination that took place in February 2015. (Dkt. 78-1 at 3 [¶ 6]). And paragraphs 7 through 23 of the affidavit—the *vast majority* of the affidavit—detail the plaintiff's interactions with Nurse Hagemeier and other medical staff, in each case relying on and specifically citing to excerpts from Mr. Littler's medical records. (Dkt. 78-1 at 3-7 [¶¶ 7-23]). This includes, of course, Nurse Hagemeier's statements concerning her interaction with Mr. Littler on December 27, 2015, which forms the basis of the plaintiff's claim against her in this action. (Dkt. 78-1 at 4-5 [¶ 11]).

> . . . .

> Nurse Hagemeier's explanation for the erroneous statement in her first affidavit—

that she "inadvertently did not notice this sentence in [paragraph 3 of her affidavit] before signing" (Dkt. 231-1 at 1 [¶ 4])—is simply implausible. After all, both Nurse Hagemeier and her counsel erroneously treat the concern as arising from the accuracy of a single sentence. Certainly one should hope that every sentence in a sworn statement would be reviewed by the affiant before its submission. But, that issue aside and as detailed above, not only did Nurse Hagemeier purport to authenticate the medical records attached to her first affidavit (and relied on extensively by the Medical Defendants in seeking summary judgment) but virtually the entirety of this affidavit consists of a recounting of the plaintiff's medical records; the asserted failure to notice a single introductory sentence does not remotely explain the existence of nearly five *pages* of sworn testimony concerning what the medical records contain.

Filing No. 232 at 1-2, 4-5.

Nurse Hagemeier's First Affidavit and the medical and cell extraction records that she purported to authenticate were the *only* evidence submitted in support of the Medical Defendants' motion for summary judgment. It follows, then, that the only evidence submitted in support of summary judgment were unauthenticated records, an affidavit riddled with false statements about what the medical records reveal, and other false statements outlined above.

The sequence of Nurse Hagemeier's failure to review the medical records and Mr. Crandall's attempt to correct her false statement that she reviewed them are a microcosm of their entire approach to honesty in this case: only admit something is false when specifically called to account for it, and then, only seek to correct the false evidence in the narrowest way possible. The entire endeavor to root out dishonesty in this case, at least with respect to the Medical Defendants, began when the Court raised a concern regarding the truth of a specific statement in Nurse Hagemeier's Second Affidavit. At this point, had she and Mr. Crandall taken the Court's concerns as seriously as they should have, they would have reviewed every sworn statement before the Court to ensure they were true. Instead, Nurse Hagemeier responded with a Third Affidavit saying the lone statement that troubled the Court was indeed false, but it was simply a mistake (which, as noted, the Court does not credit).

Then, at the hearing, it immediately became clear that she made another false statement in her First Affidavit (she had not reviewed the medical records that formed the basis of almost the entire affidavit) and multiple other false statements in her Second Affidavit. Again, had she and Mr. Crandall been as committed to honesty as they should be, they would have at minimum notified the Court that nearly the entire First Affidavit was false (because it was based on records she neither authenticated or reviewed), acknowledged that their summary judgment motion should never have been filed given that it was predicated on false statements and unauthenticated records, and requested to withdraw or correct *all* false evidence in the record. But they did not. They again attempted to excise only the specific false statement by way of a Fourth Affidavit, without at all recognizing the big picture—that almost the entirety of their summary judgment motion was predicated on evidence crafted by Mr. Crandall that Nurse Hagemeier did not review. The Court cannot allow parties and their counsel to only acknowledge their false statements when they are specifically recognized by the Court, and then only attempt to correct the false statements in the narrowest way possible.

Much more is expected from counsel practicing in this Court, and much more is required by the Indiana Rules of Professional Conduct. Rule 3.3 governs "Candor Toward the Tribunal," and states, among other things, that a lawyer shall not knowingly "fail to correct a false statement of material fact or law previously made to the tribunal." Mr. Crandall failed to make the required correction when he attempted to correct Nurse Hagemeier's First Affidavit in the narrowest way possible without acknowledging that nearly the entire factual basis for her First Affidavit (and therefore the Medical Defendants' motion for summary judgment) was undermined.

