UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
TERRE HAUTE DIVISION

PHILLIP LITTLER,                          )
                                          )
                    Plaintiff,            )
                                          )
         v.                               )          No. 2:16-cv-00472-JMS-DLP
                                          )
CHRISTOPER MARTINEZ, et al.               )
                                          )
                    Defendants.           )

**Order Sanctioning Defendants Frank Littlejohn, Justin Shroyer,
Mark Shroyer, Richard Yarber, Denver Smith, Richard Brown, Dusty Russell,
Amanda Pirtle, and Their Counsel, Amanda Fiorini**

**I.
Introduction**

Plaintiff Phillip Littler is a state inmate incarcerated at the Wabash Valley Correctional

Facility ("Wabash Valley"). He brought this action pro se, alleging that several correctional

officers and their supervisors ("State Defendants") were involved in the use of excessive force

against him and that Nurse Pamela Hagemeier and Corizon ("Medical Defendants") were

deliberately indifferent to his injuries. The correctional officers twice sprayed Mr. Littler with

chemical spray, shot him in the face and back with a pepperball gun, and then used a cell extraction

team to remove him from a shower cell after Mr. Littler refused to comply with a strip search. Mr.

Littler presented evidence that he suffered a head injury as a result from being shot in the face with

the pepperball gun and repeated blows to the head, that he was bleeding from his mouth and nose,

and that his nose and scapula may have been broken.

The defendants moved for summary judgment, but their motions were denied. As to the

State Defendants, the Court concluded that there were genuine disputes of material fact regarding

whether each use of force—the two applications of chemical spray, the pepperball gun, and the

force used by the cell extraction team—violated Mr. Littler's Eighth Amendment rights. As to the Medical Defendants, the Court concluded that there were genuine disputes of material fact regarding whether Nurse Hagemeier was deliberately indifferent to Mr. Littler's injuries.

In its Orders denying summary judgment, the Court expressed grave concerns regarding the truth of sworn statements submitted by defendants Nurse Hagemeier and Deputy Warden Frank Littlejohn. Through Mr. Littler's persistence and court intervention, video evidence and emails were uncovered that cast serious doubt on the veracity of their sworn statements. The Court also expressed concerns regarding their respective counsel, Jeb Crandall and Amanda Fiorini. It appeared that both may have violated Federal Rule of Civil Procedure 11 and their ethical obligations as officers of the Court. Four show cause orders issued detailing the Court's concerns, and the Court recruited counsel—Gavin Rose of the American Civil Liberties Union—to represent Mr. Littler.

Mr. Littler subsequently filed motions for sanctions against four additional State Defendants—Justin Shroyer, Mark Shroyer, Richard Yarber, and Denver Smith—contending that they also made false sworn statements. Ultimately, the Court held three sanctions hearings during which Nurse Hagemeier, four State Defendants, Mr. Crandall, and Ms. Fiorini testified under oath. State Defendant Justin Shroyer failed to appear at the hearing even though ordered to do so.

The Court already sanctioned Nurse Hagemeier and her counsel, Mr. Crandall, for their misconduct in this action.[1] *See* Filing No. 248. This Order discusses the appropriate sanctions for several of the State Defendants and their counsel, Ms. Fiorini. It also discusses whether discovery sanctions are warranted against State Defendants Warden Richard Brown, Deputy Warden Frank Littlejohn, Major Dusty Russell, and Captain Amanda Pirtle. Unfortunately, the

---

[1] The claim against Nurse Hagemeier and Corizon has since been settled and dismissed.

same troubling conduct by Nurse Hagemeier and her counsel is mirrored by the State Defendants' and their counsel, Ms. Fiorini.[2]

The hearings regarding the State Defendants' misconduct only increased the Court's initially raised concerns. As with Nurse Hagemeier, probing one of the State Defendants' falsehoods only led to more. Not only did four of the five State Defendants' offer false testimony in multiple declarations in a failed attempt to wrongfully obtain summary judgment, all five of the State Defendants continued offering false testimony during their depositions (if one was taken) and at the sanctions hearings, repeatedly offering what the Court finds to be false testimony about the events surrounding the three uses of force against Mr. Littler.

Like Mr. Crandall, Ms. Fiorini facilitated the State Defendants' falsehoods by falling woefully short of her ethical obligations and those under Rule 11 to reasonably investigate whether the factual assertions she included in support of the motion for summary judgment had evidentiary support. Had she done so, Ms. Fiorini would have known that the State Defendants had presented numerous false statements to the Court.

If this was Ms. Fiorini's only misstep, lesser sanctions would be appropriate. But things spiraled from there. When Mr. Littler, who was still proceeding pro se at this point, pointed out in his summary judgment opposition that video evidence in the record showed the State Defendants' declarations were false and that emails showed they had withheld preserved video evidence from him, Ms. Fiorini ignored him. She did not even acknowledge these statements, let alone withdraw the false statements and immediately seek out the video evidence she previously told the Court did not exist. Then, after the Court expressed serious concerns with multiple of the

---

[2] Due to this overlap, the Court borrows from and refers to the previous sanction order when appropriate.

State Defendants' sworn statements, Ms. Fiorini again passed on an opportunity to set this litigation on the proper path. Every State Defendant reaffirmed the truth of their sworn statements, even though video evidence revealed that some of their statements were indisputably false.

Mr. Littler's counsel made a closing statement at the end of one of the sanctions hearings that perfectly captures the Court's concerns. The Court quoted from it when sanctioning Nurse Hagemeier and her counsel, but it is worth repeating:

> There is probably no legal office in the state more aware than the three offices here of the full spectrum of pro se litigation, and particularly, inmate litigation. And I think everyone involved can probably agree that Mr. Littler is an exceptionally competent, exceptionally persistent litigant. And I . . . am confident in saying that is probably the Court's understanding as well.
>
> If I had filed a brief highlighting the exact same issues that Mr. Littler did in citing to the exact same record of evidence, I am hard-pressed to imagine that those issues would have been ignored and that we would have reached this . . . point in the proceedings. . . . [W]e are only here because of some perfect storm of an exceedingly competent pro se litigant and the Court's willingness to . . . take an active role in the discovery process and analyze the pro se pleadings and hundreds of pages worth of exhibits.
>
> And it is not at all difficult to imagine how under even slightly different circumstances, this case would be over, and judgment would have been awarded in favor of all Defendants.

Filing No. 235 at 118-19.

Mr. Rose's two most salient points cannot be repeated enough. First, only due to the "perfect storm" of Mr. Littler's litigation skills and the existence of video evidence was the most egregious misconduct in this case uncovered. But for this "perfect storm," Mr. Rose is correct that the Court very easily could have granted the State Defendants' motion for summary judgment based on their litany of false evidence. By way of understatement, the Court is disturbed by this prospect. The Court wonders in how many other actions such misconduct may have occurred.

Second, in almost every prisoner civil rights case, the State Defendants and their counsel know that the pro se plaintiff will only be able to rebut their evidence with his own lay testimony and whatever evidence they provide during discovery. Prisoners rarely are able to conduct depositions, and untestable or untested defense affidavits are almost always the foundation of a defense motion for summary judgment. Under these circumstances, it is paramount for the Court to be able to trust that the information and sworn statements provided by defendants are truthful. This case has shattered that trust.

Much of this could have been avoided had Ms. Fiorini not ignored Mr. Littler and his legitimate filings and concerns throughout this litigation. Ms. Fiorini gave Mr. Littler's summary judgment opposition such short shrift that she failed to appreciate that Mr. Littler had directly pointed out that she had submitted false evidence and made false representations to the Court regarding the preservation of video evidence. Many attorneys would be thankful for this; it would provide them an opportunity to correct their errors before the Court intervened. Instead, Ms. Fiorini just ignored Mr. Littler, not to mention his evidence that obviously created genuine issues of material fact.

Despite their gross misconduct, the State Defendants argue that a jury, not the Court, must determine whether they are truthful. This argument is clearly wrong as a legal matter—the Court has the inherent authority to sanction parties who willfully abuse the judicial process and commit perjury. But the argument is also perverse. By filing summary judgment motions predicated on blatantly false evidence, it was the State Defendants who tried to use false evidence to prevent *Mr. Littler* from presenting his claims to a jury.

The Court wishes this was an isolated case gone awry. Unfortunately, Ms. Fiorini's approach in this case is not unique, even setting aside the fact that she submitted false evidence.

In the overwhelming majority of prisoner civil rights cases, defendants move for summary judgment regardless of whether there are genuine issues of material fact. When pro se plaintiffs respond with evidence that creates a material dispute of fact, they are ignored. Defendants then reply not by confronting plaintiffs' evidence, but by asking the Court to grant summary judgment based on *their* version of the disputed facts. This is the very antithesis of the summary judgment standard.

It violates Rule 11(b)(2) for counsel to ask the Court to commit an obvious legal error, and counsel rarely make such a request when the plaintiff is not a pro se prisoner. When defendants move for summary judgment or reply to their motion for summary judgment, there must be a good-faith basis to argue that summary judgment is warranted. The defendants' approach is essentially "it can't hurt to ask. It can. Any frivolous motion[] [or] pleading . . . is subject to sanctions." *Meeks v. Jewel Companies, Inc.*, 845 F.2d 1421, 1422 (7th Cir. 1988).

The Seventh Circuit sounded a clear warning to defendants throughout the circuit that the failure to take seriously the summary judgment standard is improper and sanctionable:

> [The defendant] seems to have based its litigation strategy on the hope that neither the district court nor this panel would take the time to check the record. Litigants who take this approach often (and we hope almost always) find that they have misjudged the court. We caution [the defendant] and other parties tempted to adopt this approach to summary judgment practice that it quickly destroys their credibility with the court.

> This approach to summary judgment is also both costly and wasteful. If a district court grants summary judgment in a party's favor based on its mischaracterizations of the record, the judgment will in all likelihood be appealed, overturned, and returned to the district court for settlement or trial. This course is much more expensive than simply pursuing a settlement or trying the case in the first instance. Further, the costs incurred while engaging in these shenanigans stand a real chance of being declared excessive under 28 U.S.C. § 1927, even if the abusive party prevails at trial on remand. Risking such pitfalls in the hope of avoiding a trial is a dramatic miscalculation of the risks and rewards of each approach.

*Malin v. Hospira, Inc.*, 762 F.3d 552, 564-65 (7th Cir. 2014) (citation omitted). Despite the Seventh Circuit's warning, this practice remains all too common in this District and is certainly present in this case.

In the end, just as with Nurse Hagemeier and her counsel, serious sanctions are warranted for several of the State Defendants and Ms. Fiorini. But the big picture is also important. Hundreds of pro se prisoners file civil rights actions in this Court every year (over 800 in 2019) seeking to vindicate their constitutional rights. Some are successful, while others are not. In all of these cases, the Court cannot and will not treat filings and evidence submitted by pro se prisoners differently than those submitted by represented parties. Counsel litigating against pro se prisoners cannot either. Every time they do, it erodes the perception of equal justice under law that this Court and all attorneys should seek to promote.

The Court fears that no amount of judicial action can fully mitigate the harm done when defense counsel treats opposing pro se parties as second-class litigants or when counsel so ignores the standard of review on summary judgment as to demonstrate complete disrespect for the Court's and opposing party's time. This Order and the sanctions issued in it are a small but hopefully meaningful step toward halting this practice by deterring counsel litigating against pro se prisoners from proceeding down the same ill-advised path.

## II.
## Legal Standards

### A. Misconduct by Parties

"A district court has inherent power to sanction a party who has willfully abused the judicial process or otherwise conducted litigation in bad faith." *Secrease v. Western & Southern Life Ins. Co.*, 800 F.3d 397, 402 (7th Cir. 2015); *see Montano v. City of Chicago*, 535 F.3d 558, 564 (7th Cir. 2008); *Greviskes v. Universities Research Ass'n*, 417 F.3d 752, 758-59 (7th Cir.

2005). This power "is permissibly exercised not merely to remedy prejudice to a party, but also to reprimand the offender and to deter future parties from trampling upon the integrity of the court." *Salmeron v. Enterprise Recovery Sys., Inc.*, 579 F.3d 787, 797 (7th Cir. 2009) (citation and quotation marks omitted).

The power of a district court to issue sanctions extends to "default judgments against defendants as well as to dismissals against plaintiffs." *Secrease*, 800 F.3d at 401. This power "should be used only when there is a record of delay [or] contumacious conduct . . . . In deciding what measure of sanctions to impose, the district court should consider the egregiousness of the conduct in question in relation to all aspects of the judicial process." *Greviskes*, 417 F.3d at 759 (citation and quotation marks omitted). District courts are required "to consider other sanctions before resorting to dismissal" or default judgment. *Rivera v. Drake*, 767 F.3d 685, 686 (7th Cir. 2014).

Perjury is "false testimony concerning a material matter with the willful intent to provide false testimony, rather than as a result of confusion, mistake, or faulty memory." *Montano*, 535 F.3d at 564 (citation and quotation marks omitted); *see id.* at 566 (noting that it is "almost always perjury" when "a witness [] knowingly lies about a material matter"). "A litigant's misconduct can justify default judgment, and perjury is among the worst kinds of misconduct." *Rivera*, 767 F.3d at 686. After all, "no one needs to be warned not to lie to the judiciary." *Ayoubi v. Dart*, 640 Fed. Appx. 524, 528-29 (7th Cir. 2016); *see Jackson v. Murphy*, 468 Fed. Appx. 616, 620 (7th Cir. 2012) (holding that "a warning to testify honestly [is] not required" because the plaintiff, "like any litigant, required no notification that he . . . must tell the truth when testifying in an affidavit"). Not only does false testimony undermine the truth-seeking function of the judiciary, but a party's "lies put the judicial system through . . . unnecessary work," *Rivera*, 767 F.3d at 686, which harms

"honest litigants who count on the courts to decide their cases promptly and fairly," *Secrease*, 800 F.3d at 402.

## B.      Misconduct by Attorneys

Three authorities governing the conduct of attorneys are relevant here.  First, Federal Rule of Civil Procedure 11(b) provides that when an attorney signs a filing presented to the Court, the attorney certifies "that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances . . . (3) The . . . factual contentions have evidentiary support . . . ."  Rule 11(c) authorizes the Court to sanction attorneys who violate this rule.

Second, 28 U.S.C. § 1927 authorizes the Court to sanction an attorney who "so multiplies the proceedings in any case unreasonably and vexatiously."  Sanctions are warranted under § 1927 "if the attorney has acted in an objectively unreasonable manner by engaging in a serious and studied disregard for the orderly process of justice . . . or where a claim [is] without a plausible legal or factual basis and lacking in justification."  *Lightspeed Media Corp. v. Smith*, 761 F.3d 669, 708 (7th Cir. 2014) (citation and quotation marks omitted).

Finally, the Indiana Rules of Professional Conduct,[3] Rule 3.3(a), states that "[a] lawyer shall not knowingly . . . (1) make a false statement of fact . . . to a tribunal or fail to correct a false statement of material fact . . . previously made to the tribunal by the lawyer."

## C.      Standard of Review for a Motion for Summary Judgment

A motion for summary judgment asks the Court to find that a trial is unnecessary because there is no genuine dispute as to any material fact and, instead, the movant is entitled to judgment as a matter of law.  *See* Fed. R. Civ. P. 56(a).  On summary judgment, a party must show the Court

---

[3] Local Rule 83-5(e) provides that "The Indiana Rules of Professional Conduct and the Seventh Circuit Standards of Professional Conduct . . . govern the conduct of those practicing in the court."

what evidence it has that would convince a trier of fact to accept its version of the events.  *Gekas v. Vasilades*, 814 F.3d 890, 896 (7th Cir. 2016).  The moving party is entitled to summary judgment if no reasonable fact-finder could return a verdict for the non-moving party.  *Nelson v. Miller*, 570 F.3d 868, 875 (7th Cir. 2009).  The Court views the record in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor.  *Skiba v. Illinois Cent. R.R. Co.*, 884 F.3d 708, 717 (7th Cir. 2018).  It cannot weigh evidence or make credibility determinations on summary judgment because those tasks are left to the fact-finder.  *Miller v. Gonzalez*, 761 F.3d 822, 827 (7th Cir. 2014).