Mr. Crandall also violated his duty of candor to the Court when he failed to correct other sworn statements by Nurse Hagemeier in her Second Affidavit that the video evidence revealed

were false.  When asked at the hearing whether he had any concerns about Nurse Hagemeier's sworn statements other than the one identified by the Court, he responded, "no, there are not." Filing No. 235 at 11.  But, the record establishes that there should have been.

As discussed above, Nurse Hagemeier falsely stated in her Second Affidavit and again at the hearing that she checked Mr. Littler's pupil reactivity and that Mr. Littler told her to "go to hell."  Mr. Crandall's review of the video evidence should have certainly alerted him that the former was false (Mr. Littler's eyes were swollen and pressed shut and he could not see where he was going such that he needed to be guided by correctional officers).  He should have at least been suspicious that the latter was false (Nurse Hagemeier says Mr. Littler told her to "go to hell" toward the end of the visit, but the video reveals this is false).  But, again, rather than making a comprehensive assessment of his client's testimony and determining what aspects of it are false given the video evidence, Mr. Crandall proceeded in the most limited way possible—by attempting to correct only the specific false statements identified by the Court while ignoring her other false statements.  This also violated Rule 3.3(a) of the Indiana Rules of Professional Conduct.

Hopefully, this Order will serve to encourage Mr. Crandall to take his duty of candor to the Court much more seriously than he has in this case.  It is his obligation to ensure that he has reasonably investigated the factual contentions presented to the Court, and after such an investigation reveals he has made a false assertion of fact, it is his obligation to fully and frankly correct these false assertions *before* the Court points them out, not, as he has done here, only after the Court raises concerns.

**D. Mr. Crandall's Summary Judgment Practice in this Case Wholly Ignores the Movant's Burden on Summary Judgment and Violates Rule 11(b)(2) and 28 U.S.C. § 1927**

The worst of Mr. Crandall's conduct in this case was that outlined above—submitting false sworn statements to the Court when video evidence in his possession showed those statements were false. But there was no reason for things to have proceeded this far. Had Mr. Crandall taken Mr. Littler's response and evidence seriously—as he knows, or at least should know, the Court will—he would have recognized his error and reported it to the Court. Instead of doing so, he carelessly filed a reply that ignored the summary judgment standard and asked the Court to commit legal error.

As any attorney practicing in federal court, let alone an experienced one like Mr. Crandall, should know, summary judgment is only warranted when "there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law." *Scheidler v. Indiana*, 914 F.3d 535, 540 (7th Cir. 2019); *see* Fed. R. Civ. P. 56(a). In making this determination, the Court must view "the evidence in the light most favorable to the nonmovant and drawing all reasonable inferences in its favor." *Scheidler*, 914 F.3d at 540.

After Mr. Crandall moved for summary judgment, Mr. Littler filed a sworn response, meaning the Court must treat the attestations in the response as competent evidence. *See Rowe v. Gibson*, 798 F.3d 622, 627 (7th Cir. 2015) (holding that a pro se prisoner's attestations in his verified complaint and declarations constitute competent evidence at summary judgment and "must be credited"); *Dale v. Lappin*, 376 F.3d 652, 655 (7th Cir. 2004) ("By declaring under penalty of perjury that the [response] was true, . . . [the plaintiff] converted the [response], or rather those factual assertions in the [response] that complied with the requirements for affidavits specified in the rule . . . into an affidavit." (citation and quotation marks omitted)).

Before deciding whether to continue pursuing summary judgment by filing a reply, Rule 11 required Mr. Crandall to consider whether, in light of Mr. Littler's sworn response and the standards governing summary judgment, there was a non-frivolous basis to do so. He either did not consider this, or he considered it but included legally frivolous arguments in his reply anyway.

One example from the reply is illustrative.[8] Directly contrary to the summary judgment standard, Mr. Crandall asked the Court to find a disputed fact in Nurse Hagemeier's favor and grant her summary judgment: "Plaintiff asserts that . . . he told [Nurse Hagemeier] that he was shot in the face and that his whole body was sore. This is false." Filing No. 188 at 7 (citation omitted). Mr. Crandall then repeatedly cited to Nurse Hagemeier's Second Affidavit to demonstrate that Mr. Littler's sworn statement to the contrary was false.[9] *See* Filing No. 188 at 7-8.