### III.
### Factual Background

The Court provides a brief factual background to give context for the State Defendants' false sworn testimony.  Much of this background is drawn from the video evidence presented during the sanctions hearings.[4]

At approximately 11:15 a.m. on December 27, 2015, Mr. Littler was moved by Justin Shroyer[5] and other correctional officers from his cell to the shower cell in the Custody Control Unit ("CCU").  Officer Denver Smith prepared the shower cell for Mr. Littler's arrival.  Justin Shroyer stated that he moved Mr. Littler to the shower cell in order to strip search him over concerns he possessed a cellular phone, while Mr. Littler maintains that the cellular phone

---

[4] Although the Court need not rely on this issue to conclude that sanctions are warranted, Mr. Littler persuasively demonstrated during the hearing that several of the State Defendants, including Justin Shroyer, have falsely testified regarding the timing of events on the day in question.  *See* Filing No. 328 at 11-14.  The Court agrees with Mr. Littler that the "timeline alone demonstrates the falsity of numerous aspects of the defendants' testimony" when it is compared to the video evidence presented.  Filing No. 328 at 11.

[5] The Court refers to the State Defendants by their titles and last names except for Justin Shroyer and his father, Mark Shroyer.

justification was a pretext so that Justin Shroyer could humiliate and degrade him by subjecting him to an unnecessary strip search. Mr. Littler refused to comply with the strip search, so over the next several minutes, different correctional officers, including Justin Shroyer, Captain Amanda Pirtle, and Officer Smith, approached the shower cell to discuss the situation with Mr. Littler.

Beginning at 11:53 a.m., Captain Pirtle and Deputy Warden Littlejohn discussed the situation via email (presented in reverse chronological order):

From: Pirtle, Amanda
Sent: Sun Dec 27 12:05:23 2015
To: Littlejohn, Frankie
Subject: RE: ICARSH inquiry
Importance: Normal

I love that. lol
From: Littlejohn, Frankie
Sent: Sunday, December 27, 2015 12:00 PM
To: Pirtle, Amanda
Subject: Re: ICARSH Inquiry
There is no min distance for the pepperball, correct? I'm in the giving mood so instead of the team lets shoot him. He has a history of weapons. We need to be very careful with him.

Sent from my iPhone

On Dec 27, 2015, at 11:53 AM, Pirtle, Amanda APirtie@idoc.IN.gov> wrote:
I have littler in the shower refusing to strip. He wants to take on the team. I am gonna wait for a while before doing anything. I won' t leave my mess for the next shift, but I refuse to take orders from an offenders.

Justin Shroyer first used chemical spray on Mr. Littler at 12:56 p.m. Lieutenant Yarber began briefing the cell extraction team approximately two minutes later, at 12:58 p.m. Less than a minute later, Justin Shroyer returned to the shower cell and deployed a second burst of chemical spray. Just over a minute later, Mark Shroyer approached the shower cell and immediately began firing pepperball rounds. He discharged ten rounds in quick succession, one of which struck Mr. Littler in directly in the face. Mark Shroyer attempted to discharge the remaining ten rounds, but the pepperball gun jammed.

Shortly after Mark Shroyer utilized the pepperball gun, Lieutenant Yarber directed the handheld camera, which was recording the cell extraction briefing, to be turned off. Recording

resumed more than twenty minutes later, at which time the cell extraction team approached the shower cell, entered the shower, and extracted Mr. Littler. Precisely what occurred within the shower cell cannot be seen, as the handheld camera was aimed directly at the back of a correctional officer.

## IV.
## Procedural History and Parties' Arguments

After the Court granted in part and denied in part Defendants' motions for summary judgment, the Court issued show cause orders to certain defendants and their counsel. The motions for summary judgment and the evidence submitted in support of them suggested that sanctionable misconduct may have occurred. The Court subsequently held three sanctions hearings. At the first, Deputy Warden Frank Littlejohn and his counsel, Mr. Fiorini, testified regarding their conduct, as did Medical Defendants' counsel, Jeb Crandall. Nurse Pamela Hagemeier testified at the second sanctions hearing. The Court previously issued an order sanctioning Nurse Hagemeier and Mr. Crandall. Filing No. 248.

Before the Court resolved whether sanctions were appropriate for Deputy Warden Littlejohn and Ms. Fiorini, Mr. Littler filed motions for sanctions against four additional State Defendants. These four defendants—Justin Shroyer, Mark Shroyer, Officer Smith, and Lieutenant Yarber—were ordered to testify at the third sanctions hearing. Despite having knowledge of the hearing date, time and place, Justin Shroyer failed to appear.

The Court ordered post-hearing briefing. This briefing was necessary given the significant evidentiary record, the vast array of sanctionable conduct before the Court, and the number of defendants subject to sanctions. It was, of course, the parties' opportunity to tie together the video and documentary evidence with the hearing testimony to put their best case forward for whether sanctions should issue. The Court permitted the parties to file oversized briefs of sixty pages (Mr.

Littler's opening brief), sixty pages (State Defendants' response brief), and thirty-five pages (Mr. Littler's reply brief). Dkt. 327 at 5. The Court emphasized that "it will review the appropriateness of sanctions for each defendant independently, thus the parties' briefs *must address each defendant's alleged misconduct individually*." *Id.* (emphasis added).

Mr. Littler's post-hearing brief spans sixty pages, includes hundreds of citations to the record and the State Defendants' hearing testimony, and, most importantly, analyzes each State Defendants' sanctionable conduct individually. Dkt. 328. The State Defendants' response is nine pages, five of which advance the argument that the individual State Defendants' false statements are not sanctionable because they are not material. Dkt. 331. It does not contain a single sentence addressing any of the individual State Defendants' misconduct, let alone meaningfully confront the substantial evidence of, and arguments regarding, the misconduct set forth in Mr. Littler's opening brief. The State Defendants' failure to follow the Court's instructions and failure to meaningfully confront whether sanctions are warranted in light of their hearing testimony amounts to waiver of any arguments against sanctions (save for the two, brief generalized arguments the State Defendants make, which are addressed below).

Given this, a succinct sanctions order relying on Mr. Littler's extensive recitation of the individual State Defendants' misconduct and the Court's assessment of their live testimony would be more than appropriate. Nevertheless, the Court endeavors to discuss each State Defendant's misconduct individually, with the supporting analysis that the serious matter of sanctions deserves. The State Defendants' failure to follow the Court's instructions or to meaningfully resist sanctions while maintaining that they have been honest and forthright during this litigation is merely their most recent troubling decision in a case littered with them.

First, the Court sets out each individual State Defendant's misconduct in turn. The Court then discusses what sanctions are appropriate given that misconduct. Next, the Court turns to Ms. Fiorini's misconduct. Finally, the Court discusses Mr. Littler's request for discovery sanctions against other State Defendants.

## V.
## Deputy Warden Frank Littlejohn's Misconduct

### A.    Summary Judgment Motion and Show Cause Order

Deputy Warden Littlejohn moved for summary judgment based, among other things, on the argument that he was not involved in the uses of force against Mr. Littler and that he had no notice excessive force had been or was going to be used against Mr. Littler. Filing No. 90. Deputy Warden Littlejohn submitted a sworn declaration in support of his motion for summary judgment, which included the following statement:

> 15.    I was not directly involved in the cell extraction on December 27, 2015. I did not order the cell extraction or participate in the cell extraction. The only order I issued was for Phillip Littler's cell to be inspected weekly for the safety and security of the facility.

Filing No. 88-2 at 3.

The Court denied Deputy Warden Littlejohn's motion for summary judgment and issued a show cause order. Filing No. 186. The show cause order, among other things, stated that Deputy Warden Littlejohn's above sworn statement appeared false given the following email:

14

From:: Pirtle, Amanda
Sent: Sun Dec 27 12:05:23 2015
To: Littlejohn, Frankie
Subject: RE: ICARSH Inquiry
Importance: Normal

I love that. lol
**From:** Littlejohn, Frankie
**Sent:** Sunday, December 27, 2015 12:00 PM
**To:** Pirtle, Amanda
**Subject:** Re: ICARSH Inquiry
There is no min distance for the pepperball, correct? I'm in the giving mood so instead of the team
lets shoot him. He has a history of weapons. We need to be very careful with him.

Sent from my iPhone

On Dec 27, 2015, at 11:53 AM, Pirtle, Amanda APirtle@idoc.IN.gov> wrote:
    I have littler in the shower refusing to strip. He wants to take on the team. I am gonna wait
    for a while before doing anything. I won't leave my mess for the next shift, but I refuse to
    take orders from an offenders.

Filing No. 174-1 at 6.

Deputy Warden Littlejohn responded to the Court's show cause order in three parts. *See*
Filing No. 191. First, he stated that he did not remember the email exchange with Captain Pirtle
when he submitted his declaration, as it occurred two years before he submitted his declaration, he
was not at the prison at the time it was sent, and he "typically has no involvement prior to any use
of force, including a cell extraction." Filing No. 191 at 2.

Second, Deputy Warden Littlejohn disagreed that the email shows his declaration was
false. He contended that he "did not intend his e-mail as an order to Captain Pirtle that Mr. Littler
be shot or that he be shot at point-blank range." Filing No. 191 at 2. Instead, he "believed Captain
Pirtle was simply asking for advice as to what she should do, and he gave her his recommendation."
Filing No. 191 at 2. He also asserted that the term "cell extraction" is a term of art that does not
include the use of a pepperball gun, thus his denial of involvement or participation in just the cell
extraction was not false. Filing No. 191 at 3.

Deputy Warden Littlejohn also stated that he was not aware of the email until his
recollection was refreshed by the Court's show cause order, as his counsel did not make him aware

of it when it was found during discovery. Nevertheless, he reconfirmed that all the statements in his declaration remain true. Filing No. 191 at 3.

In addition, Deputy Warden Littlejohn's declaration affirmatively stated that the "*only order*" he gave was for Phillip Littler's cell to be inspected weekly for the safety and security of the facility. Filing No. 88-2 at 3 (emphasis added). His directive to Captain Pirtle "lets shoot him," Filing No. 174-1 at 6, undermines that statement, and Deputy Warden Littlejohn's response to that challenge was that he was not giving an "order" in the email.

Deputy Warden Littlejohn's response is troubling. Instead of simply admitting that he made false statements in his declaration, he asks the Court to believe both that he was unaware of a critical email regarding the event when he signed his declaration (implying this was a simple mistake), and yet he argues that email does not change anything—his statements just so happened to be true if read in a highly technical manner.

Moreover, because Deputy Warden Littlejohn twice reaffirmed the truth of his declaration even after he was aware of the email, the Court need not delve into whether Deputy Warden Littlejohn was aware of the email when he signed his declaration. Deputy Warden Littlejohn passed on the opportunity to amend or withdraw his declaration even after he was aware of the email, so he has assured the Court his statements in the declaration are true. Unfortunately, they are not.

**B.**    **Deputy Warden Littlejohn Falsely Stated in His Declaration That He Was Not Directly Involved in the Cell Extraction**

On their face, it is difficult to square Deputy Warden Littlejohn's sworn statements that he was "not directly involved" in, did not "order," and did "participate" in the cell extraction with his email exchange with Captain Pirtle. This email was specifically about how to remove Mr. Littler from the shower cell. Filing No. 174-1 at 6. And Deputy Warden Littlejohn responded, "I'm in a

16

giving mood so instead of the team let's shoot him." Filing No. 174-1 at 6. His attempts during the hearing to explain how his sworn statements remained true despite the content of his email exchange lacked credibility.

His primary contention is that the term "cell extraction" is a term of art that does not include use of pepper spray or the pepperball gun. It is, at minimum, highly suspect that only now does Deputy Warden Littlejohn attest that "cell extraction" is a term of art referring only to the use of the cell extraction team and does not include the use of chemical spray or the pepperball gun. Urging this narrow reading allows him to argue that his sworn statements—that he was not "directly involved" and did not "participate" in the "cell extraction"—are accurate. However, this is not how either Deputy Warden Littlejohn or his counsel used the term in his declaration or summary judgment brief.

Three different uses of force were at issue in this case—the use of chemical spray, a pepperball gun, and the physical removal of Mr. Littler from the shower by the cell extraction team—but in his declaration Deputy Warden Littlejohn only disclaims direct involvement or participation "in the cell extraction." Filing No. 88-2 at 3. His counsel, after acknowledging the other uses of force, states only that "Defendant[] Littlejohn . . . did not witness or participate in the cell extraction." Filing No. 90 at 5. If "cell extraction" as used in his declaration did not include the two earlier uses of force, Deputy Warden Littlejohn could not have moved for summary judgment on all of Mr. Littler's claims. But he did, which shows that he and his counsel construed the term "cell extraction" as broader than just the use of the cell extraction team. Indeed, Deputy Warden Littlejohn answered in the affirmative when asked whether he knew his declaration would be used to argue he was "not involved, not only in the cell extraction process, but in the deployment of the PepperBall system[.]" Filing No. 235 at 80. Deputy Warden Littlejohn only urged this

narrower reading of the term when the critical email came to light that was inconsistent with his declaration.

Moreover, even if the Court accepts Deputy Warden Littlejohn's narrow definition of "cell extraction," his declaration is at least extremely misleading, if not simply false. Again, Deputy Warden Littlejohn states in his response he "does not view the use of a Pepperball gun as part of the 'cell extraction' because the person using the Pepperball gun is not on the actual cell extraction team." Filing No. 191 at 3. But this attempt to draw a clear line between the use of the pepperball gun and the cell extraction team ignores that the critical email exchange discussed both. Captain Pirtle wrote that Mr. Littler wanted to "take on" the cell extraction team, and Deputy Warden Littlejohn decided that "*instead of the team* let's shoot him." Filing No. 174-1 at 6 (emphasis added). This shows that Deputy Warden Littlejohn was consulted about using the cell extraction team, and he decided to use the pepperball gun first, "instead of the team." Thus, the email exchange was not solely about using the pepperball gun, it was about using it before the cell extraction team was used. In fact, the initial email from Captain Pirtle was *only* about the cell extraction team, and it was Deputy Warden Littlejohn who first raised using the pepperball gun. Given this, his sworn statement that he was "not directly involved in the cell extraction" and that he did not "order" or "participate in the cell extraction" is at least misleading. He *was* "directly involved" and "participate[d]" in the use of the cell extraction team in that a subordinate officer asked him whether it should be used, and he decided it should not, at least until the pepperball gun was.[6]

---

[6] Notably, Deputy Warden Littlejohn's testimony during the hearing suggests he knew the cell extraction team would be used either way. *See* Filing No. 235 at 114 ("[R]egardless of what you do, [Mr. Littler] is going to take on the team anyway."); *see also id.* at 75 ("Obviously, not too much works with Littler.").

In the end, it appears that Deputy Warden Littlejohn and his counsel, Ms. Fiorini, tied themselves in linguistic knots so they could argue that no false statements were made. Their semantic arguments are implausible and lacked credibility during the hearing. But even if accepted, they still fail to show that Deputy Warden Littlejohn was truthful with the Court. Rather than doing so, his response and testimony during the hearing show what little regard he and Ms. Fiorini have for their obligation to tell the truth. Such a continued pattern of dishonesty, even after being called on it, supports serious sanctions.

## C. Deputy Warden Littlejohn Falsely Stated in His Declaration that the Only Order He Issued Related to Searches of Mr. Littler's Cell

As noted, Deputy Warden Littlejohn further attested in his declaration that the "only order [he] issued was for Phillip Littler's cell to be inspected weekly for the safety and security of the facility." Filing No. 88-2 at 3. Deputy Warden Littlejohn contends that this remains true because his email to Captain Pirtle stating, "I'm in the giving mood so instead of the team let's shoot him," was merely a *recommendation* to a subordinate officer who was looking for advice. Filing No. 235 at 72-74. At best, this explanation strains credulity. And, Deputy Warden Littlejohn's demeanor at the hearing reveals that his explanation is simply false.

Again, Deputy Warden Littlejohn's subordinate officer sent him an email soliciting his input on what she should do about Mr. Littler, to which he replied, "I'm in the giving mood so instead of the team let's shoot him." Filing No. 174-1 at 6. The statement, "I'm in a giving mood," undoubtedly suggests that Deputy Warden Littlejohn is making the call that Mr. Littler should be shot with the pepperball gun before utilization of cell extraction team. After all, he stated that *he* was in a giving mood—meaning he is the one making the call.