Mr. Crandall knows that the summary judgment standard does not permit the Court to simply credit Nurse Hagemeier's version of events when it is directly disputed by Mr. Littler's evidence. To encourage the Court to do so violates Rule 11(b)(2) by presenting a "legal contention" that is not "warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law or for establishing new law," and also violates 28 U.S.C.

---

[8] Mr. Crandall's reply also moved to strike Mr. Littler's response and asked the Court to treat the Medical Defendants' evidence as undisputed based on Mr. Littler's violations of the Local Rules. But Rule 11 can be violated even if only a portion of a filing is legally frivolous. *See, e.g.*, *Senese v. Chicago Area I.B. of T. Pension Fund*, 237 F.3d 819, 826 n.3 (7th Cir. 2001) ("A litigant cannot expect to avoid all sanctions under Rule 11 merely because the pleading or motion under scrutiny was not entirely frivolous.").

[9] Too often medical records are also presented to the Court in prisoner civil rights cases as if they are an incontrovertible record of what occurred. Such strategy is meritless. If the plaintiff submits a sworn statement of his personal observation of something that occurred at a medical appointment—for example, what he told the medical professional or whether any assessment occurred—the absence of such evidence in the medical records does not somehow trump the plaintiff's evidence to the contrary. After all, in many of these cases, the medical record is created by a defendant and thus is of the same but no more value at summary judgment than the plaintiff's sworn statement of what occurred.

§ 1927 by pursuing summary judgment "without a plausible legal or factual basis" for doing so, *Lightspeed Media Corp.*, 761 F.3d at 708.

The Seventh Circuit roundly criticized a similar approach in *Malin*. Like the defendant in that case, Mr. Crandall "seems to have based [his] litigation strategy on the hope" that this Court would commit error. *Malin*, 762 F.3d at 564. Had the Court done so, "the judgment w[ould] in all likelihood be appealed, overturned, and returned to the district court for settlement or trial." *Id.* The Seventh Circuit warned: "[t]his approach to summary judgment is . . . costly and wasteful," and such "shenanigans stand a real chance of being declared excessive under 28 U.S.C. § 1927." *Id.* at 564-65.

This approach strikes the Court as particularly improper when litigating against pro se prisoners who face significant barriers to appeal. First, the pro se prisoner must know that an appeal is available and how to timely pursue it. Second, most pro se prisoners cannot afford the appellate filing fee, nor do they have the litigation skills necessary to demonstrate that there is an objective good-faith basis to appeal, which is required to proceed *in forma pauperis* on appeal. *See* 28 U.S.C. § 1915(a)(3); *Coppedge v. United States*, 369 U.S. 438, 445 (1962).

If Mr. Crandall (or any attorney) files a reply, the Court expects him to apply the proper standard of review to the facts and argue why his client is nevertheless entitled to summary judgment. If he cannot do so without asking the Court to clearly violate the summary judgment standards, Mr. Crandall should not file a reply. Again, doing so is both "costly and wasteful." *Id.* at 564. He should instead acknowledge that a genuine issue of material fact precludes summary judgment, move to withdraw his motion, and "pursu[e] a settlement or try[] the case in the first instance." *Id.*

This Order echoes the Seventh Circuit's concerns in *Malin* and serves as another warning to the Court's bar that this practice must stop. Mr. Crandall, however, already received such a warning only a year ago.

In *Warren v. Corizon, et al.*, 2:17-cv-00116-JMS-MJD, Mr. Crandall moved for summary judgment on the ground that the pro se prisoner plaintiff failed to exhaust his administrative remedies before filing suit. The plaintiff presented a sworn statement that the administrative remedy process was unavailable to him. Instead of acknowledging that obvious genuine issues of material fact existed that had to be resolved at a hearing, Mr. Crandall filed a reply pressing the legally frivolous argument that the Court can ignore a pro se party's sworn testimony when resolving a defendant's motion for summary judgment. The undersigned explained at length in *Warren* the "troubling pattern [it] has noticed in prisoner civil rights cases" where, among other things, the defendants move for summary judgment, the plaintiff responds with sworn testimony, and without confronting this evidence in reply, the defendants ask the Court to also ignore the evidence and enter summary judgment in their favor. *Warren v. Corizon, et al.*, 2:17-cv-00116-JMS-MJD, Filing No. 46 at 12. This pattern, the Court warned, "cannot continue." *Id.* Although sanctions were not issued in *Warren*, the Court's discussion was meant to warn Mr. Crandall and attorneys generally that they "must take their obligations under Rule 11, § 1927, and the Indiana Rules of Professional Conduct just as seriously when litigating against a pro se prisoner as they do in other litigation." *Id.*