Even if he only meant it as a suggestion, for him to argue that his sworn declaration remains true is, again, semantics. Swearing that the "only order" he gave was unrelated to the incident in

question without mentioning that he gave a "recommendation" to a subordinate officer—again, when he knew the declaration would be used to support his argument at summary judgment that he had no involvement in this incident—is extremely deceptive, so much so that one can only conclude that it is calculated to convince the Court of a version of the events that is not true.

**D.**     **Deputy Warden Littlejohn Reiterated the False Declaration Statements during the Sanctions Hearing and Offered Implausible Justifications for Those Statements**

Deputy Warden Littlejohn responded to the Court's show cause order and testified during the sanctions hearing that he stands by the statements he made in his declaration. *See* Filing No. 191 at 3; Filing No. 235 at 70. This is baffling. It is clear that Deputy Warden Littlejohn knew that his declaration was problematic, if not simply false, at the sanctions hearing. Yet when pressed at the hearing, he refused to directly acknowledge it.

For example, when asked whether he was involved in the incident—instead of saying no, which is what his declaration states but the email shows is false—Deputy Warden Littlejohn consistently returned to the justification that his declaration was signed two-and-a-half years after the incident. *See, e.g.*, Filing No. 235 at 77 ("I acknowledge I sent that e-mail . . . , but at the time I answered that, which was two and a half years later . . . So when I [signed my declaration], typically I have zero involvement, . . . [s]o I truthfully believed that that was the truth."). His constant switching between this justification (that he did not remember the email when he signed his declaration so he sincerely believed it was true when he signed it) and his other justifications discussed above (that if read in an unnatural and technical way, the declaration remains true) makes both justifications appear to be post hoc rationalizations for false statements.

When Deputy Warden Littlejohn was asked by his counsel what, in hindsight, he would have done differently, Deputy Warden Littlejohn testified: "I guess I would search my e-mails to make sure that there was no direct involvement." *Id.* at 105. This response reveals that Deputy

Littlejohn is well aware that the email shows he was directly involved in the incident and thus his declaration is false. Yet his insistence on repeatedly reaffirming that his declaration is true underscores how unwilling Deputy Warden Littlejohn is to simply state he made a mistake and, worse still, shows a continued lack of candor with the Court.

Finally, Deputy Warden Littlejohn's demeanor during the hearing only confirmed was what seemingly apparent from the substance of his testimony: that his declaration was false, and rather than admitting he simply made a mistake by submitting a false sworn statement to the Court, he doubled down. This was the worst path to choose, and is worthy of signification sanctions.

## VI.
## Justin Shroyer's Misconduct

### A.    Summary Judgment Motion, Deposition, and Motion for Sanctions

Justin Shroyer moved for summary judgment on Mr. Littler's excessive force and failure to intervene claims, arguing among other things that he utilized the chemical spray on Mr. Littler "in a good-faith manner to maintain or restore discipline," not "maliciously or sadistically to cause harm" and did not beat Mr. Littler or see other members of the cell extraction team doing so. Filing No. 137; Filing No. 138. As discussed further below, he submitted a sworn declaration setting forth the manner in which he used the chemical spray and led the cell extraction team. Filing No. 137-2. The Court denied Justin Shroyer's motion for summary judgment because there were genuine disputes of material fact regarding whether he used the chemical spray in a good faith effort to restore discipline or whether he used it maliciously to cause Mr. Littler harm, as well as disputes about whether members of the cell extraction team beat Mr. Littler while he was passive. Filing No. 184.

Following the denial of summary judgment, counsel for Mr. Littler deposed Justin Shroyer. Mr. Littler then filed a motion for sanctions against Justin Shroyer, arguing that he repeatedly

offered false testimony at various stages of this litigation. Filing No. 267. The Court ordered Justin Shroyer to appear and testify at the second sanctions hearing.

Justin Shroyer, however, failed to appear as ordered.[7] The Court issued a show cause order and Justin Shroyer responded offering various justifications for his absence. The Court concluded that his justifications "lacked credence" for several reasons. Filing No. 327 at 2. Specifically, Justin Shroyer had twice met with his counsel to prepare for the hearing, his counsel reminded him three days before the hearing that attendance was mandatory, and Justin Shroyer's father, Mark Shroyer, spoke with him the night before the hearing about "coming to court." *Id.* at 2. Moreover, Justin Shroyer's counsel attempted to reach him during the hearing and they reported that Justin Shroyer left them a message that he wanted counsel to call him, but their subsequent attempts to reach him during a recess failed. *Id.* at 3. The Court ultimately concluded that Justin Shroyer's failure to appear was not justified and he therefore "forfeited his opportunity to offer live testimony regarding the pending motion for sanctions against him." *Id.* at 4.

The Court deferred ruling on Mr. Littler's request that the Court make adverse inferences against Justin Shroyer until it ruled on the pending motion for sanctions. *Id.* In Mr. Littler's post-hearing brief, he renewed this request, suggesting that the Court should infer from Justin Shroyer's failure to appear that "he has no innocent explanation for . . . the instances of false testimony." Filing No. 328 at 40 n.21. The Court concludes that such an inference is appropriate given Justin Shroyer's clearly unjustified failure to appear at the sanctions hearing and, as outlined above, his failure to meaningfully respond to Mr. Littler's post-hearing brief.

---

[7] The Court notes that Justin Shroyer is no longer employed by the Indiana Department of Corrections.

**B.** **Justin Shroyer Falsely Testified that He Provided Mr. Littler an Opportunity to Submit to Restraints Before Spraying Mr. Littler with Chemical Spray**

Mr. Littler has outlined numerous false sworn statements made by Justin Shroyer throughout this litigation. *See* Filing No. 328 at 32-42. The Court agrees that Justin Shroyer has made a wide range of false sworn statements during this litigation. The Court focuses here on the most salient.

In his summary judgment declaration, Justin Shroyer attested to the following regarding his use of chemical spray:

> 5.    At approximately 12:45 p.m., I approached the shower door and ordered Offender Littler to comply with the strip search, but he refused.
>
> 6.    I then ordered Offender Littler to submit to the application of mechanical restraints, but he refused.
>
> 7.    In an attempt to gain compliance from Offender Littler, I utilized a burst of [chemical spray], but Offender Littler was not bothered by the chemical agent.

Filing No. 88-7 at 1. Like all the State Defendants, after the Court denied summary judgment, Justin Shroyer was given an opportunity to withdraw or amend his sworn declaration, but he declined to do so. Filing No. 190 at 5.

Whether or not Justin Shroyer gave Mr. Littler an opportunity to cuff up immediately before being sprayed is a potentially important fact in assessing whether the chemical spray was used in good faith to obtain compliance or maliciously to cause harm—that is, whether its use violated Mr. Littler's Eighth Amendment rights. *See Hudson v. McMillian*, 503 U.S. 1, 6 (1992). Notably, IDOC training materials state that such a warning should be given before *each* application of chemical spray. *See* Filing No. 257-1 at 72. Justin Shroyer is undoubtedly aware of this, which is likely why he adamantly insists he gave such warnings.

But the range video[8]—which was not disclosed until after Justin Shroyer submitted his declaration—demonstrates that he did not provide two such warnings to Mr. Littler. The range video, although it lacks audio, shows Justin Shroyer hastily approaching the shower cell from the side and immediately spraying Mr. Littler with the chemical spray. Hearing Ex. 1 at 12:56:07 – 12:56:09.[9] The time that passes from when Justin Shroyer appears on the video (when he is still around the corner from the shower cell) to when he sprays Mr. Littler is almost exactly two seconds. Hearing Ex. 1 at 12:56:07 – 12:56:09. This is simply an insufficient amount of time Justin Shroyer two give two different orders—to comply with the strip search and to submit to mechanical restraints—and receive two responses from Mr. Littler.

That Justin Shroyer failed to give any such warnings is only reinforced by the way his story changed when confronted with this video during his deposition. First, instead of two warnings, Justin Shroyer testified he gave a single, succinct order of "cuff up," to which Mr. Littler responded, "no." Filing No. 257-1 at 16. Second, instead of giving this order when he "approached the shower door," Justin Shroyer said he gave it when he "was entering the range." Filing No. 257-1 at 16.

Conveniently, this new version of events is at least plausibly consistent with the video (given that it lacks audio). But the Court does not accept it for two reasons. First, Justin Shroyer failed to appear at the sanctions hearing, which foreclosed further inquiry about why his story

---

[8] In fact, the range video was not disclosed until September 20, 2018. *See* Filing No. 190. The State Defendants subsequently located multiple other relevant videos from range cameras, which were produced to Mr. Littler's counsel on November 12, 2018. The Court refers to these videos collectively as the "range video."

[9] Citations to "Hearing Ex." reference exhibits introduced at the third sanctions hearing on June 27, 2019. Timestamps are provided when the exhibit is a video that includes timestamps, but not all videos in the record include them.

changed and, more importantly, prevented the Court from assessing his demeanor. Given his failure to appear at the hearing, the Court will not infer that this new version of events is accurate and the earlier an innocent mistake. This is especially appropriate given that, although Justin Shroyer's story changed during his deposition, he continued to stand by the truth of everything in his declaration. Filing No. 257-1 at 26. He cannot have it both ways.

Second, the reason Justin Shroyer says he would have given the order when "entering the range" rather than when he "approached the shower cell" is simply false. Justin Shroyer explained: "with [Mr. Littler's] previous history of assaulting staff with bodily fluids, if he knows that I'm coming, if you're going to stand there in front of him with [chemical spray] and utilize it, you're in an area right there where you're vulnerable to be spit on." Filing No. 257-1 at 16. But the range video shows Justin Shroyer (and other correctional officers) approaching the shower cell on several other occasions during the incident without any such concern. Hearing Ex. 2 at 4:53, 12:59, 16:00, 1:07:08. Justin Shroyer asks the Court to believe that he was concerned about assault with bodily fluids on the one occasion when it would help explain his newly developed version of events, but not during any of the other occasions he interacted with Mr. Littler that morning. This is clearly an after the fact justification that itself is false.

The foregoing shows that Justin Shroyer made false statements in his declaration that go directly to the question of whether he was entitled to summary judgment on Mr. Littler's Eighth Amendment claim regarding the chemical spray. When confronted with video evidence showing that his declaration statements were false, Justin Shroyer changed his story to align with the video evidence all while maintaining that his declaration remained true. This is the conduct of a litigant who does not take his duty to be honest with the Court seriously, and it is worthy of significant sanctions.

## VII.
## Mark Shroyer's Misconduct

**A.    Summary Judgment Motion, Deposition, and Motion for Sanctions**

Mark Shroyer moved for summary judgment on Mr. Littler's excessive force and failure to intervene claims, arguing that he deployed the pepperball gun "in a good faith effort to maintain or restore discipline," not "maliciously or sadistically" for the purpose of causing harm.  Filing No. 137; Filing No. 138.  As discussed further below, he submitted a sworn declaration attesting to these facts.  Filing No. 137-2.  The Court denied Mark Shroyer's motion for summary judgment because there were genuine disputes of material fact regarding whether he used the pepperball gun in a good faith effort to restore discipline or whether he used it to maliciously harm Mr. Littler. Filing No. 184.

On the date the Court issued the summary judgment order, the Court also issued show cause orders to Deputy Warden Littlejohn and the State Defendants' counsel, Ms. Fiorini.  Filing No. 185; Filing No. 186.  In the order directed to Ms. Fiorini, the Court expressed concern with the veracity of Mark Shroyer's declaration statement that Mr. Littler moved his face into the line of fire when Mark Shroyer was shooting the pepperball gun.  The Court suggested this explanation was "extremely implausible" given the evidence presented at summary judgment.  Filing No. 185 at 4-5. Ms. Fiorini was directed to discuss Mark Shroyer's declaration with him and move to withdraw or amend any false statements or to reaffirm that the declaration remains true.

Mark Shroyer maintained the accuracy of his declaration.  He stated: "[a]s will be proven at trial, the Pepperball incident report that Sergeant Mark Shroyer filled out is true, supported by evidence, and not 'implausible.'"  Filing No. 190 at 6.  As discussed further below, neither Mark Shroyer's declaration nor his Pepperball Incident Report are true.

Following the denial of summary judgment, counsel for Mr. Littler deposed Mark Shroyer. Mr. Littler then filed a motion for sanctions against Mark Shroyer, arguing that he repeatedly offered false testimony during his deposition regarding his knowledge of the use of the chemical spray and regarding his use of the pepperball gun. Filing No. 267. The Court ordered Mark Shroyer to appear and testify at the third sanctions hearing.

## B.    Mark Shroyer Falsely Testified Regarding His Use of the Pepperball Gun

Mr. Littler's post-hearing briefs raise several concerns about the veracity of Mark Shroyer's statements in his declaration, during his deposition, and during the sanctions hearing. Many of those are concerning to the Court, including the false statement in his declaration that he had "personal knowledge" that Mr. Littler was sprayed twice with chemical spray before he used the pepperball gun and his constantly shifting testimony about whether he (or someone else) collected unexploded pepperball rounds following the incident. But the Court focuses here on the most troubling—namely, Mark Shroyer's false statements regarding his use of the pepperball gun. These false statements were included in Mark Shroyer's declaration and relate to the core of Mr. Littler's Eighth Amendment claim.

The context in which Mark Shroyer used the pepperball gun is important. As discussed above, Deputy Warden Littlejohn told Captain Pirtle by email that he was in a "giving mood so instead of the team lets shoot [Mr. Littler]," and Captain Pirtle responded, "I love that. lol." Filing No. 174-1 at 6. Mark Shroyer was then ordered to use the pepperball gun on Mr. Littler, but contrary to policy, the use of the pepperball gun was not filmed via the handheld camera (although it was partially captured by the range camera). Filing No. 264-1 at 15. Mark Shroyer then used the pepperball gun in a manner inconsistent with IDOC policy, during which time Mr. Littler was

shot in the face. Mr. Littler has maintained throughout this litigation that Mark Shroyer intentionally did so. *See* Filing No. 173 at 2; Filing No. 174 at 34.

Mark Shroyer filled out a Pepperball Incident Report after he utilized the pepperball gun on Mr. Littler. In the narrative portion of the report, he wrote:

> I fired approximately five (5) rounds, impacting towards the ceiling of the shower. I began to fire three (3) pepperball rounds into back wall[] when the offender moved into the line of fire, striking him in the facial area. The offender turned his back towards me and I [] fired two (2) pepperball rounds[] impacting his back shoulder area. The pepperball weapon began to misfire after ten (10) pepperball rounds were impacted.

Hearing Ex. 10 at 779. Mark Shroyer also drew ten "x's" around a diagram of a person to indicate where he fired the pepperball rounds. He drew seven "x's" around the person's head, one directly on his face, and two on his back shoulders. *Id.*

Mark Shroyer's declaration in support of his motion for summary judgment also described his use of the pepperball gun. First, he attested consistently with his Pepperball Incident Report that he "fired approximately five Pepperball rounds, impacting towards the ceiling of the shower," when he "began to fire three Pepperball rounds into the back wall, . . . Offender Littler moved into the line of fire, striking him in the facial area," and he then fired "two Pepperball rounds" into Mr. Littler's "back shoulder area" before the pepperball gun "began to misfire." Filing No. 137-1 at 1. Next, he explained that he had "been trained to use the Pepperball weapon," and "[a]ll time[s] during this incident, [he] deployed the Pepperball rounds consistent with training and in a good-faith effort to restore order." Filing No. 137-1 at 2.

During his deposition, Mark Shroyer initially testified consistently with his Pepperball Incident Report and declaration. He stated that he fired the first five rounds in a semi-circle pattern over and around Mr. Littler's head. Filing No. 264-1 at 12. Then he testified that he began that pattern again with the sixth, seventh, and eighth rounds, and the eighth round struck Mr. Littler in

the face.  Filing No. 264-1 at 13.  But when pressed on the fact that this pattern would have made it difficult for Mr. Littler to move into the line of fire of the eighth shot, Mark Shroyer changed course, stating that the sixth and seventh shots may have been aimed at each side of Mr. Littler's head (making it more plausible that he moved into the line of fire for the eighth).  Filing No. 264-1 at 13-14.