But here we are again. In this case, Mr. Crandall took a slightly different path to the same unethical destination. Instead of making the legally frivolous argument he made in *Warren* that the Court should ignore the pro se prisoner's sworn statement, Mr. Crandall violated Rule 11 by either ignoring Mr. Littler's sworn response and the video evidence or, in the rare instance where

he addressed Mr. Littler's evidence in reply, asking the Court to conclude it was "false" because Nurse Hagemeier said so. Filing No. 188 at 7.

As in *Warren*, the Court has once again gone to great lengths to explain why this practice is unethical and will not be tolerated. Hopefully this will be the last time the Court has to make such a pronouncement.

## VI.
## Mr. Crandall's Sanctions

Rule 11 "requires counsel to read and consider before litigating." *Kennedy v. Schneider Electric*, 893 F.3d 414, 421 (7th Cir. 2018) (citation and quotation marks omitted). Mr. Crandall failed to do this before filing his reply. Specifically, he did not reasonably investigate the video evidence in his own possession before making false statements of fact to the Court. This violates Rule 11(b)(3).

Rule 11(c)(1) requires the Court to provide Mr. Crandall "notice and a reasonable opportunity to respond" before issuing sanctions under Rule 11(c). Mr. Crandall was provided this opportunity as to the specific Rule 11 violation identified in the Court's Show Cause Order and outlined above. Rule 11(c)(1) also mandates that, "[a]bsent exceptional circumstances, a law firm must be held jointly responsible for a violation committed by its partner, associate, or employee." As no such circumstances are present here, the Court will next determine the appropriate sanction for which Mr. Crandall and his firm will be responsible.

Rule 11(c)(4) provides that a "sanction imposed under this rule must be limited to what suffices to deter repetition of the conduct or comparable conduct by others similarly situated." Subsection (c)(4) also provides that permissible sanctions include "nonmonetary directives," "an order to pay a penalty into court" or an assessment of attorney's fees. The Court notes that, as discussed above, Mr. Crandall was warned by the undersigned about very similar conduct that

violated Rule 11 approximately a year ago, and "[r]ecidivism is relevant in assessing sanctions." *City of Livonia Employees' Retirement Sys. v. Boeing, Co.*, 711 F.3d 754, 762 (7th Cir. 2013).

Although the Court is deeply troubled by Mr. Crandall's Rule 11 violation, the Court's goal is not to punish Mr. Crandall for punishment's sake, but to deter him and other attorneys, especially those litigating against pro se prisoners, from violating Rule 11. The Court recognizes that Mr. Crandall and his firm have taken steps to ensure that they are appropriately handling video evidence so that it is properly filed. But, as detailed at length above, Mr. Crandall's misconduct runs much deeper than the misfiling of a video.

"The Supreme Court has stated that [Rule 11's] 'central purpose . . . is to deter baseless filings in district court and thus . . . streamline the administration and procedure of the federal courts.'" *Hahn v. Walsh*, 762 F.3d 617, 632 (7th Cir. 2014) (quoting *Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 393 (1990)). To accomplish this goal, the Court issues the following nonmonetary directive:

- Mr. Crandall and all attorneys at his law firm, BLEEKE DILLON CRANDALL, P.C., are **ordered** to submit a signed copy of the corresponding Rule 11 Compliance forms, attached as exhibits to this Order, any time they move for summary judgment or file a reply to a motion for summary judgment in any case in the United States District Court for the Southern District of Indiana for **one year** beginning on the date of this Order. Mr. Crandall is responsible for communicating this requirement to attorneys at his firm.

- Mr. Crandall is **ordered** to complete an at least six-hour applied professionalism continuing legal education course that has been accredited by the Indiana Commission for Continuing Legal Education within **six months** of the date of this Order. *See* Indiana Rules for Admission to the Bar and the Disciplinary of Attorneys, Rule 29. He shall file a notice to the Court immediately upon completion of this course.