As it turns out, both versions of events are false.  Video evidence—which only came to light *after* Mark Shroyer submitted his declaration—indisputably shows that the sixth and seventh rounds were aimed at a downward trajectory toward the floor or Mr. Littler's feet.  Hearing Ex. 2 at 1:00:25 – 1:00:30; *see also* Filing No. 328 at 28 n.12.  This completely undermines Mark Shroyer's facially dubious explanation that Mr. Littler moved into the line of fire of the eighth round—the round Mark Shroyer has twice sworn accidentally struck Mr. Littler in face.

The video evidence also shows that Mark Shroyer has been falsely reported his shooting pattern since the day of the incident.  The Pepperball Incident Report Mark Shroyer filled out that day reports that *all* of the shots were fired at or above Mr. Littler's shoulders.  Hearing Ex. 10 at 779.  And even when confronted with the range video during the sanctions hearing, which shows him firing the sixth and seventh shots at a downward trajectory, Mark Shroyer continued to testify that the Pepperball Incident Report was accurate.  Filing No. 323 at 120.

These inconsistencies are made all the more troubling by the fact that Mark Shroyer's declaration statement that he "deployed the Pepperball rounds consistent with training and in a good-faith effort to restore order" is patently false.  Filing No. 137-1 at 2.  IDOC policy and training requires officers to fire only four pepperball rounds at a time—one "volley"—and then wait *ten minutes* before firing another volley.  Filing No. 264-3 at 25; *see* Filing No. 257-1 at 15.  Officers are required to stop firing between each volley "to evaluate compliance."  Filing No. 257-

1 at 15.  Mark Shroyer fired ten rounds in approximately *ten seconds* and repeatedly made clear that he would have immediately fired all twenty rounds had the pepperball gun not jammed.  Filing No. 264-1 at 15.

Notably, Mark Shroyer continued firing even after Mr. Littler told him he was shot in the face, even though pepperball gun training teaches, and Mark Shroyer acknowledged, that officers are to "keep rounds away from the subject's head."  Filing No. 257-1 at 16; *see* Filing No. 264-1 at 14.  When asked during his deposition why he continued shooting after he struck Mr. Littler in the face, Mark Shroyer replied that Mr. Littler "still wasn't complying."  Filing No. 264-1 at 14.  Of course, the range video shows Mark Shroyer shooting so quickly that Mr. Littler had no opportunity to comply after being shot in the face.  Hearing Ex. 2 at 1:00:25 – 1:00:30.

In the end, it is clear that Mark Shroyer's Pepperball Incident Report was false, at least two aspects of his sworn declaration were false, and he offered false testimony during his deposition and during the sanctions hearing.  This continued pattern of dishonesty is worthy of serious sanctions, especially considering that Mark Shroyer relied on false statements in his declaration in an attempt to wrongfully obtain summary judgment and, despite multiple opportunities to correct his false statements, he continued making them.

## VIII.
## Denver Smith's Misconduct

### A.    Summary Judgment Motion, Deposition, and Motion for Sanctions

Officer Smith moved for summary judgment on Mr. Littler's excessive force and failure to intervene claims, arguing that he did not touch Mr. Littler during the extraction, see another officer use excessive force against Mr. Littler, or participate in the extraction other than recording the times the specific events occurred.  Filing No. 137; Filing No. 138.  He submitted a sworn declaration attesting to these facts.  Filing No. 137-2.  The Court denied Officer Smith's motion

for summary judgment because there were genuine disputes of material fact regarding whether officers used excessive force against Mr. Littler and whether Officer Smith failed to intervene in those uses for force.  Filing No. 184.

Afterward, Mr. Littler deposed Officer Smith.  Mr. Littler then filed a motion for sanctions against Officer Smith, arguing that he repeatedly offered false testimony during his deposition regarding his role in the cell extraction and his observations of interactions between other officers and Mr. Littler before the cell extraction.  Filing No. 299.  Based on the compelling evidence that Mr. Smith flagrantly offered false testimony during his deposition, the Court ordered Officer Smith to appear and testify at the second sanctions hearing.

**B.      Officer Smith Repeatedly Offered False Testimony During his Deposition**

Reports written after the cell extraction state that Mr. Littler was taken to the shower cell to be strip searched because officers on the range were concerned he may have possessed a cellphone.  Hearing Ex. 10 at 747.  At summary judgment, Mr. Littler attested that this was a "ploy devised by J[ustin] Shroyer in [an] effort to degrade" Mr. Littler.[10]  Filing No. 174 at 3.  If true, it would change the entire character of the State Defendants' actions during the cell extraction that followed, not to mention undermine their credibility regarding whether their subsequent uses of force against Mr. Littler were good faith attempts to restore order or were maliciously devised to inflict pain.  Mr. Littler thus questioned Officer Smith during his deposition about events leading up to the cell extraction.

Unfortunately, Officer Smith repeatedly offered false testimony on these matters during his deposition.  Officer Smith essentially disclaimed any and all knowledge about why Mr. Littler

---

[10] This alone could violate Mr. Littler's constitutional rights.  *See King v. McCarty*, 781 F.3d 889, 896-99 (7th Cir. 2015).

was in the shower cell, stated he had not interacted with Mr. Littler or overheard any other officer interact with Mr. Littler before the cell extraction team was activated, and disclaimed any involvement in relocating Mr. Littler from his cell to the shower cell. Video evidence shows that all of these statements are false. A few examples make this clear.

First, Officer Smith testified that he "played no role in moving Mr. Littler from his cell to the shower." Dkt. 299-1 at 5. Yet the range video shows Officer Smith and another officer preparing the shower cell immediately before Mr. Littler arrived, and it shows that Officer Smith was present when Mr. Littler was placed into the shower. Hearing Ex. 3 at 00:00:37 – 00:00:54.

Second, Officer Smith testified that he was on Mr. Littler's unit when the cell extraction team was activated. Filing No. 299-1 at 5. At that time, Officer Smith stated that he had not "interacted with Mr. Littler at all that day" or "overhear[d] him interacting with anyone else." *Id.* Video evidence, however, shows that Officer Smith repeatedly interacted with Mr. Littler when he was in the shower cell or was present when other officers did: (1) Officer Smith was in front of the shower cell while Justin Shroyer spoke with Mr. Littler, and Officer Smith appeared to take part in the conversation; (2) approximately three minutes later, Officer Smith approached the shower cell and spoke with Mr. Littler; (3) approximately three minutes later, Officer Smith was present when Captain Pirtle and Justin Shroyer approached the shower cell and spoke with Mr. Littler; (4) approximately a minute later, Officer Smith again approached the shower cell and spoke with Mr. Littler; and (5) approximately a minute later, Officer Smith passed the shower cell while Justin Shroyer spoke with Mr. Littler. Hearing Ex. 3 at 00:04:49 – 00:06:20, 00:09:08 – 00:09:45, 00:13:00 – 00:13:31, 00:14:47 – 00:15:13, 00:16:03 – 00:16:06.

Third, Officer Smith falsely testified during his deposition regarding the preparation of his Physical Force Report following the cell extraction. The Physical Force Report requires each

officer to explain in narrative form what force was used against an inmate.  Officer Smith explained that there are only "one or two computers" for the officers to use, so they take turns filling out their Physical Force Reports after an incident.  Filing No. 299-1 at 9.  He claimed sole authorship of his Physical Force Report, stating that "nobody wrote it for me" and that he did not "cut and paste it from anything else."  Filing No. 299-1 at 9.  But this is obviously false when compared to the other officers' reports.   Not only is much of Officer Smith's Physical Force Report a verbatim reproduction of Justin Shroyer's (who submitted his first), but his report (which was submitted last) contains verbatim language from everyone else's report.  Most obviously, other than his name and role in the cell extraction, Officer Smith's report is the *exact same* as Officer McKee's report, which was submitted only two minutes before Officer Smith's.  *See* Hearing Ex. 10.  The following portion of Exhibit 11 admitted during the hearing makes clear that Officer Smith's claim of sole authorship is false.  The shaded portions of Exhibit 11 show the portions of Officer McKee's and Office Smith's reports that are identical:



### C.    Officer Smith Continued to Offer False Testimony During the Sanctions Hearing

The hearing offered Officer Smith an opportunity to explain his false statements or retract them.  He acknowledged that certain of his statements were false.  For example, he acknowledged that the video evidence shows he interacted with Mr. Littler and others before the cell extraction

33

team was activated. Filing No. 323 at 20. Of course, the video gave him no choice but to admit this. Officer Smith explained that during his deposition he "didn't remember" these interactions, but now that he watched the video, he acknowledges they occurred. *Id.*

Officer Smith's claimed lack of memory is dubious. Unlike other State Defendants, Officer Smith had only been involved in "two or three" cell extractions, and this was the only one that occurred in a shower cell and the only one where an inmate sustained an injury. Filing No. 323 at 23-24. This was a unique event for Officer Smith. Moreover, it was not as if he only interacted with Mr. Littler once or in passing the day of the incident. He had multiple conversations with Mr. Littler and observed multiple conversations between Mr. Littler and other correctional officers.

A lack of memory fails to explain other false statements by Officer Smith. For example, Officer Smith—as the recorder for the cell extraction—wrote that the cell extraction team was briefed three minutes before entering the shower cell. Filing No. 299-1 at 21. Video evidence shows that this is false, as approximately twenty minutes elapsed between the briefing and when the cell extraction team entered the shower. *See* Filing No. 328 at 14 n.6 (explaining how a comparison of multiple videos shows that twenty minutes elapsed). Thus Officer Smith was not even completing his duties as recorder honestly on the day of the incident.

As with many of the State Defendants, it is telling that Officer Smith was unequivocal during his deposition that he did not interact with Mr. Littler or witness others doing so. He did not, for example, say he could not remember, or that he did not think he did, or otherwise acknowledge any remote possibility that these interactions occurred. He testified with certainty that they did not. Only after being shown undisputable evidence that this was false did Officer Smith raise the prospect that he did not remember essentially anything about his significant involvement in the conduct at issue. This change itself reveals Officer Smith's lack of candor

while under oath. *See Ayoubi*, 640 Fed. Appx. at 528 ("But Ayoubi's credibility problem was his inconsistency. He had accused the defendants with certitude, implying that his memory about the previous seven weeks was normal. Yet, after the defendants proved the falsity of his accusation, he professed to have overwhelming 'memory issues.'").

Worse still, when Officer Smith was confronted with certain false statements during the hearing—ones where there was not video indisputably showing his deposition testimony was false—he refused to acknowledge his mistakes. By far, the most egregious example of this is his testimony regarding the Physical Force Report. At the sanctions hearing, Officer Smith repeated his deposition testimony that he wrote the narrative on the Physical Force Report himself, did not "copy it from anyone else," and that it "wasn't there sitting on a computer waiting for [him] to just insert his name." Filing No. 323 at 34. Even after he was shown Exhibit 11—reproduced in relevant part above—Officer Smith continued to insist he wrote the report himself. When asked why the reports "are all really close or identical," Officer Smith offered that all officers take a class in writing reports that teaches them to "write them a certain way." Filing No. 323 at 36.

The Court agrees with Mr. Littler that this explanation is preposterous. It is almost impossible that Officer Smith wrote his own Physical Force Report without drawing from any other source and it just so happened to be verbatim of a report submitted by Officer McKee two minutes earlier. For Officer Smith to stick to this story, even when faced with essentially indisputable evidence that it is false, shows little regard for his obligation to be truthful under oath. Significant sanctions are warranted for this conduct.

# IX.
## Lieutenant Yarber's Misconduct

## A.    Summary Judgment Motion, Deposition, and Motion for Sanctions

Lieutenant Yarber moved for summary judgment on Mr. Littler's excessive force and failure to intervene claims, arguing that he did not "witness or participate in the cell extraction," and thus did not use force or see another officer use excessive force against Mr. Littler.  Filing No. 88; Filing No. 90.  He submitted a sworn declaration attesting to these facts.  Filing No. 88-5.  The Court denied Lieutenant Yarber's motion for summary judgment because there were genuine disputes of material fact regarding Lieutenant Yarber's involvement in the cell extraction.  Filing No. 184.  Specifically, the Court noted that Mr. Littler presented evidence "that Captain Pirtle and Lieutenant Yarber had the opportunity to prevent Justin Shroyer's excessive use of the chemical agent, but failed to do so," and that "Mr. Littler overheard Lieutenant Yarber state to Captain Pirtle that [Mr. Littler] deserves to be" harmed during the cell extraction.  *Id.* at 16.  Mr. Littler also presented evidence that Lieutenant Yarber "directed" the cell extraction team's conduct.  *Id.* at 18.

Mr. Littler deposed Lieutenant Yarber, then filed a motion for sanctions against him for offering false testimony or, at minimum, exhibiting gross negligence regarding his duty to provide truthful information to the Court and during discovery.  Filing No. 269.  Based on the compelling evidence that Lieutenant Yarber repeatedly fell well short of his obligation to be truthful, the Court ordered Lieutenant Yarber to appear and testify at the second sanctions hearing.

## B.    Lieutenant Yarber's Pattern of Dishonesty

Lieutenant Yarber's conduct throughout the course of this litigation is a microcosm of the case as a whole.  At nearly every turn, Lieutenant Yarber offered a false or, at minimum, misleading version of events.  Only when repeatedly confronted with indisputable evidence that

his statements were false did he change course and sometimes not even then. The Court summarizes some (but not all) of these false statements here.

Mr. Littler alleged in his Second Amended Complaint that Lieutenant Yarber appeared once Mr. Littler was in the shower cell, was "visibly upset" about the situation, and stated to Captain Pirtle that "I think this one deserves an orange crush." Filing No. 61 at 3. After they left, Justin Shroyer appeared and, without warning, sprayed Mr. Little with chemical spray. *Id.* at 4. In their Answer, the State Defendants' denied that Lieutenant Yarber had any involvement with the events in question, admitting only that he was a staff member at Wabash Valley. Filing No. 70 at 1.

Mr. Littler, still proceeding pro se at this time, directed interrogatories to Lieutenant Yarber. Mr. Littler asked Lieutenant Yarber, "Who ordered [Justin] Shroyer to spray the plaintiff [with chemical spray] in that manner," to which Lieutenant Yarber responded, "[n]o one ordered [Justin] Shroyer to spray offender Littler." Filing No. 174-1 at 137.

As noted above, Lieutenant Yarber then moved for summary judgment, disclaiming any participation in the cell extraction. The Court denied summary judgment because Mr. Littler provided evidence that Lieutenant Yarber directed Mr. Littler to be harmed, and Mr. Littler cited video evidence showing that Lieutenant Yarber briefed the cell extraction team. Filing No. 184.

In the post-summary judgment show cause order directed to Ms. Fiorini, the Court expressed concern with the veracity of Lieutenant Yarber's sworn statement. Specifically, the Court noted that Lieutenant Yarber's declaration states that he did not "witness or participate in the cell extraction," yet Mr. Littler attested that the video evidence showed Lieutenant Yarber

briefing the cell extraction team[11] and incident reports state the same. Filing No. 185 at 4. Ms. Fiorini was directed to discuss Lieutenant Yarber's declaration with him and move to withdraw or amend any false statements or to reaffirm that the declaration remains true.

Lieutenant Yarber maintained the accuracy of his declaration. He stated: "[a]s will be proven at trial, Lieutenant Yarber briefed the cell extraction team on camera, but then left the range before the cell extraction began. Lieutenant Yarber will testify that he did not witness or participate in the cell extraction." Filing No. 190 at 6.

Mr. Littler then deposed Lieutenant Yarber. Shortly into the deposition, it came to light that Lieutenant Yarber did not know what cell extraction this litigation concerns—even though the case had been ongoing for more than two years and he had submitted multiple sworn statements during the course of it. The following deposition excerpt is illustrative:

Q. Before the extraction . . . were you on the CCU?

A. It wasn't CCU. It was David house, wasn't it?

Q. This one was CCU.

A. Which one are we doing? See, that's the second one. I'm sorry. I don't know. The one I - - they brought it, because I didn't remember it, so they give me and showed me what happened that day, and they showed me the one in D-David.

Q. So everything you have answered specifically heretofore was about a different use of force incident?

A. Yes. That was about a totally different. I'm sorry. I - -

. . . .

---

[11] The video clearly shows the briefing of the cell extraction team. But at that point in the proceedings, the Court had no basis to know whether the person briefing the team was Lieutenant Yarber. Shockingly, Ms. Fiorini acknowledged that when she submitted the State Defendants' motion for summary judgment, she did not know that was Lieutenant Yarber either—she testified at the hearing she "hadn't met Mr. Yarber in person so [she] didn't know what he looked like." Filing No. 235 at 35.