Turning to 28 U.S.C. § 1927, this statute authorizes the Court to sanction an attorney who "so multiplies the proceedings in any case unreasonably and vexatiously," and states that such attorneys "may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct." Sanctions are warranted under

41

§ 1927 "if the attorney has acted in an objectively unreasonable manner by engaging in a serious and studied disregard for the orderly process of justice . . . or where a claim [is] without a plausible legal or factual basis and lacking in justification." *Lightspeed Media Corp.*, 761 F.3d at 708 (citation and quotation marks omitted). For the reasons discussed above, Mr. Crandall has acted in an objectively unreasonable manner by engaging in a serious disregard for the orderly process of justice. His conduct, at minimum, has required opposing counsel to prepare for and participate in a hearing regarding his misconduct. Accordingly,

- Mr. Crandall is **ordered** to pay Mr. Rose's attorney's fees and costs associated with Mr. Rose's preparation for and participation in the show cause hearings that can be attributable to Nurse Hagemeier's and Mr. Crandall's portion of the hearings. This includes attorney's fees associated with Mr. Rose's response to Nurse Hagemeier's Motion to Correct Record filed on January 16, 2019. Mr. Rose shall file a Petition setting forth his fees and costs within **fourteen days** of this Order, and Mr. Crandall may file a response, if any, to the Petition within **seven days** thereafter.

Finally, for the reasons discussed above, Mr. Crandall violated Rule 3.3(a) of the Indiana Rules of Professional Conduct by failing to correct false statements made to the Court by Nurse Hagemeier. In light of this and his numerous violations of Rule 11,

- Mr. Crandall is **ordered** to submit a copy of this Order to the General Counsels of all state bars where he is admitted to practice, or to the appropriate entity with jurisdiction over attorney discipline, within **seven days** of this Order. Mr. Crandall must simultaneously file a Report with this Court confirming he has done so, with copies of his submittals to the appropriate authorities attached.

## VII.
## Conclusion

Nurse Hagemeier made multiple false statements to the Court and a default judgment against her is the only appropriate sanction. Counsel failed to comply with his Rule 11 obligation: 1) to reasonably investigate whether the factual statements presented to the Court are true, and 2) to move for summary judgment only when there is a good-faith argument that the requisite legal standard can be met. When this misconduct is combined with a failure to meaningfully read and

consider the non-movant's response brief and evidence, the unethical and wasteful result is the submission of a meritless motion for summary judgment and reply containing a litany of false evidence in violation of both Rule 11 and 28 U.S.C. § 1927. These practices cannot continue, and increasingly severe sanctions will be warranted if they do. The Court can only hope that this Order and sanctions provide a sufficient deterrent to prevent a repeat of such conduct.

Mr. Littler's claim against Corizon shall proceed to trial. The Court will enter a default judgment against Nurse Hagemeier, leaving only the determination of damages. This action will be set for trial by separate order at a later date. Nurse Hagemeier's Motion to Correct Record, dkt. [231], is **granted** to the limited extent that all of Nurse Hagemeier's Fourth Affidavit is part of the record, as are all of her previous sworn statements.

**IT IS SO ORDERED.**

Date: 3/5/2019

Hon. Jane Magnus-Stinson, Chief Judge
United States District Court
Southern District of Indiana

Distribution:

PHILLIP LITTLER
121098
WABASH VALLEY - CF
WABASH VALLEY CORRECTIONAL FACILITY - Inmate Mail/Parcels
Electronic Service Participant – Court Only

Jeb Adam Crandall
BLEEKE DILLON CRANDALL ATTORNEYS
jeb@bleekedilloncrandall.com

Carol A. Dillon
BLEEKE DILLON CRANDALL, P.C.
carol@bleekedilloncrandall.com

Jill Esenwein
INDIANA ATTORNEY GENERAL
jill.esenwein@atg.in.gov

Christopher Andrew Farrington
BLEEKE DILLON CRANDALL ATTORNEYS
drew@bleekedilloncrandall.com

Amanda Elizabeth Fiorini
INDIANA ATTORNEY GENERAL
Amanda.Fiorini@atg.in.gov

Jonathan Paul Nagy
INDIANA ATTORNEY GENERAL
jonathan.nagy@atg.in.gov

Gavin Minor Rose
ACLU OF INDIANA
grose@aclu-in.org