A.  Now I feel really dumb.  I didn't know.  I thought we was on the one where - - oh, man.  I probably don't even remember this one, then . . .

. . . .

A.  . . . [S]ince '15, I've probably done 20 or 30 cell extractions and give the briefing [in the CCU], so that's why it's so hard to remember something that happened four years ago.

Q.  . . . [H]as it been your assumption since this lawsuit was filed that it concerned a different incident than the one in the CCU?

A.  Yeah.  That's the one I thought - - I thought this was a different one.  I'm sorry.  I didn't realize that—

. . . .

(Video playback [of cell extraction video].)

. . . .

Q.  And up until I showed you this video, was it your understanding throughout this course of the - - throughout the course of this litigation that you were talking about an entirely different incident?

A.  Yeah.  I was talking about one that happened in D-David.  I didn't realize it was CCU.

Filing No. 264-2 at 5-6.  Once Lieutenant Yarber watched the video of the incident in question, he then went on to answer questions about his role in the events that day.

Lieutenant Yarber's testimony that he was thinking about an entirely different incident during the more than two years of this litigation—including when he submitted a sworn declaration in an attempt to obtain summary judgment—is beyond disconcerting.  At the sanctions hearing, Lieutenant Yarber testified that his confusion was only during the deposition, not during the course of this entire litigation.  This, of course, is inconsistent with his statements *during the deposition* that he was confused throughout the litigation.  Thus, the Court is skeptical that his confusion is so limited.

But accepting Lieutenant Yarber's explanation only leads to the inescapable conclusion that his earlier sworn statements—when he purportedly *was* thinking about the correct incident—were simply false. A few examples are illustrative.

Lieutenant Yarber offered false statements regarding his involvement in ordering Justin Shroyer to use chemical spray on Mr. Littler. Recall that Lieutenant Yarber responded to Mr. Littler's interrogatory regarding who "ordered [Justin] Shroyer to spray the plaintiff [with chemical spray]," by stating that "[n]o one ordered [Justin] Shroyer to spray offender Littler." Filing No. 174-1 at 137. Shortly thereafter, Lieutenant Yarber moved for summary judgment based on his sworn statement that he did not "witness or participate in the cell extraction." Filing No. 88-5 at 1.

Yet during his deposition, Lieutenant Yarber was confronted with the cell extraction video where he says to the assembled cell extraction team, "They're gonna go try to spray him." Filing No. 264-2 at 7. This appeared inconsistent with Lieutenant Yarber's testimony that he was not on the CCU when Mr. Littler was first subjected to chemical spray. *See id.* ("Q. At the time that you arrived in the CCU, had the [chemical] spray already been used? A. Yes. . . . Q. And you could sense it? You could feel the burning? A. Oh, yes. That's why they had the masks and stuff on out there, because it gets to you."). In attempt to clear up this inconsistency, Lieutenant Yarber created another. He explained that Mr. Littler had already been sprayed once when he made that comment, and he "told them to try spraying him again before they used the pepperball gun or anything else." Filing No. 264-2 at 7.

The problem with this, of course, is that Lieutenant Yarber had disavowed *any* participation in the cell extraction since the beginning of the litigation—including in his sworn declaration through which he attempted to obtain summary judgment. Yet when confronted with video

evidence that definitely demonstrates otherwise, he then acknowledged that it was *his* decision to use chemical spray against Mr. Littler a second time before using the pepperball gun or the cell extraction team. *See also* Filing No. 257-1 at 16 (Justin Shroyer testifying during his deposition that Lieutenant Yarber instructed him to spray Mr. Littler a second time). But this only reveals his interrogatory response—that no one ordered Justin Shroyer to spray Mr. Littler—was false. Lieutenant Yarber himself issued that order.

Worse still, Lieutenant Yarber's declaration—which he swore was true at the time he submitted it and again once the Court expressed concerns with its veracity—was false. As discussed with respect to Deputy Warden Littlejohn's decision to use the pepperball gun against Mr. Littler, Lieutenant Yarber's decision to spray Mr. Littler a second time "before they used the pepperball gun or anything else," Filing No. 264-2 at 7, clearly constitutes "participation" in the cell extraction. Indeed, as has been clear from the outset, Mr. Littler's operative complaint concerned all of the uses of force against him through the cell extraction—the chemical spray, the pepperball gun, and his physical removal from the shower by the cell extraction team. Lieutenant Yarber's attempt to obtain summary judgment based on a blanket disavowal of any involvement in the cell extraction when he was directly involved in what force should be used and when is an egregious abuse of the judicial process. And, like the other State Defendants, it is doubly so given that the Court gave him an opportunity to rectify his mistakes, but he refused.

Lieutenant Yarber made several other false statements during his deposition and during the hearing, two of which the Court details here. First, he testified during his deposition that he was not in the area when the second chemical spray or pepperball gun were used. Filing No. 264-2 at 7. He testified the same during the hearing. Filing No. 323 at 70, 78-79. Yet the video evidence shows he was on the CCU several minutes before the *first* use of chemical spray, and the pepperball

gun is clearly audible while Lieutenant Yarber is in the CCU briefing the cell extraction team. Hearing Ex. 5 at 00:00:12 – 00:01:52; Hearing Ex. 6 at 00:00:00 – 00:02:10.

Second, Lieutenant Yarber offered false testimony regarding whether he instructed the handheld camera operator to shut it off. The Court noted in its summary judgment order that in emails following the incident, Major Russell expressed concern that the use of the pepperball gun was not filmed, which was contrary to policy. Given this, the Court found it troubling that an unknown officer (later identified as Lieutenant Yarber) ordered the cameraman to shut off the handheld camera once the pepperball gun could be heard. *See* Filing No. 184 at 12-13. Yet Lieutenant Yarber testified during his deposition that the camera should not be turned off between briefing the cell extraction team and the use of the team, and he specifically testified that he had never ordered the camera to be turned off. Filing No. 264-2 at 9. The video reveals that this is clearly false. It shows Lieutenant Yarber asking about the handheld camera and then stating, "turn it off," while making a corresponding gesture with his hand. Hearing Ex. 6 at 00:02:42 – 00:02:45. The video then shuts off and does not resume for approximately 20 minutes. Filing No. 328 at 14 n.6.

In sum, Lieutenant Yarber made false statements during discovery, in his declaration, during his deposition, and, even after the Court expressed concerns about his honesty, during the sanctions hearing. Such a consistent pattern of false testimony under oath warrants severe sanctions.

## X.
## State Defendants' Sanctions

### A.     The State Defendants' Arguments Against Sanctions

The State Defendants advance two general arguments as to why the Court should not sanction them. First, they argue that to the extent they made false statements, they were not

material.  Second, they argue that they have a right to a jury trial, and the Court would strip them of that right if it entered a default judgment against them.  The Court is not persuaded by either argument.

Beginning with materiality, it is unclear whether there is such a requirement before the Court may enter a default judgment against a party who repeatedly abuses the judicial process by making false sworn statements and falsely testifying in open court.  The Seventh Circuit has recently held that, before a Court may dismiss an action when a prisoner plaintiff fails to disclose his litigation history, the Court must determine whether the omission was material.  *Greyer v. Illinois Dept. of Corr.*, 933 F.3d 871, 880 (7th Cir. 2019).  The Court need not decide whether the materiality requirement in *Greyer* applies more generally because, as the Court has already discussed, the State Defendants' false statements were clearly material.

As set forth above, all but Denver Smith made false statements in sworn declarations used to obtain summary judgment.  The State Defendants' believed those facts to be material when they sought summary judgment, as they included them in their statement of *material* facts section in their motion for summary judgment and otherwise relied on them to argue that summary judgment was appropriate.  *See, e.g.*, Filing No.  90 at 5 ("Defendant[] Littlejohn . . . did not witness or participate in the cell extraction."); Filing No. 138 at 3 ("Mark Shroyer deployed the Pepperball rounds consistent with his training.").  As to Officer Smith, his false statements concerned both the basis for moving Mr. Littler to the shower cell for a strip search in the first place and his reporting regarding the force used against Mr. Littler later that day—both of which are important for Mr. Littler proving his version of events.  These false statements are thus material to Mr. Littler's Eighth Amendment claims as well as Officer Smith's credibility.  *See Kungys v. United States*, 485 U.S. 759, 770 (1988) ("[A] misrepresentation is material if it has a natural tendency to

influence, or was capable of influencing, the decision of the decisionmaking body to which it was addressed." (citation and quotation marks omitted)); *Greyer*, 933 F.3d at 879 ("[M]ateriality look[s] to the effect on the likely or actual behavior of the recipient of the alleged misrepresentation." (citation and quotation marks omitted)).

As to the State Defendants' argument that they have a constitutional right to a jury trial, it is both hypocritical and frivolous. It well-established that a Court has the "inherent power to sanction a party who has willfully abused the judicial process," and it is clear that power extends to "default judgments against defendants." *Secrease*, 800 F.3d at 401. Moreover, it was the State Defendants that attempted to deprive Mr. Littler of a jury trial by relying on false sworn statements to secure summary judgment. It is perverse for them to now argue that Mr. Littler is wrongly attempting to deprive *them* of their right to a jury trial.

**B.      The Appropriate Sanctions**

Mr. Littler suggests that default judgment is the appropriate sanction for the State Defendants' misconduct. Filing No. 328 at 50. He also asks the Court to consider referring the State Defendants to the United States Attorney because they committed perjury and requiring the remaining State Defendants to notify the Court of any false statements they previously made.

The Court concludes that default judgment is the appropriate sanction for four of the five States Defendants: Deputy Warden Littlejohn, Justin Shroyer, Mark Shroyer, and Lieutenant Yarber. Much like Nurse Hagemeier, whom the Court sanctioned with a default judgment, these four defendants have willfully abused the judicial process by consistently disregarding their obligation to be truthful under oath. Critical is the fact that, unlike Denver Smith, these four State Defendants made false statements in their declarations in an attempt to wrongfully secure summary judgment. Moreover, each was offered an opportunity to withdraw these statements after the Court

expressed concerns with their honesty. Yet each reaffirmed that his statements were true despite overwhelming evidence that they were not, including during their live testimony under oath. For the reasons discussed above, the Court does not credit these State Defendants' attempts to explain away their false statements or their suggestions that they were innocently made. Had any of these defendants taken his oath to be truthful with the appropriate seriousness, he would have immediately withdrawn his false statements after the Court expressed concern. Instead, each took the opposite course. These State Defendants will not only be defaulted, but also will be precluded from testifying at trial, unless Mr. Littler decides to call them.

As for Officer Smith, the Court considered entering a default judgment against him as well. His deposition testimony was flagrantly false. Although he acknowledged some of these false statements during the sanctions hearing, he refused to back down on others despite overwhelming evidence that they too were false. Nevertheless, the Court finds the distinction between false statements made to secure summary judgment and those made during a deposition post-summary judgment meaningful. On this record a default judgment would be appropriate, but the Court concludes that the following lesser sanction is sufficient: like the above four State Defendants, Officer Smith will not be permitted to testify during trial due to his demonstrated inability to offer truthful testimony. Mr. Littler will be able to call Officer Smith if he so chooses, but Officer Smith will otherwise not be able to testify in his defense.

The Court has considered other sanctions but concludes that any lesser sanctions are inappropriate under the circumstances. For example, the Court considered making adverse factual findings against them, but such findings would almost certainly amount only to what a jury would conclude anyway based on the video and documentary evidence. More importantly, adverse factual findings are an insufficient response to repeated perjury. *See Rivera*, 767 F.3d at 687 ("If

perjury pays benefits when it escapes detection, but has no cost when detected, there will be far too much perjury and the accuracy of judicial decisions will be degraded."). If the Court made adverse factual findings that did not essentially amount to judgment in Mr. Littler's favor, this would give these State Defendants the opportunity to testify in their defense at trial. The Court has no confidence that any of the five State Defendants would testify truthfully to the jury, particularly given that they have already falsely testified under oath in this case. A party who lies in their declaration or during their deposition and then lies under oath during a hearing about his misconduct does not deserve another opportunity to commit perjury. *See Greviskes*, 417 F.3d at 759.

The seriousness of the situation also militates against monetary penalties. A litigant who is repeatedly dishonest under oath even after being called to account for it may think a modest or even substantial monetary sanction is worth risking if false testimony might avoid a substantial damages award at trial.

These severe sanctions are also necessary to "deter future parties from trampling upon the integrity of the court." *Salmeron*, 579 F.3d at 797. In the overwhelming majority of pro se prisoner civil rights cases, the plaintiff's only evidence is his sworn version of events. If a just result is to be reached in these cases, it is paramount for defendants to be honest. Consequently, the need to deter parties from following the course charted by the State Defendants is evident.

The Seventh Circuit has recognized that a "litigant's misconduct can justify default judgment, and perjury is among the worst kinds of misconduct." *Rivera*, 767 F.3d at 686; *see Secrease*, 800 F.3d at 401 ("Dismissal can be appropriate when the plaintiff has abused the judicial process by seeking relief based on information that the plaintiff knows is false."). Moreover, ending a case "is an appropriate sanction for lying to the court in order to receive a benefit from

it, because no one needs to be warned not to lie to the judiciary." *Ayoubi*, 640 Fed. Appx. at 528-29. As the Court concluded with respect to Nurse Hagemeier, a party who not only lies to the Court, but when called to account for it, continues to lie under oath, is deserving of the most severe sanctions. *See Greviskes*, 417 F.3d at 759 (affirming the dismissal with prejudice of the plaintiff's claims, explaining: "Rather than admit her initial wrongdoing to the district court, [the plaintiff] subverted the purpose of the evidentiary hearing by engaging in further fraudulent conduct"); *see also Secrease*, 800 F.3d at 402 (stating that sanctions short of dismissal "would not have been sufficient because the wrongdoing was so egregious and repeated").

"[F]alsifying evidence to secure a court victory undermines the most basic foundations of our judicial system." *Secrease*, 800 F.3d at 402. Although the State Defendants' efforts to achieve an unjust victory in this case were not successful, their false testimony imposed "unjust burdens on the opposing party, the judiciary, and honest litigants who count on the courts to decide their cases promptly and fairly." *Id.* The Court is keenly aware of how much time and effort has been spent unraveling the misconduct of parties and counsel in this case, and how this has penalized honest litigants with genuine disputes who await a ruling from the Court in their cases. The Court can only hope that this severe sanction will pay dividends by deterring similar conduct in the several hundred prisoner cases filed in this Court every year.

Two final observations. First, Mr. Littler suggested that the Court consider a referral to the United States Attorney given the State Defendants' blatant perjury. The Seventh Circuit has deemed such a referral appropriate in certain cases, *see, e.g.*, *Neal v. LaRiva*, 765 F.3d 788, 791 (7th Cir. 2014), and the Court views the misconduct in this case to be at least of a similar nature as the misconduct in those cases. Yet the Court declines to take this step, as it does not want to

inject itself into decisions that rest solely with the Executive Branch. Moreover, Mr. Littler is represented by very capable counsel who is as capable as the Court in making such a referral.

Second, the Court also considered Mr. Littler's request that the remaining State Defendants be required to reexamine their sworn testimony in this action and withdraw any that is false. This is more than an appropriate request given all that has transpired in this case and the pattern of brazenly false testimony in this case. Nevertheless, the Court will not order any further filings at this time. The Court has already required the State Defendants to reaffirm that their summary judgment declarations are true, and each State Defendant did so without withdrawing or altering any previous statements. Moreover, the State Defendants and their counsel have a continuing obligation to correct or withdraw any false evidence presented to the Court. Although they have not taken this obligation seriously up to this point, the Court expects them to do so for the remainder of this litigation. There is nothing preventing the Court from reconsidering further sanctions should any further misconduct occur in this case.

For the reasons stated above, the Court issues the following sanctions on the State Defendants. As to Mr. Littler's claims against the following defendants where a default judgment is not entered, Mr. Littler may continue to pursue those claims at trial.

- A default judgment against Deputy Warden Littlejohn. The jury will determine the appropriate damages to Mr. Littler. Deputy Warden Littlejohn will not be permitted to testify at trial (unless called by Mr. Littler).

- A default judgment against Justin Shroyer. The jury will determine the appropriate damages to Mr. Littler. Justin Shroyer will not be permitted to testify at trial (unless called by Mr. Littler).

- A default judgment against Mark Shroyer. The jury will determine the appropriate damages to Mr. Littler. Mark Shroyer will not be permitted to testify at trial (unless called by Mr. Littler).

- A default judgment against Lieutenant Yarber. The jury will determine the appropriate damages to Mr. Littler. Lieutenant Yarber will not be permitted to testify at trial (unless called by Mr. Littler).

- Denver Smith will not be permitted to testify at trial (unless called by Mr. Littler).

## XI.
## Counsel Amanda Fiorini's Misconduct

After the Court denied the State Defendants' motion for summary judgment, the Court also issued a show cause order to the State Defendants' counsel, Ms. Fiorini. Filing No. 185. It set forth three areas of concern. Although since then several other concerns have arisen, the Court focuses primarily on the three areas previously identified, along with Ms. Fiorini's improper approach to summary judgment.

**A.  Ms. Fiorini Violated Rule 11 by Failing to Conduct a Reasonable Investigation Before Submitting her Reply Brief and Violated Rule 3.3 of the Indiana Rules of Professional Conduct by Failing to Correct Deputy Warden Littlejohn's False Statements**

The first area of concern overlaps the issue identified in the show cause order issued to Deputy Warden Littlejohn discussed above. Ms. Fiorini submitted a declaration on behalf of Deputy Warden Littlejohn in support of the summary judgment motion. While the summary judgment motion was pending, the Court granted in part Mr. Littler's motion to compel, requiring Ms. Fiorini to produce emails regarding the incident. *See* Filing No. 126 at 2. Ms. Fiorini produced numerous emails to Mr. Littler, including the email discussed above between Captain Pirtle and Deputy Warden Littlejohn that showed Deputy Warden Littlejohn's declaration contained false statements. Even after Ms. Fiorini received this email, she took no corrective action regarding Deputy Warden Littlejohn's previously filed declaration. As the show cause order explains,

> Mr. Littler submitted this email as an exhibit to his response to the State Defendants' motion for summary judgment, *id.*, and he specifically referenced it in his response, arguing that it shows Deputy Warden Littlejohn's true involvement in the incident, *see, e.g.*, Filing No. 174 at 10. Even after this email was explicitly relied on by Mr. Littler to oppose summary judgment, Ms. Fiorini again did not

take any corrective action. Instead, she pressed on, filing a reply brief that entirely ignored the emails and requested summary judgment for Deputy Warden Littlejohn, arguing there was "no evidence" that he knew correctional officers "were going to allegedly use excessive or inappropriate force" against Mr. Littler. Filing No. 180 at 4. In short, Ms. Fiorini had multiple opportunities to correct the false evidence before the Court—after discovering the email before turning it over, after Mr. Littler cited to it in his response, and in her reply—but never did.

Filing No. 185 at 3. Furthermore, Ms. Fiorini submitted a response to the show cause order issued to Deputy Warden Littlejohn where he continued to maintain that his declaration was accurate. *See* Filing No. 191.

None of Ms. Fiorini's explanations, either in her show cause response or during the hearing, justify her failure to correct Deputy Warden Littlejohn's declaration once the email came to light.[12] First, Ms. Fiorini asserts that the email between Deputy Warden Littlejohn and Captain Pirtle "did not raise any red flags in her mind" because she did not appreciate how it could be "seen as inconsistent" with his declaration until the Court's show cause order issued. Filing No. 190 at 2; *see* Filing No. 235 at 33 (Ms. Fiorini testifying that she read the email and Mr. Littler's response pointing to it, but she "did not make the connection" that the email contradicted Deputy Warden Littlejohn's declaration). This is simply inconceivable given the multiple ways in which Deputy Warden Littlejohn's declaration is false.

The only way this email could not raise any "red flags" is if it was not closely read. Of course, that would make Ms. Fiorini's investigation insufficient under Rule 11. Even so, Ms. Fiorini implies that she did not read the email closely because she was in a hurry. During the hearing, she testified:

> I had not looked at [Mr. Littler's] response until I believe it was the day before or the day . . . my reply was due. I had asked for an extension of time to draft the

---

[12] The Court does not address whether Ms. Fiorini should have discovered the email before she submitted the declaration as part of the reasonable investigation required by Rule 11, as her other violations of Rule 11 form a sufficient basis for the sanctions imposed.

> reply and get it filed. That motion for extension of time was denied the day it was
> due. So I had from 5:00 p.m. that day until midnight to get a reply filed.

Filing No. 235 at 33. This explanation omits two critical facts. First, Ms. Fiorini only *filed* her

motion for time at 2:57 p.m. the day the reply was due (violating the undersigned's practices and

procedures requiring such motions to be filed three business days in advance). In fact, the Court

denied Ms. Fiorini's motion *in less than ninety minutes* so she could file a reply that day. Filing

No. 179. Second, and more importantly, the Court had previously warned that "no further

extensions of time will be provided to either party," including for "the defendants to reply to the

pending motions for summary judgment." Filing No. 167 at 1. The Court pointed this out to Ms.

Fiorini during the hearing, and she merely replied that she "did not remember . . . that that had

been stated." Filing No. 235 at 61. It was surprising, to say the least, for Ms. Fiorini to suggest

that the Court's denial of her motion for time deprived her of the time necessary to review the

evidence, especially without mentioning that the motion for time was untimely and was contrary

to the Court's warning that no extensions would be given.

Nevertheless, Ms. Fiorini assured the Court that she read Mr. Littler's response and the

email in question despite the time constraints. Filing No. 235 at 33. If this is true, there is no

justification for ignoring Mr. Littler's response and evidence. As was true for Mr. Crandall, the

Court is certain that Ms. Fiorini would not have been so dismissive of Mr. Littler's response and

her obligation to carefully read it had Mr. Littler been represented by counsel. The undersigned,

like all Judges of this Court, takes the judicial oath to "administer justice without respect to

persons, and do equal right to the poor and the rich" with the utmost seriousness. 28 U.S.C. § 453.

Abiding by this oath requires the Court to treat cases, filings, and evidence submitted by a pro se

prisoner no differently than those filed by counsel. The Court expects Ms. Fiorini and any counsel

litigating against pro se prisoners to do the same.

In sum, Ms. Fiorini's handling of Deputy Warden Littlejohn's declaration and the email casting doubt on its veracity violated both Rule 11 and Rule 3.3(a) of the Indiana Rules of Professional Conduct. Specifically, she violated Rule 11 by filing a reply brief that contained factual contentions regarding Deputy Warden Littlejohn that were not supported by a reasonable investigation, and she violated Rule 3.3(a) of the Indiana Rules of Professional conduct when she failed "to correct a false statement of material fact . . . previously made to the tribunal by the lawyer."[13] These violations are all the more egregious given that Ms. Fiorini filed her reply after Mr. Littler had pointed to the email calling into question the veracity of Deputy Warden Littlejohn's declaration, but Ms. Fiorini ignored it.

**B.     Ms. Fiorini Failed to Comply with Rule 11's Requirement to Conduct a Reasonable Investigation Before Presenting Factual Contentions to the Court Both When She Moved for Summary Judgment and When She Filed the Reply Brief**

The second issue raised in Ms. Fiorini's show cause order concerned sworn statements of other State Defendants that appeared to be false—specifically, Lieutenant Yarber's statement that he did not witness or participate in the cell extraction and Mark Shroyer's statement that Mr. Littler moved his face into the line of fire when Mark Shroyer was shooting the pepperball gun. Ms. Fiorini was also ordered to, among other things, confirm with each State Defendant that their sworn

---

[13] Both in her response to the show cause order and during the hearing, Ms. Fiorini noted that Deputy Warden Littlejohn does not agree that the email shows the statements in his declaration are false. But her attempts to wordsmith Deputy Warden Littlejohn's declaration so that it is technically true fare no better than his. During the hearing, Ms. Fiorini acknowledged that Deputy Warden Littlejohn's declaration was meant to convince the Court he was not involved in the events in question and thus grant him summary judgment. Filing No. 235 at 64. In other words, she acknowledged that the declaration created a false impression of the facts, yet she did nothing to correct it even after the critical email came to light. Accordingly, any contention that Deputy Warden Littlejohn's declaration was technically true is unconvincing for this reason and those articulated above regarding his misconduct.

statements were true and, unless any of the statements were withdrawn, notify the Court that each of the State Defendants stand by their sworn statements.

Ms. Fiorini notified the Court that none of the State Defendants wished to withdraw or amend their sworn statements and that, consistent with Rule 11, "there is evidentiary support for all current factual statements in the declarations." Filing No. 190 at 4. She explained that certain of the State Defendants disagree with the Court's view of the evidence presented.

To understate it, Ms. Fiorini's decision to stand by those declarations was a poor one. The Court outlined above how at least four State Defendants—Deputy Warden Littlejohn, Justin Shroyer, Mark Shroyer, and Lieutenant Yarber—made false statements in their declarations. Although it is clear that Ms. Fiorini's Rule 11 investigation into each of these State Defendants' factual assertions was deficient in several respects, the Court focuses here on her deficient investigation into the false statement in Lieutenant Yarber's declaration.

Lieutenant Yarber moved for summary judgment, disclaiming any participation in the cell extraction. He swore that he "did not witness or participate in the cell extraction on December 27, 2015." Filing No. 88-5 at 1. As pointed out in the show cause order, Mr. Littler stated in his summary judgment response that the video shows Lieutenant Yarber briefing the cell extraction team, and the State Defendants' own incident report states that "Lt. R. Yarber began briefing the cell extraction team" after the pepperball gun was used. Filing No. 174-1 at 97.

How Ms. Fiorini could submit a sworn statement asserting that Lieutenant Yarber did not "participate in the cell extraction" when video and incident reports make clear that he instructed the cell extraction team what to do (not to mention that he ordered Justin Shroyer to use chemical spray on Mr. Littler) is baffling. But her explanation at the hearing was even more so:

> Q.    Can you explain how briefing the cell extraction team does not constitute participating in the cell extraction?

A.     If — when I drafted this declaration, I did not know that Richard Yarber was the one instructing the cell extraction team at the beginning of the video.  I hadn't met Mr. Yarber in person so I didn't know what he looked like.  So again, it wasn't drafted to intentionally be misleading, it was drafted based on information that I had at the time.

Filing No. 235 at 34-35.  It should go without saying that a reasonable investigation under Rule 11 when there is critical video evidence includes knowing what your clients look like.  How else would Ms. Fiorini have *any* basis to know if what she was submitting to the Court was true?

It is also notable that Ms. Fiorini's first response during the hearing was that she did not *know* the declaration was false.  This is much different than maintaining that a reasonable investigation revealed a factual basis for it.

Moreover, even under her own definition of "cell extraction," briefing the cell extraction team constitutes "participa[tion]" in the cell extraction—the very thing Lieutenant Yarber foreswore.  *See* Filing No. 235 at 35-36.  Nevertheless, Ms. Fiorini reiterated that Lieutenant Yarber maintained that his declaration is true, Filing No. 235 at 35, which is why she reaffirmed its truth following the show cause order, Filing No. 190 at 6.

All of this reveals a critical misunderstanding of an attorney's independent obligation as an officer of the court and under Rule 11 to ensure that "that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances . . . (3) The . . . factual contentions have evidentiary support . . . ."  It is not sufficient for an attorney to merely rely on her client's word, especially when, as here, many other sources of information contradict her client.  Rule 11 does not allow attorneys to turn a blind eye to evidence contradicting their clients' version of events simply because their clients stick to their story.

This misunderstanding came to the fore when Ms. Fiorini was questioned about Justin Shroyer's false statements in his declaration that he gave, and Mr. Littler refused, two orders as he

approached the shower cell and utilized chemical spray. Recall that the range video does not include audio, but, as discussed above, the two seconds in which Justin Shroyer is on the range video is clearly an insufficient amount of time for two different orders to be given and refused. When asked about this during the hearing, Ms. Fiorini testified as follows:

> Q. Have you had an opportunity to discuss the video with [Justin Shroyer]?
>
> A. I have not.
>
> Q. . . . [D]o you have any concerns about the veracity of Paragraphs 5 and 6 of his declaration?
>
> A. Just to clarify, the video has no sound.
>
> Q. That, that —
>
> A. So you cannot hear whether an order was given or not.
>
> Q. That is certainly true, and I acknowledge that. My, my question is still whether you have any concerns about, about the veracity of these statements . . . .
>
> A. I do not. I understand that arguments can be made on both sides, and that is for the fact finder to determine. But as it stands right now, I have no knowledge that what my client stated in his declaration is not true.

Filing No. 235 at 44.

This evinces a belief by Ms. Fiorini that she can submit whatever sworn statements she wants to the Court, so long as indisputable evidence does not prove them false. Again, this is not what Rule 11 requires. Moreover, the range video essentially is indisputable evidence that Justin Shroyer's declaration is false—which is why his story changed after viewing the range video. Even if this were not the case, the reasonable inquiry mandated by Rule 11 required Ms. Fiorini to at least investigate the question further when presented with ostensibly contradictory evidence. Unbelievably, after the Court required Ms. Fiorini to discuss the veracity of her clients' declarations with them, she did not even watch the video with Justin Shroyer.

Ms. Fiorini has exhibited a fundamental misunderstanding of her Rule 11 obligations. She violated Rule 11 when she did not even take the time to know what her clients look like so she could compare their factual statements to the video evidence before submitting those statements to the Court in an attempt to obtain summary judgment. Further, she attempted to justify this based on a complete misunderstanding of what Rule 11 and her duty of candor to the Court requires.

As with Mr. Crandall, the Court hopes this Order will serve to encourage Ms. Fiorini to take her duty of candor to the Court much more seriously than she has in this case. It is her obligation ensure that she has reasonably investigated the factual contentions presented to the Court, and after such an investigation reveals she has made a false assertion of fact, it is her obligation to fully and frankly correct these false assertions *before* the Court points them out.

## C.     Ms. Fiorini Violated Rule 26(g) and Falsely Reported to the Court that the Range Video Did Not Exist Without Having Made a Reasonable Inquiry into Its Existence

The third concern identified in the show cause order regards Ms. Fiorini's failure to turn over video evidence during discovery. The Court begins with the procedural history regarding the video evidence.

The Court's pretrial schedule required the parties to serve on each other all "electronic data that the party has that it may use to prove its case." Filing No. 53 at 1. The State Defendants identified the video recorded via the handheld camera, but not any range video. Filing No. 328-5 at 6. During discovery, Mr. Littler, then acting pro se, requested all video evidence. Filing No. 109-1 at 1. The State Defendants acknowledged the handheld video they had already identified but stated that they "possess no other responsive documents." Filing No. 109-1 at 2. Mr. Littler, still acting pro se, filed a motion to compel, requesting video from the "security cameras located in the area," specifically noting that "[t]here is a camera that hangs from the ceiling that directly faces the [shower cell] area." Filing No. 109 at 4. Mr. Littler later reiterated to the Court that the

range camera would have captured the events in question. He noted how critical this evidence was because "[t]he defendants did not record the weapons assault at issue in this case with the handheld video camera," and the range video showing Mark Shroyer's use of the pepperball gun will show that he is not being honest "about how the situation transpired." Filing No. 154 at 1-2.

Ultimately, Mr. Littler was correct that the range video existed and that it proved Mark Shroyer was not honest with the Court. However, during a conference regarding Mr. Littler's motion to compel, Ms. Fiorini represented to Magistrate Judge Pryor that the range video did not exist. Specifically, Ms. Fiorini stated that the range videos are routinely recorded over and thus the only video that exists of the incident is the video captured by the handheld camera (which, as noted, did not show use of the chemical spray or pepperball gun). Filing No. 185 at 4. That, it seemed, was the end of the matter. The Court could not order production of video evidence that did not exist.

But after the Court ordered Ms. Fiorini to produce certain emails requested by Mr. Littler, those emails revealed that the range video had been preserved. The Court explained this in the show cause order: "in an email acquired by Mr. Littler, Major Russell states that the use of the pepperball gun was captured by a range camera. Specifically, he said that it shows Mark Shroyer 'shooting the pepperball gun, [but you] just cannot see [Mr. Littler].' Major Russell also states that he would create a copy of the range tape." Filing No. 185 at 4 (quoting Filing No. 174-1 at 298). In his response to the State Defendants' motion for summary judgment, Mr. Littler specifically cites this email as proof that the State Defendants had "concealed" evidence that would support his claim. Filing No. 174 at 34.

Even though Ms. Fiorini produced the email showing she likely had made misrepresentations to Magistrate Judge Pryor, and even though Mr. Littler pointed this out to Ms.

Fiorini in no uncertain terms, she took no corrective action. The Court thus ordered her locate the range video referenced in the email, provide it to the Court, and explain whether discovery sanctions were warranted. Filing No. 185 at 6.

Ms. Fiorini located and produced the range video but maintained that discovery sanctions were unwarranted. First, she says she believed her statement to Magistrate Judge Pryor was true when made because the litigation liaison at Wabash Valley told her he had sent her everything he had, and she knows that the range cameras are routinely recorded over. Given this, she "assumed" the litigation liaison had provided her with all video evidence. Filing No. 190 at 3. As to why she took no corrective action upon obtaining the email from Major Russell, Ms. Fiorini states that she "did not read the e-mail close enough to notice that Major Russell mentioned a range tape." Filing No. 190 at 3. Finally, she maintains that no discovery sanctions are warranted because the range video "does not contradict any of the testimony provided by the State Defendants. The contents of the video are such that no defendant would have had any conceivable reason to intentionally hide it or in any way conceal its existence." Filing No. 190 at 4.

None of these explanations come close to justifying her conduct. First, Ms. Fiorini cannot delegate her discovery obligations to the prison's litigation liaison. Ms. Fiorini should, at minimum, have asked her clients to search for any range video. She acknowledged at the hearing that she did not ask any of them about the range video, let alone Major Russell, whose email made clear a copy of the range video was saved. Filing No. 235 at 41. Moreover, Ms. Fiorini did not directly ask the litigation liaison if other video existed; she simply "assumed" that none did. Filing No. 190 at 3. These failures show that Ms. Fiorini did not even approach the "reasonable inquiry" required under Rule 26(g) before responding to a discovery request. *See* Advisory Committee's 1983 Note on subd. (g) of Fed. R. Civ. P. 26 ("The duty to make a 'reasonable inquiry' is satisfied

if the investigation undertaken by the attorney and the conclusions drawn therefrom are reasonable under the circumstances. It is an objective standard similar to the one imposed by Rule 11.").

Second, as to not reading Major Russell's email "close enough to notice that [he] mentioned a range tape," that is of course not a valid justification. Filing No. 190 at 3. A reasonable inquiry obviously includes reading all of the discovery. But Ms. Fiorini's failures go beyond that. She also ignored the fact that Mr. Littler pointed her directly to Major Russell's email to support his contention that the State Defendants were concealing evidence. To take no action under these circumstances is, frankly, stunning.

Third, the Court is troubled that Ms. Fiorini would even suggest that the range video is entirely consistent with her clients' version of events. One need only look, for example, to the Court's above discussion of Mark Shroyer's declaration to see this is not true. And that is but one of several ways in which the range video shows certain of the State Defendants' sworn statements are blatantly false.

In the end, Ms. Fiorini signed discovery responses and made representations to Magistrate Judge Pryor that were simply false. While there is no evidence that she or anyone else intentionally concealed the range video, her abject failure to make a reasonable inquiry into its existence before representing to Mr. Littler and the Court that it did not exist is nearly as problematic. And it is doubly so given that she took no corrective action once Mr. Littler pointed her to evidence of its existence. Not only are significant sanctions warranted under these circumstances, Rule 26(g)(3) requires the Court to issue them. *See* Fed. R. Civ. P. 26(g)(3) ("If a [discovery] certification violates this rule without substantial justification, the court, on motion or on its own, must impose an appropriate sanction on the signer, the party on whose behalf the signer was acting, or both.").

**D. Ms. Fiorini's Summary Judgment Practice in this Case Wholly Ignores the Movant's Burden on Summary Judgment and Violates Rule 11(b)(2) and 28 U.S.C. § 1927**

When the Court sanctioned Mr. Crandall in this action, it set forth how his summary judgment practice ignored the standard the Court must apply and, worse still, violated Rule 11(b)(2) and 28 U.S.C. § 1927. Ms. Fiorini charted the exact same course. Although this is unsurprising given that it is an all-too-common path for attorneys litigating against pro se plaintiffs, the consistency of the practice does not make it any more justifiable. It is therefore worth reiterating why this practice is wrong and why the Court will not condone it.

The worst of Ms. Fiorini's conduct in this case was that outlined above—submitting false sworn statements to the Court when video and documentary evidence showed those statements were false. But there was no reason for things to have proceeded this far. Had Ms. Fiorini taken Mr. Littler's response and evidence seriously—as she knows, or at least should know, the Court will—she would have immediately recognized her error and reported it to the Court. Instead of doing so, she filed a reply that ignored the summary judgment standard and asked the Court to commit legal error.

As any attorney practicing in federal court should know, summary judgment is only warranted when "there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law." *Scheidler v. Indiana*, 914 F.3d 535, 540 (7th Cir. 2019); *see* Fed. R. Civ. P. 56(a). In making this determination, the Court must view "the evidence in the light most favorable to the nonmovant and drawing all reasonable inferences in its favor." *Scheidler*, 914 F.3d at 540.

After Ms. Fiorini moved for summary judgment, Mr. Littler filed a sworn response, meaning the Court must treat the attestations in the response as competent evidence. *See Rowe v. Gibson*, 798 F.3d 622, 627 (7th Cir. 2015) (holding that a pro se prisoner's attestations in his

verified complaint and declarations constitute competent evidence at summary judgment and "must be credited"); *Dale v. Lappin*, 376 F.3d 652, 655 (7th Cir. 2004) ("By declaring under penalty of perjury that the [response] was true, . . . [the plaintiff] converted the [response], or rather those factual assertions in the [response] that complied with the requirements for affidavits specified in the rule . . . into an affidavit." (citation and quotation marks omitted)).

Before deciding whether to continue pursuing summary judgment by filing a reply, Rule 11 required Ms. Fiorini to consider whether, in light of Mr. Littler's sworn response and the standards governing summary judgment, there was a non-frivolous basis to do so. Ms. Fiorini made clear during the hearing that she misunderstands this obligation. In response to questioning regarding why in her reply she ignored Deputy Warden Littlejohn's email with Captain Pirtle, Ms. Fiorini stated that she "didn't feel it was [her] duty, as an advocate, to necessarily highlight all the bad information or information that doesn't help [her] clients in the reply brief." Filing No. 235 at 33-34. But this is precisely what she must do, and then present an argument (if there is a non-frivolous one) for why her client is entitled to summary judgment anyway. If she cannot craft a non-frivolous argument, she must seriously consider whether her reply violates Rule 11(b)(2) by presenting a "legal contention" that is not "warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law or for establishing new law," and 28 U.S.C. § 1927 by pursuing summary judgment "without a plausible legal or factual basis" for doing so, *Lightspeed Media Corp.*, 761 F.3d at 708. Ignoring the plaintiff's version of events and hoping the Court will improperly grant summary judgment in her client's favor is not an option.

The Seventh Circuit roundly criticized a similar approach in *Malin*. Like the defendant in that case, Ms. Fiorini "seems to have based [her] litigation strategy on the hope" that this Court would commit error. *Malin*, 762 F.3d at 564. Had the Court done so, "the judgment w[ould] in

all likelihood be appealed, overturned, and returned to the district court for settlement or trial." *Id.* The Seventh Circuit warned: "[t]his approach to summary judgment is . . . costly and wasteful," and such "shenanigans stand a real chance of being declared excessive under 28 U.S.C. § 1927." *Id.* at 564-65.

This approach strikes the Court as particularly improper when litigating against pro se prisoners who face significant barriers to appeal. First, the pro se prisoner must know that an appeal is available and how to timely pursue it. Second, most pro se prisoners cannot afford the appellate filing fee, nor do they have the litigation skills necessary to demonstrate that there is an objective good-faith basis to appeal, which is required to proceed *in forma pauperis* on appeal. *See* 28 U.S.C. § 1915(a)(3); *Coppedge v. United States*, 369 U.S. 438, 445 (1962).

If Ms. Fiorini (or any attorney) files a reply, the Court expects her to apply the proper standard of review to the facts and argue why her client is nevertheless entitled to summary judgment. If she cannot do so without asking the Court to clearly violate the summary judgment standards, Ms. Fiorini should not file a reply. Again, doing so is both "costly and wasteful." *Id.* at 564. She should instead acknowledge that a genuine issue of material fact precludes summary judgment, move to withdraw the motion, and "pursu[e] a settlement or try[] the case in the first instance." *Id.*

This order echoes the Seventh Circuit's concerns in *Malin* and again warns the bar that this practice must stop.

## XII.
## Ms. Fiorini's Sanctions

### A. Introductory Concerns

Before setting forth the specific sanctions that are warranted for Ms. Fiorini's misconduct, two introductory concerns are noteworthy. First, Ms. Fiorini's sanctions are issued against the

background of the sanctions previously issued to Mr. Crandall for similar conduct in this case. In many respects, Ms. Fiorini's conduct is worse than Mr. Crandall's. For example, unlike Ms. Fiorini, Mr. Crandall was not involved in any discovery violations. However, Ms. Fiorini's relative lack of experience and, more importantly, lack of training provided by the Indiana Attorney General's Office are mitigating. *See* Filing No. 235 at 55 (Ms. Fiorini testifying that the only training she received was by watching other attorneys in her office); Filing No. 235 at 62 (Ms. Fiorini testifying that she received no electronic discovery training). These competing considerations balance each other out. The Court thus deems it appropriate to issue relatively equivalent sanctions to Ms. Fiorini.

Second, Ms. Fiorini is not solely to blame for the situation in which she finds herself. As noted, the lack of training provided by the Indiana Attorney General's Office is partially to blame for her misconduct. Her then-supervisor acknowledged as much during the sanctions hearing. And, after the Court first raised concerns about misconduct, both her written responses and hearing testimony suggest that she was not given good advice by her supervisors. This is unfortunate for such a new attorney, to the say the least, let alone a staff member of Indiana's highest law enforcement officer.

The hearing also revealed that Ms. Fiorini appears dedicated to her job and her clients, which is commendable. However, the zealous representation of her clients cannot trump her duty of candor to the Court. It clearly did in this case and, at the end of the day, Ms. Fiorini is responsible for her actions despite the lack of training and support she received. Therefore, significant sanctions will issue. But the Court does not wish or intend these sanctions to derail what can still be a long and meaningful legal career.

## B.     Sanctions

Rule 11 "requires counsel to read and consider before litigating." *Kennedy v. Schneider Electric*, 893 F.3d 414, 421 (7th Cir. 2018) (citation and quotation marks omitted).  Ms. Fiorini failed to do this, at minimum, before filing her reply brief.  Specifically, she violated Rule 11(b)(3) because she did not conduct a reasonable inquiry into whether the factual contentions she submitted to the Court had evidentiary support.

Rule 11(c)(1) requires the Court to provide Ms. Fiorini "notice and a reasonable opportunity to respond" before issuing sanctions.  Ms. Fiorini was provided this opportunity as to the specific Rule 11 violations identified in the Court's show cause order and outlined above.  Rule 11(c)(4) provides that a "sanction imposed under this rule must be limited to what suffices to deter repetition of the conduct or comparable conduct by others similarly situated."  Subsection (c)(4) also provides that permissible sanctions include "nonmonetary directives," "an order to pay a penalty into court," or an assessment of attorney's fees.

As with Mr. Crandall, although the Court is deeply troubled by Ms. Fiorini's Rule 11 violations, the Court's goal is not to punish her for punishment's sake.  The Court's goal is to deter her and other attorneys, especially those litigating against pro se prisoners, from violating Rule 11.  The Court recognizes that the Indiana Attorney General's Office has worked with the Indiana Department of Correction ("IDOC") to ensure that they are appropriately preserving and communicating about video evidence going forward.  But, as detailed at length above, Ms. Fiorini's misconduct runs much deeper than a mere breakdown in communication.

"The Supreme Court has stated that [Rule 11's] 'central purpose . . . is to deter baseless filings in district court and thus . . . streamline the administration and procedure of the federal courts.'"  *Hahn v. Walsh*, 762 F.3d 617, 632 (7th Cir. 2014) (quoting *Cooter & Gell v. Hartmarx*

*Corp.*, 496 U.S. 384, 393 (1990)). To accomplish this goal, the Court issues the following nonmonetary directive to Ms. Fiorini:

- Ms. Fiorini is **ordered** to submit a signed copy of the corresponding Rule 11 Compliance forms, attached as exhibits to this Order, any time she moves for summary judgment or files a reply to a motion for summary judgment in the United States District Court for the Southern District of Indiana for **two years** beginning on the date of this Order.

- Ms. Fiorini is **ordered** to complete an at least six-hour applied professionalism continuing legal education course that has been accredited by the Indiana Commission for Continuing Legal Education within **six months** of the date of this Order. *See* Indiana Rules for Admission to the Bar and the Disciplinary of Attorneys, Rule 29. She shall file a notice to the Court immediately upon completion of this course.

Turning to 28 U.S.C. § 1927, this statute authorizes the Court to sanction an attorney who "so multiplies the proceedings in any case unreasonably and vexatiously," and states that such attorneys "may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct." Sanctions are warranted under § 1927 "if the attorney has acted in an objectively unreasonable manner by engaging in a serious and studied disregard for the orderly process of justice . . . or where a claim [is] without a plausible legal or factual basis and lacking in justification." *Lightspeed Media Corp.*, 761 F.3d at 708 (citation and quotation marks omitted).

For the reasons discussed above, Ms. Fiorini has acted in an objectively unreasonable manner by engaging in a serious disregard for the orderly process of justice. Her conduct, at minimum, has required opposing counsel to prepare for and participate in multiple hearings and rounds of briefing regarding her and her clients' misconduct. Accordingly, the Court orders Ms. Fiorini and the Indiana Attorney General's Office to pay the following fees. The Court notes that although § 1927 fees may be issued only against Ms. Fiorini, the Court has the inherent authority to jointly sanction the Indiana Attorney General's Office when it is partially responsible for its employee's misconduct. *See, e.g.*, *Claiborne v. Wisdom*, 414 F.3d 715, 723-24 (7th Cir. 2005)

(holding that § 1927 fees cannot be issued to a law firm but "[t]his does not mean that courts are powerless to impose sanctions on law firms that bear some responsibility for an individual attorney's conduct," and specifically noting that one such avenue may be "the court's inherent power" to issue sanctions).  Ms. Fiorini's supervisor acknowledged during the show cause hearing that the Indiana Attorney General's Office and Ms. Fiorini's supervisors bear some responsibility for her misconduct.  *See* Filing No. 235 at 122 (Ms. Fiorini's supervisor stating in closing that Ms. Fioirini is not solely responsible for what occurred in this case and recognizing that "we deserve some sanction," referring to the Indiana Attorney General's Office).  Accordingly,

- Ms. Fiorini and the Indiana Attorney General's Office are **ordered** to pay Mr. Rose's attorney's fees and costs associated with (1) Mr. Rose's preparation for and participation in the show cause hearings that can be attributable to the State Defendants' and Ms. Fiorini's portion of the hearings; (2) the briefing regarding the motions for sanctions filed by Mr. Rose; and (3) the post-hearing briefing.  Mr. Rose shall file a Petition setting forth his fees and costs within **fourteen days** of this Order, and Ms. Fiorini may file a response, if any, to the Petition within **seven days** thereafter.

For the reasons discussed above, Ms. Fiorini violated Rule 3.3(a) of the Indiana Rules of Professional Conduct by failing to correct false statements made to the Court.  In light of this, her misconduct during discovery, and her numerous violations of Rule 11,

- Ms. Fiorini is **ordered** to submit a copy of this Order to the General Counsels of all state bars where she is admitted to practice, or to the appropriate entity with jurisdiction over attorney discipline, within **seven days** of this Order. Ms. Fiorini must simultaneously file a Report with this Court confirming she has done so, with copies of her submittals to the appropriate authorities attached.

Ms. Fiorini and the State Defendants also engaged in misconduct during discovery. Pursuant to Rule 26(g)(3) and the Court's inherent authority to sanction misconduct during discovery,

- Ms. Fiorini and the four State Defendants discussed in Section XIII below (Warden Brown, Deputy Warden Littlejohn, Major Russell, and Captain Pirle) are **ordered** to pay Mr. Rose's attorney's fees, if any, directly attributable to their failure to produce all video evidence prior to Mr. Rose's involvement in this action.  This includes but is not limited

to any time Mr. Rose spent preparing for and conducting depositions where he attempted ascertain who was responsible for the failure to produce the evidence and to create a record for his requested discovery sanctions discussed below. Mr. Rose shall set forth his fees and costs in the same fee Petition as that ordered above.

Finally, pursuant to Rule 11, Rule 26(g)(3), and under the Court's inherent authority to sanction misconduct during discovery,

- Ms. Fiorini and all attorneys employed by the Indiana Attorney General's Office, litigating in the Southern District of Indiana, are **ordered** to file with the Court a discovery certification at two different stages in all prisoner civil rights cases (identified as those with a Nature of Suit code of 550 or 555): (1) on the date the initial disclosures ordered in the pretrial schedule are due; and (2) in response to any motion to compel. The certification must: (1) list what evidence was produced; (2) explain in detail what steps were taken to locate each category of evidence and/or the requested evidence, including whether each defendant was individually instructed to locate responsive evidence; and (3) include a signed certification consistent with Rule 26(g) that "to the best of the person's knowledge, information, and belief formed after a reasonable inquiry," the initial disclosures and/or discovery responses are complete and correct. This sanction will last **two years** from the date this Order is signed. Ms. Fiorini is responsible for communicating this requirement to all attorneys in the Indiana Attorney General's Office who may appear in a prisoner civil rights case.

## XIII.
## Discovery Sanctions

Mr. Littler requests significant discovery sanctions against State Defendants Warden Brown, Deputy Warden Littlejohn, Major Russell, and Captain Pirtle for the failure to timely turn over the range videos he requested. Filing No. 328 at 53-66. Mr. Littler argues that these four State Defendants either "were aware that, or clearly had the means to ascertain whether, the range tape had been preserved," but nevertheless failed to properly disclose it. Filing No. 328 at 61.

The procedural history regarding the State Defendants' failure to produce the range video is set forth in Section XI.C above. In short, they failed to produce the range video as required by the initial disclosures, in response to Mr. Littler's discovery request and motion to compel, and when emails showed that the range video was preserved. It was only when the Court ordered Ms.

Fiorini to search for the range video—in light of the email saying it was preserved—that it was produced.

The undisputed evidence shows that Warden Brown, Deputy Warden Littlejohn, Major Russell, and Captain Pirtle knew since the beginning of this litigation that the range video was preserved. During his deposition, Major Russell testified that he informed Warden Brown and Deputy Warden Littlejohn that he made a copy of the range video. Filing No. 328-1 at 6. And during Captain Pirtle's deposition, she testified that she was aware the range video was preserved when she "received the lawsuit."[14] Filing No. 328-2 at 3.

Yet the State Defendants repeatedly failed to turn over the range video: they failed to disclose it in response to the Court's initial disclosure order, Filing No. 109-1 at 2; they falsely represented to Magistrate Judge Pryor that the video did not exist and was likely destroyed, Filing No. 185 at 4; and they ignored an email from Major Russell that explicitly stated the range video was preserved, even after Mr. Littler drew specifically pointed this out, Filing No. 174 at 34. This is a complete abdication of their obligation to engage in discovery by providing complete and honest disclosures.

Rule 37 authorizes a range of sanctions for parties that fail to comply with the Court's discovery orders, up to and including "rendering a default judgment against the disobedient party." Fed. R. Civ. P. 37(b)(2). The Court also has the "inherent authority to manage judicial proceedings and to regulate the conduct of those appearing before it, and pursuant to that authority may impose

---

[14] She stated later during her deposition that she was not sure when she became aware that it was preserved and that it is "very possible" she learned it was preserved "much later." Filing No. 328-2 at 3, 9. But in response to Mr. Littler's motion for sanctions against her, she does not state that she was unaware of the range video when she and the other State Defendants failed to produce it.

appropriate sanctions to penalize and discourage misconduct," including misconduct related to discovery. *Ramirez v. T&H Lemont, Inc.*, 845 F.3d 772, 776 (7th Cir. 2016).[15]

As with Ms. Fiorini, severe sanctions are warranted under these circumstances. These four State Defendants made false representations to the Court about the range video.[16] Apparently, they did so without even attempting to locate it since, after the Court ordered a search for the range video, it was quickly located. And like Ms. Fiorini, while there is no evidence that any of the State Defendants intentionally concealed the range video, their failure to locate it when it was readily available is simply inexcusable. It is doubly so given that Mr. Littler pointed the State Defendants to their own emails showing a copy of the range video was made.

The State Defendants resist sanctions on multiple bases, none of which are persuasive. Filing No. 331 at 7-9. First, they argue that harsh sanctions are unwarranted because, in the wake of this litigation, they have taken steps to ensure that video evidence is properly disclosed in future litigation. Specifically, they say they have increased training on retention of video evidence, established a shared cloud drive accessible by the Indiana Attorney General's Office to which prison staff may upload video evidence, and there are now regular meetings between IDOC and the Indiana Attorney General's Office to improve practices for responding to discovery requests.

---

[15] As Mr. Littler acknowledges, the sanctions authorized by Rule 37(b) are available when a party "fails to obey an order" issued by the Court. Fed. R. Civ. P. 37(b)(2)(A). As discussed herein, the Court's pretrial schedule required each party to turn over all electronic data. And a specific order to disclose all video evidence did not issue after Mr. Littler filed a motion to compel only because the State Defendants (through counsel) falsely represented that no additional video evidence existed. For these reasons, and because Rule 37 overlaps with the Court's inherent authority to sanction the State Defendants' misconduct during discovery, *see Ramirez*, 845 F.3d at 776, the Court will consider the available sanctions set forth in Rule 37(b)(2)(A).

[16] Other State Defendants did as well, but Mr. Littler seeks sanctions for this discovery violation only against these four State Defendants.

While the Court encourages such steps, for this case, it is too little too late. Indeed, harsh sanctions will hopefully encourage the relevant parties to take these new initiatives seriously. Moreover, while these changes may help preserve and locate video evidence, they do little to change the overarching failure by the State Defendants to meaningfully engage in the discovery process. As Mr. Littler rightly points out, the changes appear to "obviate the need for individual correctional officials to assume responsibility for satisfying their litigation responsibilities," and in this sense they "actually threaten to undermine the result that they are designed to achieve." Filing No. 332 at 11.

Second, the State Defendants argue that, because Mr. Littler did not file a motion for sanctions against these defendants regarding their failure to disclose the video evidence, issuing sanctions against them would violate their due process rights. The State Defendants are correct that due process requires "the party against whom the sanctions may be imposed . . . notice of the possible sanction and an opportunity to be heard." *Marjal v. City of Chicago*, 774 F.3d 419, 422 (7th Cir. 2016); *see Ayoubi*, 640 Fed. Appx. at 528 ("Before exercising its inherent authority to sanction misconduct, a court must notify the litigant of the specific misdeed that is the basis for possible sanction and allow the litigant an opportunity to respond.").

The State Defendants had the requisite notice and opportunity to be heard. When the Court issued a show cause order to Ms. Fiorini, it directed her to investigate the existence of the range video and to explain "whether and what discovery sanctions are warranted." Filing No. 185 at 6. At the first sanctions hearing, Mr. Littler took no position on whether discovery sanctions were appropriate in the case. Filing No. 235 at 118. But both during the third sanctions hearing and in a subsequent filing, Mr. Littler explicitly requested permission to address the propriety of discovery sanctions against the State Defendants in his post-hearing briefing. *See* Filing No. 323

at 158 ("I can state that we know from depositions now that the existence of the video was known at least to Major Russell . . . . So I think I would request permission in my post[-hearing] briefing to also address whether discovery sanctions are warranted."); Filing No. 325 at 7 ("[C]ounsel requests permission to also address in his [post-hearing] briefing whether discovery sanctions are appropriate against the defendants as a result of the failure to timely produce several surveillance videos in this case."). The State Defendants did not object, and the Court granted Mr. Littler's request for post-hearing briefing, specifically directing the parties to "address each defendant's alleged misconduct individually." Filing No. 327 at 5. The State Defendants were thus clearly on notice that the Court permitted Mr. Littler to pursue discovery sanctions against them in his post-hearing briefing.

In accordance with his request, Mr. Littler sought discovery sanctions against these four State Defendants. The State Defendants cannot now object that this request was inappropriate. The time to do so was when Mr. Littler made the request, not after he fully briefed the matter. Most importantly, the State Defendants then had an opportunity to respond in their post-hearing response. Instead of addressing the substance of Mr. Littler's argument, the State Defendants largely raised procedural arguments such as this one. Moreover, they did not even attempt to summarize what they wished to present to the Court that they could not have been presented in their response. The State Defendants had clear notice that Mr. Littler was going to pursue discovery sanctions against them, but when he did, they failed to take advantage of it by filing a substantive response. In other words, they had an "opportunity to be heard," which is all due process requires. *Marjal*, 774 F.3d at 422.

Finally, the closest the State Defendants come to addressing the substance of Mr. Littler's request for discovery sanctions is their argument that he only presents "conjecture" that these four

State Defendants knew the video existed in 2017 when they failed to produce it (rather than in December 2015 when the event occurred). Filing No. 331 at 8. Notably, the State Defendants stop short of asserting that Mr. Littler is wrong that they knew the video was preserved. They essentially argue that Mr. Littler has not established a discovery violation.

But the undisputed evidence Mr. Littler has provided shows such a violation has occurred. Mr. Littler laid out in his post-hearing briefing why these four State Defendants in particular should be sanctioned—namely, because they were aware the range video was preserved and, when the Court ordered a search for the video, it was quickly discovered. Again, the State Defendants do not dispute any of this.

More importantly, Rule 34 permits discovery of electronically stored information in the opposing party's "possession, custody, or control." Fed. R. Civ. P. 34(a)(1). As Mr. Littler aptly explained, "[i]n civil litigation, of course, parties do not only produce evidence that they can recall; were that the case, countless discovery requests would be virtually meaningless. To the contrary, they are responsible for taking an active role in discovering responsive evidence in the first place[.]" Filing No. 332 at 10. The State Defendants do not contend that the range video was not in their possession, custody, or control.[17] And it clearly was, given that the range video was quickly discovered after the Court ordered a search for it.

Thus, none of these bases on which the State Defendants resist sanctions are persuasive. However, it is important to note that Ms. Fiorini appears primarily at fault for these four State Defendants' failure to disclose the range video. As detailed above, she did not ask the litigation liaison at Wabash Valley, let alone her clients, about the existence of any range video. Filing No.

---

[17] Any such objection would now be waived because the State Defendants did not raise it in their discovery response. Filing No. 109-1 at 2.

235 at 41. But it is well-established that "litigants are bound by the acts and omissions of their chosen agents, including lawyers." *Choice Hotels Intern., Inc. v. Grover*, 792 F.3d 753, 754 (7th Cir. 2015); *see Bakery Machinery & Fabrication, Inc. v. Traditional Baking, Inc.*, 570 F.3d 845, 848 (7th Cir. 2009) ("The rule is that *all* of the attorney's misconduct (except in the cases where the act is outside the scope of employment or in cases of excusable neglect) becomes the problem of the client."). While it may seem harsh to sanction these four State Defendants for not turning over evidence when their counsel never asked them to search for it, doing so is critical to deterring such conduct in the future—an objective of even greater importance when the State Defendants and their counsel are government employees who regularly are involved in litigation in this Court.

The Seventh Circuit long ago explained the importance of holding clients liable for their counsel's misconduct:

> Although [the plaintiff] blames her lawyer for the failure [to comply with discovery obligations], a litigant is bound by his lawyer's acts. Holding the client responsible for the lawyer's deeds ensures that both clients and lawyers take care to comply. If the lawyer's neglect protected the client from ill consequences, neglect would become all too common. It would be a free good—the neglect would protect the client, and because the client could not suffer the lawyer would not suffer either. The court's power to dismiss a case is designed both to elicit action from the parties in the case at hand and to induce litigants and lawyers in other cases to adhere to timetables. A court cannot lightly excuse a litigant because of the lawyer's neglect without abandoning the pursuit of these objectives.

*Tolliver v. Northrop Corp.*, 786 F.2d 316, 319 (7th Cir. 1986) (citations omitted).

It is in this light that the Court orders the sanction of default judgment against Warden Brown, Deputy Warden Littlejohn, Major Russell, and Captain Pirtle.[18] These four State

---

[18] Although Major Russell's failure to disclose the video evidence (even if it was primarily his agent's fault) warrants sanctions, the Court recognizes that Major Russell deserves credit for preserving the range video after his subordinate officers failed to properly record the use of the pepperball gun.

Defendants are liable for damages to be determined by the jury at trial.  While their counsel failed them by not directly asking whether any range video existed, and they undoubtedly heavily rely on their counsel for guidance in these matters, it is ultimately their obligation to ensure that they are complying with the requirements of discovery.  Such a sanction is especially appropriate given that the undisclosed evidence was critical to the merits of Mr. Littler's claims, and the failure to timely produce it has so extremely consumed and complicated the litigation of the case.[19]  In another case against a less capable or tenacious pro se litigant, their failure to turn over the video evidence could have resulted in summary judgment in their favor based on false evidence.  It is paramount that the Court deter such misconduct.


## XIV.
## Conclusion

This case has significantly undermined the Court's confidence that certain defendants and their counsel in pro se prisoner civil rights cases are litigating in good faith.  This concern is exacerbated when, as here, defendants' counsel failed to comply with the Rule 11 obligation to reasonably investigate whether the factual statements presented to the Court are true, and to only move for summary judgment when there is a good faith argument that the requisite legal standard can be met.  When this misconduct is combined with Ms. Fiorini's failure to meaningfully read and consider Mr. Littler's response and evidence, the unethical result was the presentation of a

---

[19] The Court agrees with Mr. Littler that severe sanctions are warranted for the additional reasons set forth in his post-hearing brief, including that the failure to timely disclose the range video was prejudicial.  *See* Filing No. 328 at 61-67.  For example, the range video reveals that another correctional officer, Officer Berry, was present during some of the critical events leading up to the cell extraction, yet he was not identified by the State Defendants.  Mr. Littler at least arguably could have brought an Eighth Amendment claim against Officer Berry, but the statute of limitations has now run.  It had not run, however, when the State Defendants' initial disclosure were due.

meritless motion for summary judgment and reply containing a litany of false evidence. None of these practices can continue, and increasingly severe sanctions will be warranted if they do. The Court can only hope that this Order and the sanctions in it provide a clear warning to Ms. Fiorini and all counsel litigating against pro se prisoners that they must discontinue these at best reckless and at worst misleading practices.

Mr. Littler's motions for sanctions, dkt. [266], dkt. [267], dkt. [268], dkt. [299], are **granted** to the extent that the Court issues the sanctions outlined above.

The Magistrate Judge is requested to set a telephonic status conference in this matter as soon as possible to discuss whether the parties wish to have a settlement conference prior to the final pretrial conference scheduled for January 31, 2020.

**IT IS SO ORDERED.**

Date: 1/3/2020

Hon. Jane Magnus-Stinson, Chief Judge
United States District Court
Southern District of Indiana

Distribution:

PHILLIP LITTLER
121098
WABASH VALLEY - CF
WABASH VALLEY CORRECTIONAL FACILITY - Inmate Mail/Parcels
Electronic Service Participant – Court Only

Jeb Adam Crandall
BLEEKE DILLON CRANDALL ATTORNEYS
jeb@bleekedilloncrandall.com

Carol A. Dillon
BLEEKE DILLON CRANDALL, P.C.
carol@bleekedilloncrandall.com

Jill Esenwein
INDIANA ATTORNEY GENERAL
jill.esenwein@atg.in.gov

Christopher Andrew Farrington
BLEEKE DILLON CRANDALL ATTORNEYS
drew@bleekedilloncrandall.com

Amanda Elizabeth Fiorini
INDIANA ATTORNEY GENERAL
Amanda.Fiorini@atg.in.gov

Jonathan Paul Nagy
INDIANA ATTORNEY GENERAL
jonathan.nagy@atg.in.gov

Gavin Minor Rose
ACLU OF INDIANA
grose@aclu-in.org